Marc P. Berger
Sanjay Wadhwa
Sheldon L. Pollock
Philip A. Fortino
Lee A. Greenwood
John O. Enright
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1014 (Fortino)
Email:  FortinoP@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------:
SECURITIES AND EXCHANGE COMMISSION,         :        18 Civ. _____ (   )
                                             :
                Plaintiff,                   :        ECF CASE
                                             :
        - against -                          :        COMPLAINT
                                             :
ADAM MATTESSICH AND                          :        JURY TRIAL
JOSEPH (A/K/A JAY) LUDOVICO,                 :        DEMANDED
                                             :
                Defendants.                  :
                                             :
------------------------------------------------------------------:

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Adam Mattessich ("Mattessich") and Joseph (a/k/a Jay) Ludovico ("Ludovico"), alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1. This matter concerns a scheme by Defendants, both registered representatives (*i.e.*, brokers) formerly employed by Cantor Fitzgerald & Co. ("Cantor"), to bypass the firm's compensation-related procedures designed to comply with various tax and regulatory requirements.

2. In or about 2002, Mattessich, then a senior execution trader at Cantor, requested, but was denied permission from his supervisor to receive, commission compensation on certain customer accounts he serviced.

3. Refusing to accept his supervisor's decision, Mattessich schemed with Ludovico and another junior sales trader (the "Junior Sales Trader") on Cantor's international equities trading desk (the "Desk") to circumvent Mattessich's supervisor's decision and the firm's established procedures for the paying and recording of commissions. Under the scheme, Mattessich would officially transfer the accounts to Ludovico and the Junior Sales Trader, who were eligible to receive commission compensation under the firm's policies. Then, Ludovico and the Junior Sales Trader would pay a portion of the net commissions they received to Mattessich via personal check.

4. The mutually beneficial scheme resulted in widespread violations of Rule 17a-3(a)(19) under the Securities Exchange Act of 1934 (the "Exchange Act"), which requires registered broker-dealers like Cantor to, among other things, make and keep accurate records of each security transaction attributable, for compensation purposes, to each associated person, including the amount of compensation received by the associated person, or, alternatively, to produce this information upon request by a securities regulator. This rule promotes the supervisory processes of broker-dealers by making transparent which persons have direct financial interests in which transactions.

5. In or about 2004, Cantor promoted Mattessich to head the Desk, at which point he began supervising Ludovico and the Junior Sales Trader. Notwithstanding his promotion, Mattessich continued to receive unrecorded commission payments from both subordinates for many years.

6.　In or about 2011, Mattessich also arranged for another subordinate on the Desk (the "Junior Execution Trader") to begin receiving off-the-books commissions from Ludovico and the Junior Sales Trader.

7.　As a result of the scheme, Mattessich had an undisclosed conflict of interest with respect to his subordinates, including Ludovico, who were splitting commissions with him.

8.　From January to December 2013 (the "Relevant Period"), Ludovico paid Mattessich a total of at least $58,200 in unrecorded commission compensation and paid the Junior Execution Trader a total of at least $32,500 in unrecorded commission compensation. In addition, the Junior Sales Trader paid the Junior Execution Trader a total of at least $44,263.50 in unrecorded commission compensation during the Relevant Period.

9.　Mattessich and Ludovico's secret commission-splitting scheme violated the federal securities laws and, by risking compromising Mattessich's supervision, posed a risk of harm to Cantor's customers and counterparties. Here, the Commission is seeking, among other relief, an injunction prohibiting Defendants from engaging in similar violations in the future.

## **VIOLATIONS**

10.　As a result of the foregoing conduct and as alleged further herein, Defendants aided and abetted Cantor's violations of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3(a)(19) thereunder [17 C.F.R. § 240.17a-3(a)(19)].

11.　Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

**JURISDICTION AND VENUE**

12. The Commission brings this action pursuant to authority conferred by Sections 21(d)(1) and 20(e) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78t(e)] and seeks a final judgment: (a) permanently restraining and enjoining Defendants from engaging in the acts, practices, and courses of business alleged against them herein; (b) imposing civil money penalties on Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (c) such other and further relief as the Court may deem just and appropriate.

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14. In connection with the conduct alleged in this Complaint, Defendants have, directly or indirectly, singly or in concert, made use of the mails, or the means or instrumentalities of interstate commerce.

15. Venue is proper in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Complaint occurred in this District. For example, a significant amount of the conduct alleged herein took place at Cantor's offices in New York, New York, where Defendants worked during the Relevant Period. In addition, upon information and belief, Mattessich currently resides in this District, and resided in this District for some or all of the Relevant Period.

**DEFENDANTS**

16. **Mattessich**, age 47, resides in New York, New York. He has been a broker since February 1991 and was associated with Cantor from in or about October 2001 until in or about February 2018, when he was permitted to resign from the firm as a result of the conduct described herein. During his tenure at Cantor, Mattessich held Series 3, 7, 24, 55, and 63

licenses and various supervisory positions, including most recently as the firm's global co-head of equities.

17.     **Ludovico**, age 41, resides in Brooklyn, New York. He has been a broker since October 1998 and was associated with Cantor from in or about October 1998 until in or about February 2018, when he was permitted to resign from the firm as a result of the conduct described herein. During his tenure at Cantor, Ludovico held Series 7, 24, 55, and 63 licenses and was a sales trader on the Desk. In December 2015, Ludovico was suspended for two months and fined $25,000 by the Financial Industry Regulatory Authority ("FINRA") based on his role in the sale of billions of unregistered shares of microcap issuers on behalf of Cantor's customers.

## RELEVANT ENTITY

18.     **Cantor** is a broker-dealer with its principal place of business in New York, New York. Cantor provides equity research, sales and trading, and investment-banking services to its customers. Cantor has been registered with the Commission since December 1947. Today, the Commission instituted settled administrative and cease-and-desist proceedings against Cantor related to the conduct alleged herein.

## FACTS

*Cantor's Policies and Procedures Concerning the Payment and Recording of Commission Compensation*

19.     During the Relevant Period, Cantor paid its brokers commissions for securities transactions they brokered (*i.e.*, arranged) on behalf of Cantor's customers.

20.     From at least 2002 to the present, Cantor has used a system of account executive or "AE" codes to apportion and track commission compensation for its brokers. Every brokerage transaction is associated with an AE code. The particular AE code associated with a transaction dictates which Cantor employee or employees will receive the commission generated

by the transaction. Some AE codes are associated with a single employee, but other AE codes apportion the commission generated by a transaction among more than one employee or trading desk, according to specific percentages or "splits."

21. When Cantor pays commissions pursuant to the AE codes, it deducts and withholds from its payments to the employees firm overhead, taxes, and deferred compensation (the "Deferred Compensation"). The employees receive the remaining commissions net of these amounts (the "Net Commissions") from Cantor by check or direct deposit.

22. Cantor relies upon this system to ensure compliance with various regulatory and tax obligations, including Exchange Act Rule 17a-3(a)(19)(i) [17 C.F.R. § 240.17a-3(a)(19)(i)] (the "Compensation Record Rule"). The Compensation Record Rule became effective in May 2003 and was thus in effect during the Relevant Period. The Compensation Record Rule requires that registered broker-dealers make and keep a record:

> As to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record shall include the amount of compensation if monetary and a description of the compensation if non-monetary. In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority.

23. Since at least 2006, Cantor's Written Supervisory Procedures (the "WSPs") expressly prohibited off-book commission-splitting. For example, Section 2.1 of the WSPs, which includes a subsection titled "Business Conduct of Cantor Fitzgerald Registered Representatives," includes the specific attestation: "I will not rebate, directly or indirectly to any person, firm or corporation any part of the compensation I receive as a registered employee, and I will not pay such compensation or any part thereof, directly or indirectly, to any person, firm,

or corporation, as a bonus, commission, fee or other consideration for business sought or procured for me."

24. All brokers at Cantor, including Mattessich and Ludovico, were required to certify their compliance with the firm's WSPs, including the provision expressly banning sharing compensation, on an annual basis and during the Relevant Period.

25. Since at least 2007, the annual certifications that Mattessich and Ludovico signed advised them that they were required to know and follow Cantor's WSPs because those procedures allowed the firm to comply with applicable securities laws and regulations.

***Mattessich and Ludovico Scheme to Circumvent Cantor's Procedures for Paying and Recording Commissions***

26. Sales traders at Cantor were primarily responsible for interacting with customers and taking orders, whereas execution traders like Mattessich were primarily responsible for routing and fulfilling orders.

27. In or about 2002, Mattessich, then a senior execution trader at Cantor, requested that the firm pay him commissions on transactions in customer accounts he serviced. Mattessich's supervisor denied the request and instructed him to transfer the accounts to more junior sales traders for coverage.

28. Following the denial of his request to receive commission compensation, Mattessich separately approached Ludovico and the Junior Sales Trader and proposed an arrangement that would circumvent the firm's established procedures for paying and recording commissions. Both Ludovico and the Junior Sales Trader were sales traders and were entitled under the firm's policies to receive commissions on accounts linked to their AE codes.

29. Ludovico was familiar with the firm's established procedures for splitting and recording commissions. Beginning in at least February 2012, Ludovico had multiple AE codes

7

assigned to him by Cantor, which reflected commission splits between Ludovico and other trading desks and employees.

30. Mattessich proposed that certain accounts he serviced be reassigned to Ludovico's and the Junior Sales Trader's AE codes so that they would receive the commissions generated by those accounts from Cantor and then remit some of the Net Commissions they received to Mattessich. Ludovico and the Junior Sales Traders agreed to the scheme and began paying Mattessich a portion of their Net Commissions.

31. The plan financially benefitted Ludovico as well as Mattessich. By taking on the additional accounts Mattessich transferred to him, Ludovico received additional compensation. Ludovico generally retained the full amount of the Deferred Compensation attributable to the commissions generated by the transferred accounts. In addition, Ludovico retained approximately 50 percent of the additional Net Commissions he received from Cantor as a result of the scheme.

32. Both Ludovico and the Junior Sales Trader generally made payments to Mattessich on a monthly basis from approximately 2002 to 2010, and Ludovico continued the practice until December 2013. Typically, Ludovico and the Junior Sales Trader would make the payments to Mattessich by personal check, writing these checks and handing them to Mattessich on the trading desk.

33. In or about 2004, Mattessich was promoted to head of the Desk and assumed supervisory responsibility over Ludovico and the Junior Sales Trader. Despite Mattessich's promotion, the commission-splitting scheme continued unabated, and Mattessich continued to receive checks from his subordinates.

34. During the Relevant Period, Ludovico gave Mattessich personal checks totaling at least $58,200 in connection with their commission-splitting arrangement. In addition to failing to report his receipt of these commissions to Cantor, Mattessich failed to report them as income to any taxing authorities.

35. The commission-splitting scheme created an undisclosed conflict of interest for Mattessich, who was responsible for supervising trading activity by the very subordinates (including Ludovico) who were making the payments to him.

*The Commission-Splitting Scheme Expands on the Desk*

36. After Mattessich's arrangement with Ludovico and the Junior Sales Trader was established, in or about 2011, another one of Mattessich's subordinates, the Junior Execution Trader, asked Mattessich whether he could receive commission compensation on certain accounts. Mattessich suggested that the Junior Execution Trader enter into an arrangement similar to the one he had with Ludovico and the Junior Sales Trader, specifically referring him to the Junior Sales Trader. Ludovico and the Junior Sales Trader thereafter began making commission payments to the Junior Execution Trader in the same manner as they had been making payments to Mattessich—by personal check.

37. During the Relevant Period, Ludovico gave the Junior Execution Trader checks totaling at least $32,500 in connection with their commission-splitting arrangement, and the Junior Sales Trader gave the Junior Execution Trader checks totaling at least $44,263.50.

*The Commission-Splitting Scheme Is Discovered by Cantor Legal and Compliance*

38. When the Desk's commission-splitting scheme was brought to the attention of legal and compliance personnel at Cantor, Cantor's chief compliance officer sent an email to all equities personnel on January 14, 2014, reaffirming the firm's prohibition on unrecorded

commission-splitting: "It is not permissible for one employee to pay another employee directly in connection with any Cantor activity. Any such arrangement should be arranged and documented through [the Chief Operating Officer] so that [it] is compliant with regulatory and tax regulations."

39. In February 2018, Defendants were permitted to voluntarily resign from Cantor as a result of the conduct described herein.

*The Commission-Splitting Scheme Caused Cantor to Have Deficient Books and Records*

40. None of the participants in the commission-splitting scheme kept records of the commission compensation paid to Mattessich or the Junior Execution Trader for the purchases and sales of securities that generated the commissions, or provided any information to Cantor from which Cantor could have created such records. As a result, Cantor did not make and keep records of the compensation that Mattessich or the Junior Execution Trader received through the scheme and did not have information about such compensation available to provide to regulators when requested.

41. Upon information and belief, Defendants are continuing to seek employment in the securities industry.

**CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Section 17(a) of the Exchange Act and Rule 17a-3(a)(19) Thereunder**

42. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-41.

43. Defendants knowingly, or at least recklessly, aided and abetted Cantor's failures, while operating as a broker-dealer, to make and keep current, accurate books and records relating to its business, to wit, records as to Defendants listing each purchase and sale of a security

10

attributable, for compensation purposes, to Defendants, or in lieu of making such records, to produce the required information promptly upon request of a representative of a securities regulatory authority.

44. By virtue of the foregoing, Defendants violated, and unless restrained and enjoined, will continue violating, Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3(a)(19) thereunder [17 C.F.R. § 240.17a-3(a)(19)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Defendants, their respective agents, servants, employees, and attorneys, and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3(a)(19) thereunder [17 C.F.R. § 240.17a-3(a)(19)];

### II.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)][1]; and

### III.

Granting such other and further relief as the Court may deem just and proper.

---

[1] Defendants have executed tolling agreements in this matter, in which they have agreed to toll the five-year statute of limitations applicable to seeking civil money penalties for the period December 20, 2017, through June 20, 2018.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
       June 29, 2018

                      By:     s/ Marc P. Berger
                                Marc P. Berger
                                Sanjay Wadhwa
                                Sheldon L. Pollock
                                Philip A. Fortino
                                Lee A. Greenwood
                                John O. Enright
                                *Attorneys for Plaintiff*
                                U.S. Securities and Exchange Commission
                                New York Regional Office
                                200 Vesey Street, Suite 400
                                New York, New York 10281-1022
                                (212) 336-1014 (Fortino)