UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

- against -                          18 Civ. 5884 (KPF)

ADAM MATTESSICH and
JOSEPH (JAY) LUDOVICO,

*Defendants.*

—————————————————————

# MEMORANDUM IN SUPPORT OF DEFENDANT
# JOSEPH (JAY) LUDOVICO'S MOTION TO DISMISS

Stephen J. Crimmins (SC2714)
Theodore A. Krebsbach
Leonard J. Amoruso
Sharon A. O'Shaughnessy
Murphy & McGonigle PC
1185 Avenue of the Americas, 21st floor
New York, NY 10036
(212) 880-3624 (Crimmins)
email: scrimmins@mmlawus.com

# TABLE OF CONTENTS

Standards for Consideration of This Motion ................................................................. 2

Factual Allegations Concerning Ludovico ................................................................. 3

ARGUMENT ................................................................................................................. 6

   I.   FAILURE TO ALLEGE FACTS SHOWING A PRIMARY VIOLATION
       BY CANTOR ......................................................................................................... 7

      A.   The Rule's Plain Meaning ............................................................................. 7

      B.   *Noscitur a Sociis* Interpretive Canon ........................................................... 9

      C.   *Expressio Unius* Interpretive Canon ........................................................... 9

      D.   Rulemaking History ..................................................................................... 10

      E.   Vagueness and Lack of Fair Notice .............................................................. 12

      F.   No Primary Violation ................................................................................... 15

  II.  FAILURE TO ALLEGE FACTS SHOWING LUDOVICO'S KNOWLEDGE OF A
       VIOLATION ....................................................................................................... 15

      A.   Admittedly No Commission-Splitting Primary Violation. .......................... 15

      B.   No Knowledge of a Books-and-Records Primary Violation ........................ 17

      C.   Account Executive Codes. ............................................................................ 18

      D.   Cantor's Internal Procedures ....................................................................... 20

      E.   Post Hoc January 2014 Email. ..................................................................... 21

      F.   No Knowledge of Primary Violation ........................................................... 22

 III. FAILURE TO ALLEGE FACTS SHOWING RECKLESS SUBSTANTIAL
       ASSISTANCE ..................................................................................................... 22

      A.   The "Judge Hand Standard." ....................................................................... 22

      B.   Allegations Concerning Ludovico's Conduct ............................................... 23

      C.   No Substantial Assistance ............................................................................ 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)................................................................................ 14

*de Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002) ............................................................... 20

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)................................................................................ 13

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995).................................................................................. 9

*Honeycutt v. U.S.*,
   137 S. Ct. 1626 (2017).......................................................................... 10

*John Wiley & Sons, Inc. v. DRK Photo*,
   882 F.3d 394 (2d Cir. 2018) ................................................................ 10

*Martinez v. Riverbay Corp.*,
   2016 WL 5818594 (S.D.N.Y. Oct. 4, 2016) ..................................... 3, 21

*Matter of Legend Securities, Inc.*,
   SEC Rel. 34-64502, 2011 WL 1847051 (May 16, 2011) ...................... 8

*N.L.R.B. v. SW Gen., Inc.*,
   137 S. Ct. 929 (2017)............................................................................ 10

*Price v. City of New York*,
   2018 WL 3117507 (S.D.N.Y. June 25, 2018) ....................................... 2

*SEC v. Apuzzo*,
   689 F.3d 204 (2d Cir. 2012) ...........................................................22-23

*SEC v. Frohling*,
   851 F.3d 132 (2d Cir. 2016) ................................................................ 24

*SEC v. Lek Securities Corp.*,
   276 F. Supp. 3d 49 (S.D.N.Y. 2017) ................................................ 6, 21

*Sessions v. Dimaya*,
   138 S. Ct. 1204 (2018)......................................................................... 14

*Sfiraiala v. Deutsche Bank A.G.*,
   2018 WL 1173502 (2d Cir. Apr. 13, 2018) ........................................ 24

*United States v. Finnerty,*
  533 F.3d 143 (2d Cir. 2008) .................................................................................. 20

*Yates v. U.S.,*
  135 S. Ct. 1074 (2015)........................................................................................... 9

## Statutes

Securities Exchange Act §15(b)(4)(E), 15 U.S.C. §78o(b)(4)(E)...................................... 2

Securities Exchange Act §15(b)(6)(A)(i), 15 U.S.C. §78o(b)(6)(A)(i) ........................................ 2

Securities Exchange Act §17(a), 15 U.S.C. §78q(a)................................................... 2, 7

Securities Exchange Act §20(e), 15 U.S.C. §78t(e) ....................................................... 6

## SEC Rule

Securities Exchange Act Rule 17a-3(a)(19), 17 C.F.R. §240.17a-3(a)(19)................2, 7-8, *passim*

## SEC Releases

SEC Rel. 34-37850, 1996 WL 606622, Oct. 22, 1996 ................................................. 10

SEC Rel. 34-40518, 1998 WL 681441, Oct. 2, 1998 .................................................. 11

SEC Rel. 34-44992, 2001 WL 1327088, Oct. 26, 2001, effective May 2, 2003 ..................... 11-12

SEC Rel. 34-44992A, 2003 WL 23319669, March 26, 2003, effective May 2, 2003 ................. 11

SEC Rel. 34-47910, 2003 WL 21205149, May 22, 2003........................................... 11

## Article

T. Boutrous & B. Evanson, "The Enduring and Universal Principle of 'Fair Notice,"
  86 So. Cal. L. Rev. 193 (2013) .................................................................................. 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

- against -                                      18 Civ. 5884 (KPF)

ADAM MATTESSICH and
JOSEPH (JAY) LUDOVICO,

*Defendants.*

## MEMORANDUM IN SUPPORT OF DEFENDANT
## JOSEPH (JAY) LUDOVICO'S MOTION TO DISMISS

This memorandum is submitted in support of Defendant Joseph (Jay) Ludovico's motion

to dismiss the Complaint as to him, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a

claim upon which relief can be granted.

The following is undisputed (*see also* Complaint ¶¶3, 17, 18, 39, 41):  Jay Ludovico is 41

years old and lives with his wife and children in Bay Ridge, Brooklyn.  He graduated from Iona

College in 1998, and his first and only job since college has been with Cantor Fitzgerald & Co.

Ludovico was in Cantor's London office on 9/11, when most of the firm's employees died in the

World Trade Center attacks.  Ludovico then returned to New York, stayed with Cantor and

helped it rebuild.  Until earlier this year, he worked as a trader on the firm's International

Equities Trading Desk.  After 20 years with Cantor, on the eve of the filing of the present

Complaint and a parallel settled administrative proceeding as to Cantor, the firm permitted him

to resign.  He is presently unemployed.

1

The Complaint, which demands a jury trial, charges **(i)** that non-party Cantor violated a books-and-records provision of Section 17(a) of the Securities Exchange Act, 15 U.S.C. §78q(a), and Rule 17a-3(a)(19) thereunder, 17 C.F.R. §240.17a-3(a)(19); and **(ii)** that Ludovico and his supervisor, Defendant Adam Mattessich, "at least recklessly" aided and abetted Cantor's books-and-records violation. The Complaint does not charge fraud.[1]

This is a very serious matter for Ludovico. The Complaint asks this Court to make findings that he violated the law, to enjoin him from future violations, and to impose a monetary penalty. Additionally, based on a "finding" by this Court that Ludovico "aided" or "abetted" another's (here Cantor's) violation of a "rule" under the Securities Exchange Act (here Rule 17a-3(a)(19)), the SEC can then issue its own follow-on administrative order barring Ludovico from the securities industry for life or for a period of years under Securities Exchange Act §§15(b)(4)(E) and 15(b)(6)(A)(i), 15 U.S.C. §§78o(b)(4)(E) and 78o(b)(6)(A)(i).

## Standards for Consideration of This Motion

In *Price v. City of New York*, 2018 WL 3117507, \*5-\*6 (S.D.N.Y. June 25, 2018) (Failla, J.), this Court set forth the standards for determining a motion to dismiss under Fed. R. Civ. P. 12(b)(6) as follows:

> When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007) ). While this plausibility requirement "is not akin to a probability requirement ..., it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation

---

[1] Counsel has acknowledged that "There is not a fraud with respect to the compensation practices. This is a books and records case." The Complaint is "not suggesting that there was a violation of any of the antifraud provisions based on this conduct." (8/30/2018 Pre-Motion Conf. Tr. 34)

marks omitted).

Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  It is not enough for a plaintiff to allege "naked assertions or conclusory statements"; rather, a plaintiff must come forward with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Biro* v. *Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (internal quotation marks omitted). ...

The motion should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Matson* v. *Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (citation omitted, alterations in original). ...

In deciding the motion, the Court may consider the facts alleged and any documents attached, incorporated or heavily relied on in the Complaint, as this Court stated in *Martinez v. Riverbay Corp.*, 2016 WL 5818594, *3 (S.D.N.Y. Oct. 4, 2016) (Failla, J.):

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-60 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a motion to dismiss).

## Factual Allegations Concerning Ludovico

Following a lengthy and detailed investigation,[2] the Complaint in this action alleges the following facts as to Jay Ludovico:

- Ludovico joined Cantor in October 1998 and remained with the firm for almost 20 years (until February 2018).  (Complaint ¶¶17, 39)

---

[2] This investigation, conducted with subpoena power under 15 U.S.C. §78u(b) & (c), included pre-Complaint depositions of Defendants and others, and production of records, emails, instant messages, and other documents. Ludovico was deposed twice, on August 3, 2017 and on December 19, 2017.  Mattessich was also deposed twice, on August 1, 2017 and on December 19, 2017.  The Complaint was filed on June 29, 2018.

- In 2002, Ludovico worked as a "junior sales trader" (taking customer orders) on the firm's International Equities Trading Desk ("the Desk"). Defendant Adam Mattessich worked as a "senior execution trader" (routing and filling orders) on the same Desk. (Complaint ¶¶2, 3, 26)

- In 2002, the Desk's then-supervisor denied Mattessich's request to receive commission compensation from the firm for certain customer accounts he had been personally servicing. Mattessich's supervisor also "instructed him to transfer the accounts to more junior sales traders for coverage." (Complaint ¶¶2, 27)

- As instructed, Mattessich then transferred certain of the accounts to Ludovico and another junior sales trader (anonymously called "the Junior Sales Trader" in the Complaint). Both were eligible to receive commission compensation from the firm, and Mattessich requested them to pay some unspecified portion of their commissions from these accounts' future transactions to Mattessich. Both did as Mattessich requested. (Complaint ¶¶3, 28, 30)

- At the time, Rule 17a-3(a)(19), the rule here at issue, did not yet exist. The following year, in May 2003, the SEC promulgated this rule, which required broker-dealer firms like Cantor to keep records of the compensation paid to their "associated persons" (individual registered employees). (Complaint ¶22) The Complaint does not make any allegation that Ludovico knew or was ever made aware of this new rule.

- In 2004, Cantor made Mattessich the Desk's new supervisor, and this put Mattessich in charge of Ludovico, the Junior Sales Trader, and the other sales and execution traders on the Desk. (Complaint ¶¶5, 33) The prior commission splitting arrangement continued without interruption.

- In 2006, Cantor adopted an internal policy (i) that brokers could not "rebate" commissions, and (ii) that brokers could not pay all or part or their commissions to persons who "sought or procured" business for the broker. (Complaint ¶23)

- Ludovico and the Junior Sales Trader continued to make monthly payments to the Desk's supervisor Mattessich, as Mattessich had previously requested several years earlier. Both made the payments, according to the Complaint, "by personal check, writing these checks and handing them to Mattessich on the trading desk." (Complaint ¶32) The amount and timing of the payments were discretionary and not fixed. (Complaint ¶¶30-31)

- While still the Desk's supervisor in 2011, Mattessich arranged for another trader he supervised (called "the Junior Execution Trader" in the Complaint) to also begin receiving from Ludovico and the Junior Sales Trader a portion of the commission

compensation that the firm paid them on certain accounts.  Here again both did as Mattessich requested.  (Complaint ¶¶6-7, 36)

- During the year 2013 – deemed the "relevant period" by the Complaint – Ludovico paid Mattessich $58,200, and paid $32,500 to the Junior Execution Trader, as arranged by Mattessich.  (Complaint ¶¶8, 34, 36-37)

- Apart from the "personal checks" Ludovico used to pay Mattessich (still Ludovico's direct supervisor during the relevant time period) and any related bank statements (Complaint ¶32), Ludovico did not keep any other "records" of his payments to Mattessich.  (Complaint ¶40)

- Ludovico's payments at issue continued only "until" December 2013, not beyond. (Complaint ¶32)  Two weeks later, Cantor's chief compliance officer sent a January 14, 2014 email advising brokers that payments to another employee "in connection with any Cantor activity" needed to be "arranged and documented through" the firm's chief operating officer.  (Complaint ¶38)

- While aware in  early January 2014 of the payments Ludovico made at his supervisor's request, Cantor did not discipline Ludovico over the ensuing four years, 2014-2018.  It was in February 2018, four months before this action was filed, that Ludovico was "permitted to voluntarily resign from Cantor as a result of" the payments.  (Complaint ¶¶18, 38-39)  Thus, after 20 years at Cantor, Ludovico is now unemployed and "continuing to seek employment."[3]  (Complaint ¶41)

Based on the foregoing specific factual allegations, the Complaint charges Mattessich with "failing to report" to Cantor "his receipt" of the amounts that he had requested Ludovico pay to him.  (Complaint ¶34)  The Complaint does not contend that Ludovico in any way interfered with Mattessich's ability to report these payments to Cantor.  The Complaint does not contend that Ludovico had a duty to report the payments made to his Cantor supervisor (at the supervisor's request), or that Ludovico had any role in the creation or maintenance of the firm's books and records, with respect to compensation or otherwise.  And while the Complaint alleges

---

[3] It would appear unlikely under the circumstances that Ludovico will succeed in his search for employment in the securities industry.  Just as securities firms typically enter into consent orders to avoid litigating with their regulator, firms likewise do not typically hire individuals who are defendants in pending enforcement litigation that can lead to a follow-on SEC administrative bar from the securities industry.

that Mattessich "failed to report" these payments "as income to any taxing authorities" (Complaint ¶34), it does not contend that Ludovico or the Junior Sales Trader failed to pay taxes on 100% of the full compensation that they received from Cantor.

## ARGUMENT

The Complaint fails to allege facts supporting its charge that Ludovico aided and abetted a books-and-records violation by Cantor.  Section 20(e) of the Securities Exchange Act, 15 U.S.C. §78t(e), sets forth the elements for an aiding-and-abetting claim as follows:

> ... [A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this title, or any rule or regulation issued under this title, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

Judge Cote recently summarized the steps for evaluating a motion to dismiss an SEC aiding-and-abetting claim.  The Court will first examine the Complaint to determine whether it alleges a primary violation, and then determine whether it alleges that the supposed aider-and-abettor both knew of the violation and also substantially assisted the primary violator by participating in the violation to make it succeed:

> To survive a motion to dismiss a claim of aiding and abetting liability, the SEC must allege: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012) (citation omitted).  Substantial assistance, in turn, requires that the aider and abettor "in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *Id.* at 206 (citation omitted).

*SEC v. Lek Securities Corp.*, 276 F. Supp. 3d 49, 58 (S.D.N.Y. 2017).

The Complaint here does not satisfy any one of the three requirements specified by Judge Cote as necessary to survive a motion to dismiss.  ***First***, the Complaint does not allege "the existence of a securities law violation by" a primary violator, here Cantor.  (**Point I** below)

***Second***, even assuming such a violation, the Complaint does not allege facts showing

"knowledge of this violation on the part of" Ludovico.  (**Point II** below)  ***Third***, the Complaint

does not allege facts showing that Ludovico provided "substantial assistance" by "participating"

in Cantor's violation "as in something that he wished to bring about" and sought to "make it

succeed."  (**Point III** below)

## I.  FAILURE TO ALLEGE FACTS SHOWING A PRIMARY VIOLATION BY CANTOR

Section 17(a) of the Securities Exchange Act provides that "Every ... registered broker or

dealer ... shall make and keep for prescribed periods such records ... as the Commission, by rule,

prescribes as necessary or appropriate...."  Pursuant to Section 17(a), the SEC adopted Rule 17a-

3(a)(19) on October 26, 2001, and it became effective on May 2, 2003.  (SEC Rel. 34-44992)

**A.  The Rule's Plain Meaning.**  By its plain terms, Rule 17a-3(a)(19) requires a

registered broker-dealer to keep records of the "compensation" that the broker-dealer itself pays

to its associated persons.  Nowhere does the rule say that it requires the broker-dealer to also

attempt to track how their associated persons spend their post-tax money – whether for

purchases, for investments, or for payments to others inside or outside the firm.  Specifically,

Rule 17a-3(a)(19) requires every registered broker-dealer to "make and keep current the

following books and records <u>relating to its business</u>":

> (19)  A <u>record</u>:  (i) As to each associated person <u>listing each purchase and sale</u> of a security <u>attributable</u>, for compensation purposes, <u>to that associated person</u>.  The record shall <u>include the amount of compensation</u> if monetary and a description of the compensation if non-monetary.  In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority. [and]

> (ii) Of all <u>agreements</u> pertaining to the <u>relationship between each associated person and the</u> member, <u>broker or dealer including</u> a summary of each

<u>associated person's compensation arrangement</u> or plan <u>with the</u> member, <u>broker or dealer</u>, including commission and concession schedules and, to the extent that compensation is based on factors other than remuneration per trade, the method by which the compensation is determined.  (emphasis added)

Thus, the rule's text simply required Cantor to keep a record of "each" transaction "attributable" to Ludovico "for compensation purposes," and the corresponding "amount of compensation" paid or to be paid to Ludovico for the transaction.  This is what the rule plainly says.  And this is what Cantor actually did.  It is undisputed that Cantor kept a record of each transaction it was attributing to Ludovico for compensation purposes, and the amount it paid Ludovico on each transaction.

In the 15 years since the rule was promulgated in 2003, there has never been a litigated case interpreting and applying Rule 17a-3(a)(19).  And the only non-litigated administrative consent order applying the rule did so, consistent with the rule's language, simply to the relationship between the broker-dealer and the associated person, and not to the relationship between the associated person and other people, associated or otherwise.  *Matter of Legend Securities, Inc.*, SEC Rel. 34-64502, 2011 WL 1847051 (May 16, 2011) (the rule "requires registered brokers and dealers to make ... records 'of all agreements pertaining to the relationship between each associated person' and the broker or dealer").

We submit that the Complaint fails to state a claim based on the rule's plain meaning.  But to the extent there may be any ambiguity, we submit that it can be resolved based on the two interpretive canons discussed below, and based on consideration of the relevant rulemaking history.  Finally, as further discussed below, applying the rule in the novel way suggested in the Complaint would render the rule impermissibly vague and would deprive regulated entities and their personnel of fair notice of what the rule requires.

**B.  *Noscitur a Sociis* Interpretive Canon.**  As Justice Ginsburg has explained, the "words immediately surrounding" a term will "cabin the contextual meaning of that term," and courts "rely on the principle of *noscitur as sociis* – a word is known by the company it keeps – to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'"  *Yates v. U.S.*, 135 S. Ct. 1074, 1085 (2015) (Sarbanes-Oxley Act prohibited destruction of any "tangible object" to obstruct a federal agency's investigation; Court considered words surrounding "tangible object" in the statute to determine that it referred to destruction of objects for recording or preserving information, and not to destruction of other kinds of evidence), quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

In the present case, subclause (ii) of the rule specifies that its use of the word "compensation" is in the context of the "associated person's compensation arrangement ... with the ... broker or dealer," and that it otherwise requires a record of "agreements ... between each associated person and the ... broker or dealer."  That is, it concerns the "compensation" the broker-dealer itself pays to its associated person – and not any payment from one associated person to another associated person.  Based on the rule's text, there is no reason to interpret the word "compensation" in subclause (i) any differently from the plain articulation of the meaning of "compensation" in subclause (ii) of the same rule.  Where subclause (i) refers to the broker-dealer's records of transactions attributed to an associated person for "compensation" purposes, it is referring to compensation that the broker-dealer pays the associated person.

**C.  *Expressio Unius* Interpretive Canon.**  Where Congress in a statute, or the SEC in a rule issued under a statute, specifies its applicability to one particular alternative but not to another, the statute or rule should not be inventively stretched to extend to the alternative not

included.  The Second Circuit, in recently affirming this Court in *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394 (2d Cir. 2018), made a similar point when it noted that the Copyright Act allowed the "owner of an exclusive right" under a copyright to bring an infringement action, but did not state that the "assignee of a bare right to sue" could bring such an action.  The Court ruled that "[t]he statute nowhere provides that such an assignee may sue, and we think, in view of its designation of who *may* sue, that the omission signals that Congress did not so intend." *Id.* at 399.  "[T]he interpretive canon of *expressio unius est exclusio alterius* instructs that Congress's expression of one or several items in an enumerated list typically reflects an intent to 'exclude[ ] another left unmentioned.'" *Id.* at 405, citing *N.L.R.B. v. SW Gen., Inc.*, 137 S.Ct. 929, 940 (2017).[4]

So also in the present case, Rule 17a-3(a)(19) provides that a broker-dealer must keep records of the compensation paid to its associated persons.  Nowhere does the rule even refer to subsequent payments by one associated person to another.  Having included the former and not referred to the latter, the rule must be interpreted as excluding the latter.

**D.  Rulemaking History.**  If the SEC had really wanted to require broker-dealers like Cantor to track what their associated persons do with their post-tax compensation, it could have easily done so in adopting Rule 17a-3(a)(19).  A sentence or two would have done it.  But it did not choose to impose such a requirement in adopting the rule, despite considerable effort over a seven-year rulemaking process, stretching from 1996 to 2003, in drafting, considering, reconsidering, and finally issuing Rule 17a-3(a)(19) and the other rules adopted under Section 17(a).  Along the way, the SEC's work included a Proposing Release in 1996 (SEC Rel. 34-37850, 1996 WL 606622, Oct. 22, 1996), analysis of public comments, a Reproposal Release in

---

[4] *Cf. Honeycutt v. U.S.*, 137 S. Ct. 1626 (2017) (Sotomayor, J.) (statute allowed forfeiture of property a defendant "obtained" through a crime, but did not provide for joint and several liability for forfeiture).

1998 making substantial changes (SEC Rel. 34-40518, 1998 WL 681441, Oct. 2, 1998), analysis

of more public comments, a Final Rule Release in 2001 (SEC Rel. 34-44992, 2001 WL 1327088,

Oct. 26, 2001, effective May 2, 2003), a corrected release in 2003 (SEC Rel. 34-44992A, 2003

WL 23319669, March 26, 2003, effective May 2, 2003), and a post-effective Interpretive Release

(SEC Rel. 34-47910, 2003 WL 21205149, May 22, 2003).

   None of these five SEC rulemaking releases over seven years discusses or even mentions

commission splitting by a broker-dealer firm's associated persons.  This can be quickly

confirmed by electronically word-searching each of the five releases on Westlaw for the terms

"split," "splitting," "share," and "sharing."

   The SEC's Final Rule Release (SEC Rel. 34-44992, 2001 WL 1327088, Oct. 26, 2001,

effective May 2, 2003), like the text of the rule, speaks entirely of the relationship between the

firm and the associated person.  In so doing, the release supports the conclusion that the rule

should be read, consistent with its plain language, as applying to "compensation" that broker-

dealer firms pay to their associated persons, and not to amounts that one associated person

subsequently pays to another associated person or to anyone else.  The relevant portion of the

release states:

>    Paragraph (a)(19)(i) of Rule 17a-3 requires firms to make a record as to
> each associated person listing each purchase and sale of a security attributable, for
> compensation purposes, to that associated person.  Again, the purpose for this
> requirement is to allow securities regulators to quickly identify compensation
> trends and focus examinations.  The record must include the amount of
> compensation (if monetary) and a description of the compensation (if non-
> monetary).  Under this requirement, firms must make records of all commissions,
> concessions, overrides, and other compensation to the extent they are earned or
> accrued for transactions.  In addition, if the compensation is non-monetary, that
> description should include an estimate of its value.
>
>    The term "non-monetary compensation" includes compensation such as
> sales incentives, gifts, or trips that would be provided to associated persons if

certain sales goals were achieved.  Such non-monetary compensation should be recorded if directly related to sales.  If sales would be counted toward achieving these goals, then a notation of the sales should be made regardless of whether that goal is actually achieved.  Non-monetary compensation does not include items of little value <u>distributed by the firm</u>.

Paragraph (ii) of new Rule 17a-3(a)(19) requires that <u>firms maintain a record of</u> all agreements pertaining to <u>the relationship between each associated person and the broker-dealer, including</u> a summary of each associated person's <u>compensation arrangement</u> or plan.  Further, to the extent that compensation is based on factors other than remuneration on a per trade basis, the firm must make a record that describes the method by which compensation is to be determined.

It should be noted that the requirement under paragraph (ii) that a <u>broker-dealer maintain a record</u> of all <u>agreements between itself and each associated person</u> includes verbal agreements and records, such as commission schedules, which may change on a periodic basis.

The term "<u>relationship</u>," as used in paragraph (a)(19) of Rule 17a-3, <u>solely refers to the</u> employment or contractual <u>relationship between the associated person and the broker-dealer</u>.  It would not relate to personal relationships unrelated to the firm's business.   (Exch. Act Rel. 34-44992, sec. III(E) (Oct. 26, 2001) (emphasis added))

Likewise, the SEC's last pronouncement, its May 2003 post-effective Interpretive Release (SEC Rel. 34-47910, 2003 WL 21205149, May 22, 2003), speaks only about compensation paid *by* the broker-dealer itself *to* its associated persons, and *not* about money paid by one of its associated persons to another associated person or to someone else.

**E.  Vagueness and Lack of Fair Notice.**  In adopting a rule requiring broker-dealers to keep records of transactions attributable to particular associated persons for compensation purposes, the SEC never told the industry – in its five releases during a seven year rulemaking (1996-2003) or over the ensuing 15 years (2003-18) – that the rule would also require broker-dealers to keep records of post-payment after-tax sharing by one associated person with another associated person of a portion of their compensation.

The Constitution does not permit federal agencies to put citizens through this kind of guessing game about what federal law does or does not require.  In *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), the FCC charged two television networks with violating a statutory prohibition on "any obscene, indecent, or profane language."  One network broadcast isolated utterances of obscene words during two live broadcasts, and the other network showed seven seconds of nudity in one show.  The Supreme Court held that, because the FCC failed to give the networks fair notice prior to their broadcasts that fleeting expletives and momentary nudity could be found actionably indecent, the FCC's standards as applied to these broadcasts were vague and unenforceable.  The Court explained in language relevant to the present case:

> A <u>fundamental principle</u> in our legal system is that <u>laws which regulate persons or entities must give fair notice of conduct that is forbidden or required</u>. See *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act <u>in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process</u> of law"); *Papachristou v. Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids'" (quoting *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (alteration in original))).  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment. See *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).  It requires the invalidation of laws that are impermissibly vague.  A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained "<u>fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement</u>." *Ibid.*  As this Court has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved. See *id.,* at 306, 128 S.Ct. 1830.
>
> Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that <u>regulated parties should know what is required of them so they may act accordingly</u>; second, precision and guidance are necessary <u>so that those enforcing</u>

> the law do not act in an arbitrary or discriminatory way. See *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). ...

567 U.S. at 253 (emphasis added). *Accord, Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (citing "the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires'"). *See* T. Boutrous & B. Evanson, "The Enduring and Universal Principle of 'Fair Notice," 86 So. Cal. L. Rev. 193 (2013).

The Court made a similar point a few months ago in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), in rejecting on vagueness grounds an attempt, in a civil enforcement case, to deport a resident alien on the ground that his state burglary conviction was a "crime of violence," and thus an "aggravated felony," under the Immigration and Nationality Act. Concurring with Justice Kagan's majority opinion, Justice Gorsuch said:

> Vague laws invite arbitrary power. Before the Revolution, the crime of treason in English law was so capaciously construed that the mere expression of disfavored opinions could invite transportation or death. The founders cited the crown's abuse of "pretended" crimes like this as one of their reasons for revolution. See Declaration of Independence ¶ 21. Today's vague laws may not be as invidious, but they can invite the exercise of arbitrary power all the same – by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up.

138 S. Ct. at 1223-24 (emphasis added).

If Rule 17a-3(a)(19) had spelled out to broker-dealers that they were supposed to keep records of what their associated persons did with their compensation after they received and paid taxes on it, the firms could have issued compliance alerts, amended internal policies, created forms for associated persons to report payments to others, and periodically have presented questionnaires for their associated persons to confirm that all payments had already been reported to the firms. Instead of providing fair notice to broker-dealers, the SEC's 2003 rule left them, in Justice Gorsuch's words, "in the dark about what the law demands." Applying the rule

14

to the present situation would thus violate the Constitution's vagueness prohibition and fair notice requirements.

**F.  No Primary Violation.**  The Complaint does not state a legal basis for a primary violation of Rule 17a-3(a)(19) by Cantor:  **(i)** The text of the rule speaks to keeping records of compensation paid by Cantor to its associated persons – compensation that Cantor <u>did</u> record – and not to downstream post-tax payments by one associated person to another.  **(ii)** Under the *noscitur a sociis* interpretive canon, analysis of the rule's use of "compensation" in its second subclause – pertaining to arrangements "with" the broker-dealer – informs the meaning of the same word in the first subclause as applying to compensation payments by the firm.  **(iii)** Under the *expresssio unius* interpretive canon, the inclusion of a clear requirement for recording compensation from the broker-dealer to an associated person, with the omission of a direct reference to payments between associated persons, should be read as an exclusion of the latter.  **(iv)** The five rulemaking releases, essentially the rule's legislative history, reflect that the focus was simply on compensation paid directly by the broker-dealer.  **(v)** Applying the rule to payments by one associated person to another associated person, as involved in this matter, would violate the Constitution's vagueness prohibition and fair notice requirements.

## II.  FAILURE TO ALLEGE FACTS SHOWING LUDOVICO'S KNOWLEDGE OF A VIOLATION

Cantor did not commit a primary violation.  But even if Cantor had, the Complaint does not allege facts showing knowledge of a Cantor primary violation on the part of Ludovico.

**A.  Admittedly No Commission-Splitting Primary Violation.**  The Complaint alleges commission-splitting, but does not contend that it was illegal.  When Mattessich in 2002 asked Cantor for commissions on accounts he serviced as a "senior execution trader," Cantor refused his request and "instructed" him to transfer these accounts to "junior sales traders" for coverage.

(Complaint ¶27)  Under Cantor's policies, "sales traders" were entitled to receive commissions on accounts they serviced.  (Complaint ¶28)  Mattessich proposed to transfer his accounts to Ludovico and the other Junior Sales Trader, with the understanding that they would remit some of their commissions to Mattessich, which they agreed to do.  (Complaint ¶30)

In 2002 Cantor internally allowed commission-splitting between its associated persons, and indeed facilitated this sharing with other associated persons at Cantor through shared AE (account executive) codes, discussed below, that allowed Cantor to pay the split commissions directly to two or more associated persons according to agreed-upon percentages or "splits." (Complaint ¶20)  Cantor's only limitation was that associated persons could not "rebate" commissions to customers or pay part of commissions to solicitors who procured business, as spelled out in §2.1 of Cantor's WSPs (written supervisory procedures).  (Complaint ¶23)

Ludovico did nothing illegal by agreeing to share a varying portion of his commissions with Mattessich in 2002.  The Complaint is "not saying that it is inherently wrong for Mr. Ludovico and Mr. Mattessich to have been sharing commissions."  (8/30/2018 Pre-Motion Conf. Tr. 29)  As commission-sharing between registered persons was and is a legal and accepted practice, doing so did not give Ludovico "knowledge" of some primary violation of the securities laws by Cantor at the time Ludovice agreed to his supervisor's request.  Particularly as Ludovico did so in 2002 – at a time when Rule 17a-3(a)(19), the rule here involved, did not yet even exist, and which Complaint notes only became effective a year later, in May 2003.  (Complaint ¶22)

In 2004, Cantor made Mattessich head of the Desk, thereby making him the supervisor of Ludovico and the Junior Sales Trader.  (Complaint ¶33)  The commission sharing here continued from 2002 to 2013, and it was done openly, with Ludovico and the other Junior Sales Trader paying Mattessich "by personal check, writing these checks and handing them to Mattessich on

16

the trading desk." (Complaint ¶32)  While the Complaint claims that this "risk[ed] compromising Mattessich's supervision" and caused a "risk of harm" to customers (Complaint ¶9), it does not allege any fact showing actual compromise or actual harm to customers, and the Complaint does not seek any disgorgement.  (8/30/2018 Pre-Motion Conf. Tr. 34-35)

This commission sharing came to the attention of Cantor's legal and compliance personnel at the beginning of 2014.  (Complaint ¶38)  With this information, Cantor continued to employ Mattessich and Ludovico for another four years, and only had them "voluntarily resign" in February 2018, on the eve of the filing of the present Complaint and a simultaneous no-admit-no-deny administrative consent decree as to Cantor.  (Complaint ¶¶18, 39)

**B.  No Knowledge of a Books-and-Records Primary Violation.**  The Complaint does not allege facts showing Ludovico's knowledge of a supposed books-and-records violation by Cantor.  As noted above in Point I, the Complaint's interpretation of Rule 17a-1(a)(19) presents this Court with a question of first impression.  Ludovico was a sales trader, and not a lawyer or member of Cantor's legal and compliance staff.  The Complaint does not allege any means by which Ludovico could have become aware of the rule interpretive question involved here, or how he could have resolved it in a way to give him "knowledge" of Cantor's supposed primary violation of the rule.

The Complaint does not allege that Ludovico was ever made aware of the rule's passage or of any particular books-and-records obligations placed upon the firm (or on himself) as a result of its passage.  Indeed, instead of contending that Ludovico received any training on Rule 17a-3(a)(19), the Complaint alleges that it was actually Ludovico's direct Cantor supervisor (Mattessich) who proposed that Ludovico and the other sales trader share with him some portion of the commissions they had already received and paid taxes on, and that it was their supervisor

who then accepted the payments for over a decade.  (Complaint ¶¶28, 32)  This does not allege facts showing Ludovico's knowledge of Cantor's supposed violation of the Complaint's novel interpretation of the rule at issue.

It is undisputed that Cantor kept a record of "each" transaction it was "attributing" to Ludovico "for compensation purposes," and the "amount of compensation" it paid Ludovico on each transaction.  Thus, looking at the actual text of Rule 17a-3(a)(19) would likewise not have given Ludovico knowledge that Cantor was committing a primary violation by doing what appeared to comply with what the rule said.

Finally, the Complaint states that it was Mattessich, the supervisor, who failed to report to Cantor on the payments he had received from Ludovico and the Junior Sales Trader. (Complaint ¶34)  The Complaint fails to allege facts showing that Ludovico had a duty to file reports with Cantor, that he in any way interfered with Mattessich's ability to report these payments to Cantor had Mattessich chosen to do so, that he had a duty to monitor whether and to what extent his supervisor Mattessich filed such reports, or that he knew what Cantor was told (or not told) by Mattessich or what Cantor supposedly did or didn't do to commit its alleged violation.  The Complaint does not allege facts showing knowledge by Ludovico of a books-and-records violation by Cantor.

**C.  Account Executive Codes.**  The Complaint tells us that Cantor was using account executive (or "AE") codes to track which of its employees would get paid commissions on what transactions for which accounts.  And it says that Cantor used AE codes for this purpose from before 2002, when the Complaint's narrative begins.  (Complaint ¶20)  However, the Complaint does not point to any document or written policy which would have otherwise put employees on notice that the usage of AE codes for commission splitting was required by federal statute or

18

industry regulation. Nevertheless, the Complaint alleges that Cantor was for some time using AE codes for its own internal management. This obviously made sense to Cantor as it facilitated the firm's ability to determine to whom to pay what commissions, "by check or direct deposit" from Cantor, subject to withholding for taxes, overhead and deferred compensation. (Complaint ¶21)

But suggesting that Ludovico must have seen Cantor's use AE codes to manage the commission payments it made, by Cantor check or deposit, does not show that Ludovico had knowledge of a primary violation. While the Complaint says that Cantor used AE codes before 2002, the Complaint acknowledges that Rule 17a-3(a)(19) was only effective in May 2003. And while the Complaint alleges that at some point in or after May 2003 Cantor began using AE codes "to ensure compliance" with the new rule, the Complaint does not allege Ludovico was ever made aware of the fact that this continued use of AE codes at the firm was now used "to ensure compliance" with a new regulatory requirement. (Complaint ¶22)

Moving years along, the Complaint tells us that, beginning "in at least February 2012," Cantor assigned multiple AE codes to Ludovico, "which reflected commission splits between Ludovico and other trading desks and employees" at Cantor. (Complaint ¶29) As the Complaint notes, this told Ludovico, at least by 2012, that the firm had "established procedures" for commission splits where Cantor would have to divide (according to agreed percentages) how much the firm would pay Ludovico in commissions and how much it would pay "other trading desks and employees" on a particular account. (Complaint ¶29) While validating that Cantor allowed commission splits where the firm itself was paying its employees, this said nothing about any subsequent payments by one employee to another employee of varying amounts of post-tax compensation already received, and the Complaint does not allege that Cantor ever requested that its employees provide such information to Cantor.

**D.  Cantor's Internal Procedures.**  Whether Rule 17a-3(a)(19) can be extended beyond commissions paid by Cantor itself so that the rule would reach subsequent post-tax payments by one employee to another employee is a matter of statutory interpretation, as discussed above, and such interpretation of a federal rule is obviously not governed by whatever may be in Cantor's internal procedures – even if Cantor's internal procedures were more rigorous than federal law for prophylactic or other reasons.  Nor can a violation of a firm's internal procedures form the basis for a government enforcement action.  *See United States v. Finnerty*, 533 F.3d 143, 149–150 (2d Cir. 2008); *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1311 (2d Cir. 2002) ("it makes no sense to discourage the adoption of higher standards than the law requires by treating them as predicates for liability").

So whether Cantor as a firm did or did not allow one employee to make a payment to another employee does not show knowledge by Ludovico of a primary violation of Rule 17a-3(a)(19) by Cantor.  In particular, Cantor's Written Supervisory Procedures (called "WSPs"), quoted and relied on in the Complaint, did not give Ludovico's knowledge of an alleged Cantor violation.  The Complaint refers specifically to WSP §2.1, which provided that (i) brokers could not "rebate" commissions, and (ii) brokers could not pay all or part or their commissions to persons who "sought or procured" business for the broker.  (Complaint ¶23)  This WSP section appears to relate to portions of former NASD Rule 2420 (superseded in August 2015 by FINRA Rule 2040), regulating payments to unregistered persons.  WSP §2.1 is inapplicable here because such rebates to unregistered customers and payments to unregistered business solicitors are very different – including in the nature, purpose and recipient of the payment – from a discretionary post-tax payment that one registered broker chooses to make to another registered broker.  The

Complaint does not contend that the WSPs contained any similar prohibition against splitting

commissions with another <u>registered</u> person.

     **E.  Post Hoc January 2014 Email.**  Unable to cite any Cantor WSP or other policy

document actually addressing the topic of commission sharing by registered employees during

the relevant period, the Complaint refers to an after-the-fact January 14, 2014 email from

Cantor's chief compliance officer that the Complaint claims without factual basis "reaffirm[ed]

the firm's prohibition on unrecorded commission splitting."  (Complaint ¶38)  However the

email provides in full as follows:[5]

> Any <u>compensation arrangement between employees whether formal or</u>
> <u>informal</u> should be discussed with Ron Wexler [Cantor's chief operating officer].
> It is not permissible for one employee to pay another employee directly in
> connection with any Cantor activity.  Any such arrangement <u>should be arranged</u>
> <u>and documented</u> through Ron so that [it] is compliant with regulatory and tax
> regulations.  There is <u>no grandfather provision</u> – so please call <u>even if the</u>
> <u>arrangement is existing and longstanding</u>.  (emphasis added)

Ludovico's payments to his supervisor since 2002 were obviously "existing and longstanding"

by 2014, but with "no grandfather provision" offered, the Complaint indicates that they did not

continue beyond this January 2014 email.  (Complaint ¶¶32, 38)  And neither the email nor the

Complaint suggests that Ludovico's payments to his supervisor could not have been "arranged

and documented," if they had been "discussed with" the chief operating officer as indicated in

the email.  This email thus shows that "informal" commission-splitting arrangements were

"existing and longstanding" by 2014, and does not "reaffirm" any prior prohibition.

     **F.  No Knowledge of Primary Violation.**  Thus, the Complaint does not allege facts

showing "knowledge of" a primary Cantor violation "on the part of" Ludovico.  *SEC v. Lek*

---

[5] As the Complaint substantively relies on and quotes more than half of this short email (Complaint ¶38), we request
the Court to consider the email's full text, quoted above.  *Martinez v. Riverbay Corp.*, 2016 WL 5818594, *3
(S.D.N.Y. Oct. 4, 2016) (Failla, J.).

*Securities Corp., supra*, 276 F. Supp. 3d at 58.  There is no way Ludovico could have anticipated

the never-before-seen interpretation of Rule 17a-3(a)(19) in the present Complaint.  And instead

of showing that Ludovico had knowledge that Cantor was supposedly violating this record-

keeping rule, the Complaint alleges facts showing that it was Ludovico's Cantor supervisor who

authorized him (and another junior sales trader) to share with the supervisor a portion of his

already-paid post-tax compensation, that it was the supervisor who allegedly failed to make

reports to Cantor (if reports indeed needed to be filed), that Ludovico did not himself have a duty

to make reports and did not interfere with reporting by his supervisor, that the firm explicitly

permitted splitting of commissions when paid by Cantor itself through shared AE codes, and that

Ludovico did not share commissions he received after the firm's 2014 email telling employees

that such sharing would need to be formally "arranged and documented."  This does not allege

facts showing a supposed aider and abettor acting with knowledge of a primary books-and-

records violation.

### III.  FAILURE TO ALLEGE FACTS SHOWING RECKLESS SUBSTANTIAL ASSISTANCE

The Complaint does not allege facts showing that Ludovico provided "substantial

assistance" by "participating" in Cantor's violation "as in something that he wished to bring

about" and sought to "make it succeed."  *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).

**A.  The "Judge Hand Standard."**  The Second Circuit in *Apuzzo* based its definition of

"substantial assistance" on an earlier opinion for the Court by Judge Learned Hand:

> ... Nearly seventy-five years ago, Judge Learned Hand famously stated
> that in order for a criminal defendant to be liable as an aider and abettor, the
> Government – in addition to proving that the primary violation occurred and that
> the defendant had knowledge of it ... – must also prove "that he in some sort
> associate[d] himself with the venture, that [the defendant] participate[d] in it as in
> something that he wishe[d] to bring about, [and] that he [sought] by his action to
> make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938). ...

Judge Hand's standard has thus survived the test of time, is clear, concise, and workable, and governs the determination of aider and abettor liability in securities fraud cases.

689 F.3d at 212.  The Court then went on "to clarify that the appropriate standard for determining the substantial assistance component of aider and abettor liability in an SEC civil enforcement action is the Judge Hand standard set forth above." *Id.* at 213.

**B.  Allegations Concerning Ludovico's Conduct.**  The Complaint's allegations here concerning Ludovico do not satisfy the substantial assistance component under the Judge Hand standard endorsed by the Second Circuit in *Apuzzo*.  The Complaint does not set forth facts showing that Ludovico participated in a Cantor books-and-records violation as in something that he wished by his conduct to bring about and make it succeed.

The Complaint describes Ludovico as a "sales trader" on an "international equities trading desk" (Complaint ¶3), but does not allege that Ludovico had any role in the creation or maintenance of Cantor's books and records, with respect to compensation or otherwise.  Nor does the Complaint allege that Ludovico made any false statement or false entry in Cantor's books and records as part of his work as a sales trader.

The Complaint instead alleges (i) that Ludovico's supervisor at Cantor asked him and another trader to share discretionary portions of commissions on certain accounts with their supervisor (Complaint ¶¶28, 33); (ii) that Ludovico and the other trader complied with their supervisor's request (Complaint ¶¶30, 32-33; (iii) that both traders did so openly "by personal check, writing these checks and handing them to Mattessich on the trading desk" (Complaint ¶32); and (iv) that it was the supervisor who did not report to Cantor on the payments he received from two traders he supervised (Complaint ¶¶33-34).  And after promulgation of Rule 17a-3(a)(19) in May 2003 (Complaint ¶22), the Complaint does not allege that Cantor or the

23

supervisor made Ludovico and the other sales trader aware of the new books-and-records rule, trained them on the rule, or alerted them that by continuing to comply with their supervisor's request they could be substantially assisting Cantor to violate this rule.

Finally, the Complaint fails to allege facts showing recklessness, a statutory element for an aiding-and-abetting claim under Section 20(e) of the Exchange Act.  That is, even if Ludovico did, under the Judge Hand standard, provide substantial assistance to Cantor in a violation, the Complaint does not allege facts showing that Ludovico did so recklessly.  "Recklessness in the securities context requires conduct that at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Sfiraiala v. Deutsche Bank A.G.*, 2018 WL 1173502, *2 (2d Cir. Apr. 13, 2018) (summary order) (internal quotation marks omitted); *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care").  In fact, there was no "extreme departure from the standards of ordinary care," as the January 2014 email from the firm's chief compliance officer clearly noted that such arrangements at the firm may be "existing and longstanding."

**C.  No Substantial Assistance.**  Thus, the Complaint does not satisfy what the Second Circuit has termed the "Judge Hand standard," which does not allow a claim for <u>passive</u> substantial assistance.  Instead of showing Ludovico to be an <u>active</u> participant in a Cantor books-and-records violation as something he wished to bring about and sought by his actions to make succeed – what Judge Hand defined for substantial assistance – the Complaint alleges facts showing Ludovico to be passively compliant with his supervisor's requests to him and another trader to make payments (by check written and delivered on the Desk in front of others) of

24

varying portions of their already-received post-tax commissions.  This does not allege facts

showing substantial assistance to a Cantor books-and-records violation.

## CONCLUSION

The Complaint **(i)** fails to allege a primary books-and-records violation by Cantor; **(ii)**

fails to allege facts showing that Ludovico had knowledge of Cantor's alleged books-and-records

violation; and **(iii)** fails to allege facts showing reckless and substantial participation by

Ludovico in a Cantor books-and-records violation.  With each of these three elements required

but none satisfied, Ludovico's motion to dismiss as to him should be granted.

Dated:  September 21, 2018

Stephen J. Crimmins (SC2714)
Theodore A. Krebsbach
Leonard J. Amoruso
Sharon A. O'Shaughnessy
Murphy & McGonigle PC
1185 Avenue of the Americas, 21st floor
New York, NY 10036
(212) 880-3624 (Crimmins)
email: scrimmins@mmlawus.com