UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

-v.-

ADAM MATTESSICH and JOSEPH LUDOVICO,

               Defendants.

18 Civ. 5884 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

     Plaintiff Securities and Exchange Commission (the "SEC") brought this civil enforcement action against Defendants Adam Mattessich and Joseph Ludovico (collectively, "Defendants"), two securities brokers formerly employed by Cantor Fitzgerald & Co. ("Cantor" or the "Firm"). The Complaint alleges that Defendants schemed to circumvent Cantor's established procedures for paying and recording commission payments to its brokers, and in so doing aided and abetted Cantor's violations of Rule 17a-3(a)(19), 17 C.F.R. § 240.17a-3(a)(19), which was promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), Pub. L. 73-291, 48 Stat. 881, and which requires registered broker-dealers to make and keep accurate records of each securities transaction attributable, for compensation purposes, to each broker. Defendants now seek to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Taking the Complaint's well-pleaded allegations as true,

the Court finds that the SEC has stated a claim against Defendants for aiding and abetting Cantor's books and records violations.

## BACKGROUND[1]

### A. Factual Background

#### 1. Cantor's Policies and Procedures Concerning the Payment and Recording of Commission Compensation

Cantor has been a registered broker-dealer with the SEC since December 1947. (Compl. ¶ 18). It pays commission compensation to its brokers for securities transactions that they broker on behalf of Cantor's customers. (*Id.* at ¶ 19). From at least 2002 to the present, Cantor has used a system of account executive (or "AE") codes to apportion and track commission compensation for its brokers. (*Id.* at ¶ 20). Each brokerage transaction is associated with an AE code that dictates which Cantor employee or employees will receive the commission generated by the associated transaction. (*Id.*). Some AE codes are associated with a single employee, but other AE codes apportion the commission generated by a transaction among more than one employee or trading desk, according to specific percentages or splits. (*Id.*). Cantor pays its employees commissions pursuant to AE codes by either check or direct deposit. (*Id.* at ¶ 21).

---

[1] This Opinion draws its facts from the Complaint. ("Compl." (Dkt. #1)).

For ease of reference, the Court refers to the parties' briefing as follows: Defendants' Memorandum of Law in Support of the Motion to Dismiss as "Def. Br." (Dkt. #36); Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss as "Pl. Opp." (Dkt. #39); and Defendants' Reply Memorandum of Law in Support of the Motion to Dismiss as "Def. Reply" (Dkt. #40).

Cantor relies upon the AE system to ensure compliance with various regulatory and tax obligations, including Exchange Act Rule 17a-3(a)(19)(i), 17 C.F.R. § 240.17a-3(a)(19)(i) (the "Compensation Record Rule"), which became effective in May 2003. (Compl. ¶ 22). The Compensation Record Rule requires registered broker-dealers to make and keep a record

> [a]s to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record shall include the amount of compensation if monetary and a description of the compensation if non-monetary. In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority.

17 C.F.R. § 240.17a-3(a)(19)(i).

Since at least 2006, Cantor's Written Supervisory Policies (the "WSPs") have expressly prohibited off-book commission-splitting. (Compl. ¶ 23). Specifically, Section 2.1 of the WSPs, titled "Business Conduct of Cantor Fitzgerald Registered Representatives," states:

> I will not rebate, directly or indirectly to any person, firm or corporation any part of the compensation I receive as a registered employee, and I will not pay such compensation or any part thereof, directly or indirectly, to any person, firm, or corporation, as a bonus, commission, fee or other consideration for business sought or procured for me.

(*Id.*). All brokers at Cantor are required to certify their compliance with the Firm's WSPs, including Section 2.1, on an annual basis. (*Id.* at ¶ 24).

## 2. Mattessich's and Ludovico's Commission-Splitting Scheme

In or about 2002, Mattessich — then a senior execution trader at Cantor — requested, but was denied, permission from his supervisor to receive commission compensation on certain customer accounts that he serviced. (Compl. ¶¶ 2, 27). Mattessich's supervisor instructed Mattessich to transfer the accounts to more junior sales traders for coverage. (*Id.* at ¶ 27). Mattessich then approached Ludovico and another junior sales trader (the "Junior Sales Trader") with a scheme to circumvent the supervisor's decision and the Firm's established procedures for the paying and recording of commissions. (*Id.* at ¶¶ 3, 28). Mattessich proposed that certain accounts he serviced be reassigned to Ludovico's and the Junior Sales Trader's AE codes, since they were eligible to receive commission compensation under the Firm's policies. (*Id.*). Once Ludovico and the Junior Sales Trader received the net commission from Cantor, they would remit some portion of it to Mattessich via personal check. (*Id.* at ¶ 30).[2]

Mattessich, Ludovico, and the Junior Sales Trader implemented Mattessich's proposed plan, and Ludovico and the Junior Sales Trader began receiving commissions on the accounts transferred to them by Mattessich. (Compl. ¶ 30). From 2002 to 2010, both Ludovico and the Junior Sales Trader made payments to Mattessich on a monthly basis, typically by personal check.

---

[2] When Cantor pays commissions to its brokers pursuant to AE codes, it deducts and withholds firm overhead, taxes, and deferred compensation. (Compl. ¶ 21). The brokers receive the remaining commissions net of these amounts. (*Id.*).

4

(*Id.* at ¶ 32).[3] Ludovico continued the practice until December 2013. (*Id.*). In or around 2011, other members of the Equities trading desk entered into commission-splitting arrangements similar to the one Mattessich had with Ludovico and the Junior Sales Trader. (*Id.* at ¶¶ 36-37).

Mattessich's scheme financially benefitted all participants. (Compl. ¶ 31). For instance, by taking on the additional accounts Mattessich transferred to him, Ludovico received additional compensation from Cantor. (*Id.*). Ludovico generally retained approximately 50% of the net commissions he received on the accounts transferred to him by Mattessich. (*Id.*). From January to December 2013, Ludovico gave Mattessich personal checks totaling at least $58,200 in connection with their commission-splitting arrangement. (*Id.* at ¶ 34).

Unsurprisingly, neither Ludovico nor Mattessich disclosed the commission-splitting to Cantor, nor did they keep records of the commission compensation paid to Mattessich. (Compl. ¶ 40). As a result, Cantor did not make and keep records of the compensation Mattessich received through the scheme, and Cantor did not have information about such compensation available to provide regulators when requested. (*Id.*). In February 2018, Mattessich and Ludovico were permitted to resign voluntarily from Cantor as a result of this conduct. (*Id.* at ¶ 39). On June 29, 2018, contemporaneous with the filing of this action, the SEC settled administrative cease-and-desist

---

[3] In 2004 Mattessich was promoted to head of Cantor's International Equities trading desk and assumed supervisory responsibility over Ludovico and the Junior Sales Trader. (Compl. ¶ 33).

5

proceedings against Cantor regarding books and records violations. (*Id.* at ¶ 18).

B.  **Procedural Background**

The SEC filed the Complaint in this action on June 29, 2018. (Dkt. #1). On July 31, 2018, Defendant Ludovico requested leave to file a motion to dismiss. (Dkt. #26). On August 30, 2018, the Court held a pre-motion conference and set a briefing schedule for Defendants' motions to dismiss. (Dkt. #32). On September 21, 2018, Defendant Mattessich notified the Court that he would join in any motion to dismiss filed by Defendant Ludovico. (Dkt. #34).[4] Defendant Ludovico moved to dismiss the Complaint on September 27, 2018. (Dkt. #35-36). The SEC filed its opposition brief on October 22, 2018. (Dkt. #39). This motion became fully briefed when Defendant Ludovico filed his reply brief on November 6, 2018. (Dkt. #40).

## DISCUSSION

A.  **Motions to Dismiss Under Rule 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted);

---

[4]  The motion to dismiss briefing focuses on Defendant Ludovico, but because Defendant Mattessich notified the Court that he was joining in Defendant Ludovico's motion, the Court construes the arguments made in the motion to dismiss to apply to both Defendants to the extent they also apply to Defendant Mattessich.

*see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

**B.     The Court Denies Defendants' Motion to Dismiss**

The Complaint charges Mattessich and Ludovico each with a single count of aiding and abetting Cantor's violations of Section 17(a) of the Exchange Act, 15 U.S.C. § 78q, and Rule 17a-3(a)(19), 17 C.F.R. § 240.17a-3(a)(19), promulgated thereunder. The SEC seeks both injunctive relief, enjoining Defendants from future violations of Section 17(a) of the Exchange Act, as well as civil penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

Section 20(e) of the Exchange Act establishes liability for those who aid and abet others in securities violations. 15 U.S.C. § 78t(e). It provides that:

> [a]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

7

*Id.*

To state a claim for aiding and abetting, the SEC must allege three things: "[i] the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; [ii] knowledge of this violation on the part of the aider and abettor; and [iii] substantial assistance by the aider and abettor in the achievement of the primary violation." *SEC* v. *Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012) (internal quotation marks omitted) (citing *SEC* v. *DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)). Defendants' motion to dismiss argues that the SEC has failed adequately to allege all three elements of an aiding and abetting claim. The Court disagrees with Defendants as to all three elements.

### 1. The Complaint Alleges Primary Violations of Section 17(a) of the Exchange Act and Rule 17a-3(a)(19)(i)

Section 17(a) of the Exchange Act provides that "[e]very … [registered] broker or dealer … shall make and keep for prescribed periods such records … as the Commission, by rule, prescribes as necessary or appropriate[.]" 15 U.S.C. § 78q(a)(1). Pursuant to Section 17(a), the SEC enacted the Compensation Record Rule, which became effective on May 2, 2003. As noted, the Rule requires broker-dealers to make and keep current

> [a] record: (i) As to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record shall include the amount of compensation if monetary and a description of the compensation if non-monetary. In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority.

17 C.F.R. § 240.17a-3(a)(19)(i).[5]

By its terms, the Compensation Record Rule requires broker-dealers, such as Cantor, to record the amount of monetary compensation attributable to each associated person (i.e., broker) for each purchase and sale of a security. Compensation is "attributable" to an employee if it is earned or accrued in favor of such employee. *See Books and Records Requirements for Brokers and Dealers Under the Securities Exchange Act of 1934* (hereinafter, "*Books and Records Requirements*"), 76 S.E.C. Docket 343, Release No. 34-44992, 2001 WL 1327088, at sec. III(E) (Oct. 26, 2001) ("Under this requirement, firms must make records of *all* commissions, concessions, overrides, and other compensation to the extent they are *earned or accrued for transactions*." (emphases added)). The Complaint here alleges that Mattessich earned (and received) commission compensation on customer accounts for which Cantor's books and records reflected that the commission was attributable to Ludovico. Thus, the SEC argues, and the Court agrees, Cantor violated the Compensation Record Rule.

Defendants argue that the Complaint does not allege a primary violation of the Compensation Record Rule because the Rule requires that a registered broker-dealer keep records of only the compensation that it pays to its brokers, and does not reach private agreements between brokers to split commissions.

---

[5]  To the Court's (and parties') knowledge, no court has ever interpreted the Compensation Record Rule and this is the first litigated case addressing it. (*See* Def. Br. 8). The Court has been made aware of only one settled administrative consent order under the Rule. *See Matter of Legend Securities, Inc.*, SEC Rel. 34-64502, 2011 WL 1847051 (May 16, 2011).

9

(*See* Def. Br. 7). They contend that because Cantor's records accurately reflected the compensation that Cantor itself paid to Ludovico and Mattessich, Cantor did not violate the Compensation Record Rule. (*See id.* at 8).

Defendants' argument is too clever by half: It reads a limitation into the Rule, regarding who pays the compensation, that is untethered from the plain language of the Rule.[6] The text of the Rule requires that Cantor maintain a record, for compensation purposes, of all transactions that are "attributable" to each broker. As the SEC points out, the phrase encompasses *all* compensation attributable to the broker — regardless of whether it has been paid, and regardless of who has paid it. (*See* Pl. Opp. 8).

Defendants' attempt to characterize their remuneration scheme as a private agreement between brokers to share post-tax compensation (*see* Def. Br. 7, 12, 15; Def. Reply 2), does not take it outside the scope of the Rule. The

---

6     Defendants also invoke the *noscitur a sociis* and *expressio unius* canons of statutory interpretation. (*See* Def. Br. 9-10). However, because the meaning of the Compensation Record Rule is unambiguous, the Court need not resort to consideration of such canons. *See Greenery Rehab. Grp., Inc.* v. *Hammon*, 150 F.3d 226, 231 (2d Cir. 1998) ("If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words."). Even if the Court were to consider Defendants' arguments regarding these canons, it would find such arguments unpersuasive. Defendants claim that the because subclause (ii) of Rule 17a-3(a)(19) requires that a broker-dealer keep a record of "all agreements pertaining to the relationship between each associated person and the member, broker or dealer including a summary of each associated person's compensation arrangement or plan with the member, broker or dealer," the term "compensation" in subclause (i) must refer only to the compensation that the broker-dealer pays to its brokers, and not to the payment of commissions from one broker to another. (*See* Def. Br. 9). But the very fact that subsection (ii) specifies that it is referring to compensation that is paid from the broker-dealer to the broker indicates that subsection (i) is not so limited. *See Russello* v. *United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotations and alterations omitted)).

Complaint alleges that Ludovico shared his post-tax compensation with Mattessich because part of that compensation constituted commission that was owed, or attributable, to Mattessich for accounts that Mattessich had transferred to Ludovico.[7] Defendants' contention that the Rule does not address the situation where "an employee gifts some arbitrary portion of what he or she gets to another" (Def. Reply 2), is, thus, beside the point. And to the extent Defendants raise red flags about the Rule's application in other contexts, the Court need not address those issues in this motion. *See, e.g., Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (reaffirming that a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of law as applied to the conduct of others" (quotation marks omitted)).

Further, Defendants' interpretation is inconsistent with the stated purpose of the Compensation Record Rule, which is to "allow securities regulators to quickly identify compensation trends and focus examinations." *Books and Records Requirements*, 2001 WL 1327088, at sec. III(E). The purpose of the Rule is thwarted to the extent that brokers can enter private agreements to share commission compensation that are not reflected on the broker-dealer's books and records.

Defendants next point to the Compensation Record Rule's rulemaking history to argue that if the SEC had wanted to prohibit commission-splitting,

---

[7] The Complaint's allegations are not that Ludovico cut checks to Mattessich with income he obtained from Cantor because they had a private agreement for Mattessich to paint Ludovico's house or mow his lawn.

11

then the five SEC rulemaking releases issued over seven years would have said so. (*See* Def. Br. 10-11). But the SEC concedes that commission-splitting is not *per se* prohibited (*see* Transcript of Aug. 30, 2018 Pre-Motion Conference (Dkt. #37) at 26:12-27:16), and that is not the violation with which the SEC has charged Defendants. On-the-books commission-splitting is permitted by both Cantor's internal systems and the Compensation Record Rule. Thus, it is of no moment that the rulemaking history does not address commission-splitting. Had Cantor's books and records reflected Mattessich's and Ludovico's commission-splitting scheme, then Cantor would not have violated the Compensation Record Rule.

Defendants' final contention on the primary violation element, that the Rule is vague because it did not put the industry on notice that it would apply to post-tax commission-sharing between brokers, is belied by the Rule's plain language, which, as noted above, does not contain any exclusions. Defendants claim that if the Compensation Record Rule "spelled out to broker-dealers" that commission-splitting must be recorded, then broker-dealers could have, *inter alia*, "issued compliance alerts, [and] amended internal policies." (Def. Br. 14). But the Complaint alleges that Cantor did just that: Cantor required its brokers to use its AE code system to obtain commission compensation so that the Firm could record such compensation (*see* Compl. ¶¶ 20, 22), and it expressly prohibited brokers from sharing a portion of their commission with others (*see id.* at ¶ 23).

### 2. The Complaint Alleges Defendants' Knowledge of the Violations

Turning to the second element of the aiding and abetting violation, the Court finds that the Complaint adequately alleges that Defendants had knowledge of Cantor's violations of the Compensation Record Rule. Specifically, the Complaint alleges that both Defendants were aware of Cantor's AE code system, which the Firm used to apportion and record commission payments (*see* Compl. ¶¶ 20, 29-30), and that Defendants secretly agreed to split commissions that were paid to Ludovico by Cantor, circumventing the AE code system (*see id.* at ¶¶ 30-32). Because Defendants knew that the AE code system reflected the commissions as paid to Ludovico, when in fact a portion of the commissions were transferred to Mattessich, Defendants knew that Cantor's compensation records were inaccurate. Such allegations suffice to show that Defendants had knowledge of Cantor's violations of the Compensation Record Rule. *Cf. Apuzzo*, 689 F.3d at 211 ("Apuzzo *knew* that the results from the transactions would be inaccurately reflected in URI's financial statements if the true structure of the transactions was not known to URI's auditor; and Apuzzo *knew* that URI's auditor was being misled." (emphases added) (quoting *SEC* v. *Apuzzo*, 758 F. Supp. 2d 136, 148 (D. Conn. 2010))).

Defendants argue that because commission-sharing is in and of itself a legal and accepted practice, doing so did not give Defendants "knowledge" of primary violations of the securities laws by Cantor. (*See* Def. Br. 16-17). But the Complaint alleges facts indicating that Defendants knew their conduct to

be wrongful. Specifically, the Complaint alleges that since 2006, Cantor's WSPs have expressly prohibited off-book commission-splitting. (*See* Compl. ¶ 23). The Complaint contains further allegations indicating that Defendants had notice that such conduct would cause Cantor to violate regulatory requirements. (*See id.* at ¶¶ 24-25). Both Defendants signed certifications attesting to their understanding that the purpose of the Firm's policies and procedures, including its policy against sharing commissions, was to ensure compliance with applicable regulatory requirements. (*Id.*).

Defendants also argue that they did not have knowledge of the specific SEC Rule that they caused Cantor to violate. In this regard, Defendants point out that "the Complaint does not allege that Ludovico was ever made aware of the [Compensation Record Rule's] passage[.]" (Def. Br. 17). However, to state a claim for aiding and abetting, the SEC need not allege that Defendants knew the specific books-and-records rule that they helped violate. The Compensation Record Rule itself contains no scienter requirement, *see SEC* v. *Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 610 (S.D.N.Y. 1993), and the aiding and abetting provision of the Exchange Act requires only that the aider and abettor "knowingly or recklessly provide[] substantial assistance to another person" who commits a violation, 15 U.S.C. § 78t(e). *Cf. SEC* v. *Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) ("Except in very rare instances, no area of the law not even the criminal law demands that a defendant have thought his actions were illegal. A knowledge of what one is doing and the consequences of those actions suffices.").

### 3. The Complaint Alleges That Defendants Substantially Assisted the Achievement of the Primary Violations

To satisfy the substantial assistance component of an aiding and abetting violation, the SEC must show that a defendant "in some sort associated himself with the venture, that [he] participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *Apuzzo*, 689 F.3d at 212 (internal quotations and alterations omitted). The SEC is not required to plead that the aider and abettor proximately caused the primary securities law violation. *Id.* at 213.

The Complaint alleges that Mattessich and Ludovico agreed to engage in a compensation-splitting scheme and that they participated in the scheme when Ludovico paid and Mattessich accepted, on a monthly basis, a portion of the commissions Ludovico received on certain accounts. The allegations of Defendants' active steps to implement and carry out the scheme include Ludovico's writing of commission checks to Mattessich and Mattessich's acceptance of such checks totaling over $58,200. (*See* Compl. ¶¶ 32, 34). Those steps, in combination with their failure to report such commission-splitting scheme to Cantor, are sufficient to support an allegation of substantial assistance. *See, e.g., Drexel Burnham Lambert*, 837 F. Supp. at 610 (holding that defendants aided and abetted broker-dealer's violation of books and records rule under Section 17(a) of the Exchange Act and Rules 17a-3 and 17a-4 promulgated thereunder where they failed to record beneficial interests in securities purchased through the broker-dealer); *In re Howard A. Rubin*, SEC Release No. 27828, 1990 WL 1102975, at *2 (Mar. 20, 1990) (Settled

Administrative Order) (finding that individual aided and abetted Rule 17a-3 where he "did not record, and caused not to have been recorded, on a blotter or other record, any information" concerning a transaction by a broker-dealer).

Defendants' corollary argument — that the SEC was also required to allege recklessness here because recklessness is a statutory element for an aiding-and-abetting claim under Section 20(e) of the Exchange Act (*see* Def. Br. 24) — is incorrect. Section 20(e) of the Exchange Act states that one can be held liable for aiding and abetting if that person "knowingly *or* recklessly provides substantial assistance." 15 U.S.C. § 78t(e) (emphasis added). Thus, the SEC can allege either knowledge or recklessness; it need not allege both. Given that the SEC has adequately pleaded that Defendants knowingly provided substantial assistance, the SEC's failure to plead separately that Defendants were reckless does not warrant dismissal of its Complaint.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motion at docket entry 35. On or before September 23, 2019, the parties shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

SO ORDERED.

Dated: September 6, 2019
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge