**DEFEUNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **18 Civ. 05884 (KPF)** |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| -against- | |
| **ADAM MATTESSICH,** | |
| Defendant. | |

**DEFENDANT ADAM MATTESSICH'S OPPOSITION TO PLAINTIFF SEC'S MOTION FOR SUMMARY JUDGMENT**

Denis Patrick Kelleher
Noam Greenspan
Talkin, Muccigrosso & Roberts LLP
40 Exchange Place, 18th Floor
New York, NY 10005
(212) 242-0007

*Attorneys for Adam Mattessich*

## **TABLE OF CONTENTS**

Preliminary Statement ................................................................................................ 1

Statement of Facts .................................................................................................... 4

Standard of Review ................................................................................................. 15

Argument ............................................................................................................... 15

   A.   The SEC Cannot Demonstrate A Primary Violation Of The Compensation Records Rule By Cantor ........................................................................................... 16

   B.   Mattessich Did Not Have Knowledge Of A Violation By Cantor ................................. 18

   C.   Mattessich Did Not Substantially Assist The Commission Of A Primary Violation ........................................................................................................ 24

Conclusion ............................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ........................................................ 19

*Gemmink v. Jay Peak Inc.*, 807 F.3d 46 (2d Cir. 2015) ................................................................ 15

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) ......................... 24

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107 (2d Cir. 2017) ......................... 15

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ................................................................... 16, 24, 25

*SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ............... 22

*SEC v. DiBella*, 587 F.3d 553 (2d Cir. 2009) ........................................................................ 16, 19

*SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 609-10 (S.D.N.Y. 1993).................. 23

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980)........................................ 19, 23

*SEC v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 1375656, (S.D.N.Y. March 26, 2019) ................................................................................................................................................ 15

*SEC v. Mattessich*, 407 F. Supp. 3d 264, 272 (S.D.N.Y. 2019) ............................................. 19-21

*SEC v. Paulsen,* 18 Civ. 6718, 2020 U.S. Dist. LEXIS 68845, at *19 (S.D.N.Y. Apr. 18, 2020) 22

*Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) .................................................. 15

*United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) ....................................................... 19

*United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938).......................................................... 24


**Statutes**

15 U.S.C. §§78o........................................................................................................................... 1


**Rules**

Fed. R. Civ. P. § 56.................................................................................................................... 15

Local Civil Rule 56.1 ................................................................................................................... 1

**<u>Regulations</u>**

17 C.F.R. § 240.17a-3 ................................................................................................. 1, 25

**<u>Other Authorities</u>**

Matthew E. Fishbein, *Why Individuals Aren't Prosecuted for Conduct Companies Admit*, N.Y.
L.J. (Sept. 19, 2014) ................................................................................................ 18

Defendant Adam Mattessich respectfully submits this memorandum of law, together with his Local Civil Rule 56.1 Responsive Statement ("Resp. 56.1 Stmt.") and the Declaration of Noam Greenspan ("Greenspan Decl.") and attached exhibits in opposition to the motion of Plaintiff Securities and Exchange Commission ("SEC") for summary judgment as to liability against Mattessich.  For the reasons stated below, the Court should deny the motion.

## PRELIMINARY STATEMENT

On June 29, 2018, the SEC charged Mattessich with aiding and abetting an alleged violation of the Compensation Record Rule, Section 17a-3(a)(19) of the Securities Exchange Act ("Exchange Act"), by his former employer, Cantor Fitzgerald & Co. ("Cantor"), by entering into an informal commission-splitting arrangement with another Cantor trader, Joseph Ludovico, whereby Ludovico would remit a portion of the commission compensation Cantor paid Ludovico to Mattessich by check to compensate Mattessich for work done to help service accounts that the two covered jointly ("Ludovico-Mattessich Arrangement").  The SEC now moves for summary judgment as to liability against Mattessich, which would allow the Court to enjoin Mattessich from future violations and to impose a monetary penalty.  Additionally, under the Exchange Act, the SEC would then likely issue its own follow-on administrative order barring or suspending Mattessich from the securities industry for a period of months or years under Securities Exchange Act §§15(b)(4)(E) and 15(b)(6)(A)(i), 15 U.S.C. §§78o(b)(4)(E) and 78o(b)(6)(A)(i). A grant of the SEC's motion would thus almost certainly cost Mattessich his current job as a registered investment advisor and perhaps end his career in the securities industry, all without him having an opportunity to present his case to a jury.

The SEC has acknowledged that this case does not involve fraud.  Rather, the SEC has charged Mattessich exclusively with aiding and abetting Cantor's violation of the Compensation

Records Rule, which has never before been prosecuted in Federal Court and thus presents unique questions regarding the evidence necessary to prove liability. The SEC must prove by a preponderance of the evidence that (1) Cantor committed a primary violation of the Compensation Records Rule; (2) that Mattessich had knowledge of Cantor's violation of the Compensation Records Rule; and (3) that Mattessich substantially assisted Cantor's violation of the Compensation Records Rule. Because there are material questions of fact with regard to each of these three elements, any one of which defeats the SEC's application, the motion should be dismissed.

Initially, the SEC must prove that Cantor committed a primary violation; that is, that Cantor's books and records violated the Compensation Records Rule. Curiously, the SEC has never produced or cited to a single document or record it claims is violative of the Rule. Instead, the SEC now relies primarily on Mattessich's testimony, which the SEC incorrectly asserts demonstrates that he reviewed inaccurate or incomplete "Cantor records" relating to commission compensation. The testimony regarding these supposed "records" clearly establishes that the documents in question, which documents the SEC has also not produced or identified, were documents Mattessich specially created for the limited purpose of determining year-end bonuses and were not part of the firm's record-keeping procedures. Furthermore, the evidence establishes that these "records" related to trading activity that occurred no later than 2011, and likely several years earlier, and bear no relevance to the trading activity, and resulting commission compensation, in this case, which took place exclusively in 2013. Additionally, the SEC relies on the dubious testimony of Cantor's chief compliance officer that in 2013 or 2014 he believed that Cantor had committed a books and records rule violation despite the fact that he did not provide any basis for this belief and that this testimony is contrary to the officer's nearly

complete inaction to investigate, rectify, or report this supposed violation and testimony regarding statements made by various other high-ranking executives that they did not believe that Cantor had committed a violation, as well as the fact that the compliance officer seems not to have shared this supposed view with anyone at Cantor.

Additionally, the SEC cannot prove that Mattessich had knowledge of Cantor's alleged violation of the Compensation Records Rule. The SEC's argument to the contrary is based on misstatements of both law and fact. The SEC asserts that it need only prove that Mattessich had "knowledge of the circumstances that constitute the primary violation," but this is not the legal standard. Rather, the SEC must prove not only that Mattessich knew the underlying facts of what he was doing but also the consequences of those actions. In an effort to meet this standard, the SEC continues to assert the false and baseless narrative that Mattessich and Ludovico engaged in a secret scheme to circumvent Cantor's prohibition on Mattessich receiving commission compensation for the sales he transacted. Instead, the record demonstrates that Mattessich was both generally permitted under Cantor policy to receive commission compensation and specifically received permission from Cantor's CEO to service accounts and receive resulting compensation from transactions on behalf of clients. The only thing that prevented Mattessich from doing so through Cantor's Account Executive ("AE") code system was an administrative problem whereby his personal AE code had been hard-coded to receive erroneous fees—for which Mattessich was not actually responsible—generated by transactions conducted by the International Equities Desk (the "Desk"), which would have been subtracted from his compensation.

Mattessich therefore followed what he understood to be the directive from the CEO and entered into informal commission-sharing arrangements with Ludovico and one other trader on

the Desk, which arrangements were conducted very openly.  Mattessich even informed his supervisor about his arrangement with Ludovico.  The record thus demonstrates that Mattessich believed, and reasonably so, that his arrangement with Ludovico was a firm-sanctioned and appropriate means of receiving compensation to which he was entitled, and he had no reason to suspect that the arrangement was in any way wrongful, let alone could subject himself and the firm to liability for a books and records violations.  There is thus no evidence that Mattessich knew (or should have known) that a consequence of his actions was that Cantor would commit a primary violation.

Finally, the SEC cannot meet its burden to show that Mattessich substantially assisted Cantor's primary violation.  The Compensation Records Rule allows registered entities, like Cantor, to meet the Rule's requirements by promptly producing the information called for by the Rule upon the request of the SEC, in lieu of keeping this information in its books and records.  Cantor's former Chief Operating Officer ("COO") of the Equities Division testified that Cantor could have collected copies of the checks Ludovico wrote to Mattessich in 2013 and used this information to correct the books and records, thereby avoiding a violation of the Compensation Records Rule.  Furthermore, Mattessich disclosed the arrangement to his supervisor several years prior to 2013, and Cantor chose not to act.  Mattessich therefore played only a minimal role in any books and records violation committed by Cantor and did not associate himself with Cantor's violation as something he wished to bring about.

## STATEMENT OF FACTS

Mattessich left Cantor in the summer of 2001 but returned to the firm after the terrorist attacks of September 11, 2001 ("9/11") to help rebuild the firm.  (56.1 Resp. Stmt. ¶51.)  Prior to

2001, Cantor's offices had been located in the World Trade Center, and the majority of its workforce had perished in 9/11.  (*Id.* ¶52.)

Cantor used a system of personal identifying numbers assigned to traders called AE codes, which were recorded on all actions that looked like transactions, including transactions that did not generate commissions, and were entered by the trader[1] on each such action.  (*Id.* ¶13 Response.)  AE codes were a method the firm used to track some, but not all, of the commission compensation earned by traders.  *Id.*

Mattessich was authorized to use his AE code to receive commission compensation directly from Cantor for sales he transacted, but was prevented from doing so by an administrative issue wherein his AE code had been hard coded to receive fees for international trades that he did not transact and/or for which he was not responsible.  (*Id.* ¶¶ 69-77.)  International transactions involved certain types of execution and clearing fees that were not automatically assigned to the trader receiving compensation for the trade and were therefore problematic from an accounting perspective. (*Id.* ¶70.)  For example, if a US-based customer wanted to buy a Canadian security, that transaction would have to be conducted through Cantor Canada, which was a separate legal entity, on a Canadian stock exchange in Canadian dollars.  (*Id.* ¶71.)  Because the Cantor customer paid in US dollars, a currency conversion was required.  (*Id.* ¶72.)  There would then be execution fees charged by the Canadian stock exchange for completing the transaction.  (*Id.* ¶73.)  Finally, once the shares were purchased, they would need

---

[1] Within the Equities Division were "sales traders," whose primary responsibility was to service customer accounts, and "execution traders," who were primarily responsible for assisting the sales traders by executing trades.  We use the term "trader" to refer to both sales traders and execution traders.  In or about 2004, Mattessich and Ludovico were both execution traders (and not sales traders), but they had "hybrid" responsibilities, executing trades for sales traders on those sales traders' accounts and servicing their own accounts, thereby generating commission revenues for the firm and entitling themselves to commission compensation.  (*Id.* ¶68.)

to be moved to a US clearing account, such as Depository Trust Corporation ("DTC"), to settle the transaction.  (*Id.* ¶74.)  Because Cantor's system required an AE code for every transaction, Mattessich's AE code had been assigned and his account was acting as a repository for many of the above-described fees from international transactions—even on transactions he played no role in—though he was not actually responsible for paying the fees.  (*Id.* ¶75.)  These erroneous fees were not a problem as long as Mattessich's AE code was not assigned to positive commission revenue because there was no commission compensation from which to subtract the fees, and the accounting department knew to disregard them; however, had Mattessich's account been credited with any commission compensation, the erroneous fees would have automatically been deducted, and he would have been undercompensated or even received no compensation at all.  (*Id.* ¶76.)

In late 2001 or early 2002, Mattessich was approached by an acquaintance of his who was a trader at a Cantor client named Smith Capital Management ("Smith").  (*Id.* ¶53.)  The Cantor trader who had previously serviced the Smith account, a friend of Mattessich's, had perished in 9/11, and Smith wanted to do business specifically with Cantor and Mattessich.  (*Id.* ¶54.)  Mattessich approached his direct supervisor, Keith Rance, the head of the Desk at the time, and asked for permission to service the Smith account.  (*Id.* ¶55.)  Rance had no objection to Mattessich servicing the Smith account but did not believe himself to have the power to authorize Mattessich to receive the commission compensation that would be generated by Mattessich's coverage of the Smith account, so he suggested that Mattessich discuss the matter with the Cantor's chief executive officer ("CEO"), Phil Marber.  (*Id.* ¶56.)

Mattessich requested permission from Marber to service the Smith account and receive commission compensation payouts for this work, and Marber granted Mattessich's request.  (*Id.* ¶57.)  Mattessich then attempted to explain the erroneous fee issue that prevented him from

obtaining proper commission compensation directly through his AE code.  (*Id.* ¶58.)  Before Mattessich could finish, however, Marber cut Mattessich off, told him to service the account and partner with a sales trader to use that trader's AE code to complete the transactions on behalf of Smith, and kicked Mattessich out of his office.  (*Id.* ¶59.)

Mattessich returned to the trading desk and relayed his conversation with Marber to Rance, at which point Jake Schrader, a sales trader on the Desk, overheard, and, after an ensuing one-on-one conversation, Schrader offered to let Mattessich use Schrader's AE code on Smith transactions and to convey the accumulated after-tax commission compensation generated by the Smith account to Mattessich via personal check ("Schrader-Mattessich Arrangement").  (*Id.* ¶60.)  Mattessich thereafter commenced openly handling Smith business, including broadcasting transaction negotiations on behalf of Smith over a device called the "hoot," which would broadcast to all of Cantor's offices in the US to ensure that other traders were aware of the development of large transactions and could participate.  (*Id.* ¶61.)

The payments Schrader made to Mattessich were not done in a secretive or furtive manner. (*Id.* ¶62.)  Schrader would hand checks to Mattessich in full view of anyone on the desk, and Mattessich would very publicly cover the Smith account.  (*Id.*)  Schrader knew with certainty that at least David Pennella, another trader on the Desk, was aware of the payments that Schrader was making to Mattessich and believed that many others likely were as well.  (*Id.* ¶63.)

The Commission Compensation Arrangement Between Mattessich and Ludovico

Prior to 2004, Mattessich had serviced several Canadian client accounts, which did not at that point accrue any commission revenue to Cantor because they were executing transactions primarily or entirely in Canada and not the United States, and Mattessich brought in Jay Ludovico, another trader, to assist him in servicing these clients.  (*Id.* ¶64.)  Over time, Ludovico

developed his own relationships with some of the Canadian brokers, and Ludovico convinced

them to use Cantor to execute an increasing number of transactions in the United States,

generating commission revenue for Cantor and entitling the trader servicing the accounts to

commission compensation.  (*Id.* ¶65.)  In or about 2004, the Canadian accounts were assigned

Ludovico's AE code.  (*Id.* ¶65.)  Ludovico and Mattessich serviced the Canadian accounts

together, and the two therefore decided that Ludovico would make payments to Mattessich to

compensate Mattessich for the work he did on the accounts, in similar fashion to the Schrader-

Mattessich Arrangement.  (*Id.* ¶67.)

Mattessich-Ludovico Commission Splitting Arrangement

Beginning in or around 2004 and continuing until 2013, Ludovico would pay Mattessich

a portion of his commission compensation by personal check approximately every month.  (*Id.*

¶78.)  There was no predetermined amount or percentage Ludovico would pay, and Ludovico

had total discretion to pay Mattessich whatever amount Ludovico thought fair to compensate

Mattessich for the work Mattessich did on the accounts they serviced together.  (*Id.* ¶79.)

Typically, Ludovico paid Mattessich half of his commission compensation.  (*Id.* ¶80.)  Over

time, the number of accounts Mattessich and Ludovico jointly serviced, and, consequently, the

number of accounts for which Ludovico compensated Mattessich, expanded.  (*Id.* ¶81.)

At some point, Ludovico approached Mattessich and expressed a desire to pay Pennella

part of the commission compensation he had previously been paying Mattessich because of the

work that Pennella had begun doing helping to service their accounts, and Mattessich agreed.

(*Id.* ¶82.)  At no time did Mattessich and Ludovico have a disagreement on the amount

Ludovico remitted to Mattessich.  (*Id.* ¶83.)

Prior to 2012, Ludovico asked Mattessich to ensure that Cantor management knew that Ludovico was paying part of his commission compensation to Mattessich because he was concerned that otherwise his annual bonus might be affected.  (*Id.* ¶84.)  Mattessich went to his direct supervisor, Elon Spar, CEO of Cantor Europe and Asia, and, on at least two occasions, informed Spar that Ludovico was paying a portion of his commission compensation to Mattessich and that this needed to be taken into account in determining Ludovico's year-end bonus.  (*Id.* ¶85.)  Spar never told Mattessich to discontinue the arrangement.  (*Id.* ¶86.)  Spar played a role in recommending bonuses for the international desk from 2004 to 2011 so these conversations would have taken place during that time span.  (*Id.* ¶87.)  Mattessich reported back to Ludovico that he had complied with Ludovico's request and informed management that Ludovico was paying a portion of his commission compensation to Mattessich.  (*Id.* ¶88.)

Cantor's Response to the Ludovico-Mattessich Arrangement

In or about 2013, Ludovico disclosed the commission compensation arrangement with Mattessich in the process of giving testimony in a separate FINRA matter, and this disclosure was brought to the attention of the compliance department.  (*Id.* ¶89.)  When Gary Distell, Cantor's head of compliance, learned of the Ludovico-Mattessich Arrangement, the only step he took to investigate the nature of the arrangement was to speak to Mattessich, choosing not even to speak to Ludovico or Pennella, or to obtain any documents or to investigate whether similar arrangements existed elsewhere in the firm.  (*Id.* ¶90.)

Distell then spoke to Ron Wexler ("Distell-Wexler Conversation"), COO of Equities, informing Wexler that he had learned of the Ludovico-Mattessich Arrangement and that he was going to write an email memo to the Equities Division mandating that all arrangements to share compensation between employees be discussed with Wexler.  (*Id.* ¶91.)  Distell did not reference

any policies or procedures or tell Wexler that he thought that the Ludovico-Mattessich Arrangement violated any Cantor policy. (*Id.* ¶¶92-93.) Nor did Distell ever express to Wexler any concern that the Ludovico-Mattessich Arrangement had caused Cantor to violate its books and records duties or discuss possible ways to ameliorate any such concern. (*Id.* ¶94.)[2]

On January 14, 2014, Distell emailed a memo ("Distell Memo") to the Equities Division, stating that "any compensation arrangement . . . be discussed with Ron Wexler"; that "it is not permissible for one employee to pay another employee directly in connection with any Cantor activity"; and that "[t]here is no grandfather provision." (*Id.* ¶95.) All of the members of the Equities Division who have testified in this case—Mattessich, Ludovico, Penella, and Wexler—believed the Distell Memo to have been a new policy in January 2014 and therefore did not believe that the Ludovico-Mattessich Arrangement had been a violation of any Cantor policy or procedure. (*Id.* ¶96.) None of these witnesses believed in January 2014 that the Ludovico-Mattessich Arrangement caused Cantor to violate its books and records duties. (*Id.* ¶97.)

Prior to 2014, Cantor had never provided traders in the Equities Division or their supervisors any compliance training regarding the firm's books and records obligations. (*Id.* ¶98.) Nevertheless, Mattessich attempted to familiarized himself with all of Cantor's policies and procedures by reading the entire employee handbook and by endeavoring to read the firm's Written Supervisory Procedures ("WSPs") at least once in their entirety, despite the fact that they ran

---

[2] Either during the Distell Conversation or around the same time, Distell also informed Wexler that there was an administrative issue with Mattessich's AE code which prevented Mattessich from receiving commission compensation directly from Cantor. (56.1 Resp. Stmt. ¶ 91.) Wexler was eventually asked to investigate and resolve this administrative issue with Mattessich's AE code so that Mattessich could receive future commission compensation directly through the AE system. *Id.* Wexler worked with Dan Windram, the head of technology for the Equities Division, to design a technological fix to stop the erroneous fees from being associated with Mattessich's AE code. *Id.* After the issue was fixed, Mattessich documented trades through his AE code and received commission compensation directly from Cantor. *Id.*

hundreds of pages.  (*Id.* ¶99.)  Neither Ludovico nor Mattessich nor Pennella was ever told that his off-book commission splitting violated any Cantor policies or procedures or was punished in any way by Cantor.  (*Id.* ¶100.)

Neither Distell nor anyone else in the compliance department took any steps to amend Cantor's books and records to reflect the payments made by Ludovico to Mattessich, (*Id.* ¶101), despite the fact that it would have been possible in 2014 to reflect the payments made by Ludovico to Mattessich by using copies of the checks Ludovico wrote and existing commission reports, payroll records, and, if necessary, additional information from Mattessich and Ludovico. (*Id.* ¶¶102-103.)  Neither Distell nor anyone else ever asked Wexler whether it was possible to rebook the trades or in some other way amend the firm's records.  (*Id.* ¶104.)  Wexler took no action to rebook any of the trades himself because he did not believe that these trades had created a problem with Cantor's books and records, and Distell never told him otherwise.  (*Id.* ¶105.)

After 2013, Mattessich was promoted to global Co-Head of the Equities Division and later Global COO of the Equities Division.  (*Id.* ¶106.)  In 2016, Ludovico was promoted and briefly served as Head of the Desk.  (*Id.* ¶107)

In late 2017, Ludovico offered to resign as a result of the SEC's investigation, but his offer was rejected by Cantor's Head of the Equities Division, Pascal Bandelier, and by Cantor's CEO, Shawn Matthews, who told Ludovico that he "was crazy" to offer his resignation and that he was a valued employee.  (*Id.* ¶108.)  In or about early 2018, Bandelier told Mattessich and Pennella that the Ludovico-Mattessich Arrangement had not been a violation of firm policy and that even though the SEC was investigating the arrangement, he and others in management did not think that either Mattessich or the firm had committed any transgression.  (*Id.* ¶109.)

The "Pooling" of Commission Compensation by Multiple Traders

In 2013, Wexler, Mattessich, and Distell were aware of a number of instances in which traders in the Equities Division "pooled" their commission compensation and agreed to split the commission compensation outside of the AE code system.  (*Id.* ¶¶ 110, 117.)  In each instance, all of the trades transacted by the entire group of traders would be entered into Cantor's system under the AE code of one of the traders, and subsequently that trader would facilitate a split of the pool of commission compensation money to the other traders.  (*Id.* ¶111.)

Andy Sale was a sales trader and a top revenue producer in the Equities Division as well as head of Cantor's Connecticut office with supervisory responsibility for all Connecticut personnel.  (*Id.* ¶112.)  Over a period of months or years, he worked together with his brother and another, more junior trader (together "Sale Group") to collectively service accounts.  *Id.* All of the commission revenue generated for Cantor by the Sale Group and all of the commission compensation to be paid to the Sale Group was booked in Cantor's systems under Andy Sale's AE code, and, conversely, none of it was booked to any AE code belonging to either of the other two, even though each individual had his own AE code.  *Id.*  At the end of each month, Andy Sale would send instructions by email to Wexler and/or the Accounts Payable Department reflecting how the Sale Group's commission compensation should be split, and the Accounts Payable Department would issue commission compensation checks to each of the three traders in the Sale Group in accordance with these instructions.  *Id.*

Peter Cecchinni was the Head of the Equity Derivatives Options Desk ("Options Desk") in the Equities Division in 2013, essentially the same level as Mattessich, and would later become a Co-Head of Equities along with Mattessich and one other individual.  (*Id.* ¶ 113.)  All of the commission revenue generated for Cantor by the Options Desk and all of the commission

compensation to be paid to the Options Desk was booked in Cantor's systems under Cecchinni's AE code, and, conversely, none of it was booked to an AE code associated with any other members of the Options Desk, even though each member had an individual AE code. *Id.* At the end of each month, Cecchinni would send instructions by email to Wexler and/or the Accounts Payable Department reflecting how the Options Desk's commission compensation should be split, and the Accounts Payable Department would issue commission compensation checks to each trader on the Options Desk in accordance with these instructions. *Id.*

Sean Goodrich was a top sales trader in the Equities Division, and, for a period of time, the US Head of Sales Trading, with supervisory duties over all US sales traders. (*Id.* ¶ 114.) At or around 2012 or 2013, Goodrich brought to Cantor a senior sales trader named Jason Capone, who brought with him several clients to Cantor. *Id.* Capone and Goodrich had a set arrangement from the time that Capone arrived at Cantor whereby they would service accounts together and book all of their trades under Goodrich's AE code and then split the commission compensation they generated according to a percentage split that was the same every month. *Id.* The Accounts Payable Department was aware of the terms of the Goodrich-Capone compensation arrangements and would issue each of them a commission compensation check in accordance with this arrangement at the end of each month. *Id.*

Dave Kravette was a senior trader in the Equities Division who worked with one or more junior traders (together "Kravette Group") to collectively service Kravette's clients. (*Id.* ¶115.) All of the trades executed by the Kravette Group would be booked to Dave Kravette's AE code. *Id.* At the end of each month, a set portion of Kravette's commission compensation would be withheld by the firm and set aside into a bonus pool. *Id.* At the end of the year, this bonus pool would be paid out to the junior traders in the Kravette Group. *Id.* The withholdings

13

from Kravette's commission compensation and the bonuses paid to the junior traders in the Kravette Group were not reflected in the AE code system. *Id.* Several other senior traders in the Equities Division had similar arrangements to the Kravette Group, whereby one or more junior traders would assist in the servicing of client accounts, all of the transactions executed by the group would be booked under the senior sales trader's AE code, and the junior traders would later be compensated from money set aside from the commission compensation attributed by the AE code system to the senior sales trader. (*Id.* ¶116.)

Distell and Wexler discussed the various "pooling" arrangements, which paid commission compensation to traders outside of the AE system around the time that Distell sent out the Distell Memo. (*Id.* ¶117.) Wexler was told that the compliance department had determined that the "pooling" arrangements did not violate any Cantor policy or procedure, including the policy stated in the Distell Memo, and these arrangements were allowed to continue and did continue until at least 2018, when Wexler left the firm. (*Id.* ¶¶118-19.)

If a regulator like the SEC or FINRA had asked for Cantor's commission compensation records, they may or may not have seen the commission splits from the "pooling" arrangements, depending on which set of records they were given. (*Id.* ¶120.) So-called "gross sheets," generated by the AE system, would show all of the commission compensation from "pooling" arrangements flowing to the senior salesperson and would not contain any information regarding the portion of the pooled commission compensation that was actually paid to other members of the commission "pooling" group. (*Id.* ¶ 121.) Worksheets used to process payroll would show the percentage splits and the precise amounts paid to the more junior members of the "pooling" groups, but, even these records would not show which trader executed which

trade, only the percentage of the commission pool and the monthly commission compensation each trader received.  (*Id.* ¶ 122.)

## STANDARD OF REVIEW

A motion for summary judgment "may not be granted unless all of the submissions taken together 'show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *SEC v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 1375656, at *3 (S.D.N.Y. March 26, 2019) (quoting Fed. R. Civ. P. § 56(a)). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question.  *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015).  In deciding a summary judgment motion, the Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (citation omitted).

## ARGUMENT

"In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove:  '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 556 (2d Cir. 2009)).  Because there exist disputes of material fact with regard to each of these elements (though any one would be sufficient), the SEC's motion fails.

**A.  The SEC Cannot Demonstrate A Primary Violation Of The Compensation Records Rule By Cantor**

While alleging that "[t]here is no genuine dispute that . . . Cantor violated the Compensation Records Rule" and that "Cantor's records were inaccurate," (SEC Mot. at 10), the SEC has failed entirely to produce or cite to a single Cantor record, or other document that it alleges to be inaccurate.  Instead, the SEC relies upon:  (1) Mattessich's testimony regarding worksheets (which the SEC has also not produced) that could not have been part of the firm's books and records and were from a time period outside of the Relevant Period; and (2) the uncorroborated and highly disputed testimony of Distell.  Far from undisputed, the evidence, or lack thereof, suggests that the SEC cannot prove that Cantor committed a primary violation.

The SEC alleges that "Cantor's records show that the relevant commission compensation was attributable to Ludovico only and failed to reflect that any part of it was attributable to Mattessich." (*Id.* at 11.)  But the SEC has apparently not even procured these allegedly inaccurate records or even identified which documents comprise "Cantor's records" or where they reside.  Instead, the SEC cites as its primary evidence supporting this statement testimony Mattessich gave in both his 2019 deposition and 2017 investigative testimony that on one or more occasions in advance of recommending annual bonuses for members of the Desk, he prepared a worksheet with figures on it from the accounting group and alerted his supervisor, Spar, that the data reflecting Ludovico's commission compensation on the spreadsheet overstated the amount Ludovico had actually received because Ludovico paid Mattessich a portion of that commission compensation.  (56.1 Resp. Stmt. ¶43.)  Without explanation or evidence, the SEC seems to be asking the Court to assume (improperly on summary judgment) that the spreadsheet Mattessich referred to was a "Cantor's record" relevant to this case or otherwise reflected the information in those records.  However, the spreadsheet Mattessich referred to cannot be a

"Cantor's record" of Ludovico's (or Mattessich's) total compensation because it was prepared in advance of and to facilitate the process of awarding Ludovico his annual bonus so his bonus compensation would not be recorded.  No witness testified and no document showed that Mattessich's spreadsheet was a "Cantor record" of the compensation of any member of the Desk or that the information in Mattessich's spreadsheet was used in any other firm record.

Additionally, Spar testified that he was Mattessich's supervisor from 2004 to 2011 and that after the 2010 or 2011 bonus was paid, he no longer participated in the process of determining bonuses for the Desk.  (*Id.* ¶87.)  This is uncontroverted evidence that the spreadsheets about which Mattessich testified were not relevant to any trade or commission from 2013, the Relevant Period according to the SEC's Complaint and its motion.

The only other evidence cited by the SEC in support of its assertions that Cantor's records were inaccurate is a single statement from Distell that he believed that Cantor had committed a books and records violation.  (*Id.* ¶43.)  But Distell did not testify as to what, if any, records he reviewed to reach this conclusion, or otherwise in any way regarding the basis for this conclusion.  Furthermore, this account is totally uncorroborated by any other evidence and is inconsistent with Distell's actions and the testimony of others.  Distell's testimony is substantially undercut by the fact that:  (1) he apparently did not disclose his asserted view to anyone, and certainly not to Mattessich and Wexler, the two people most involved in correcting any possible problem, (*id.* ¶94); (2) he chose not to conduct a meaningful investigation into the nature of the commission splitting or to see if others were engaging in a similar practice, (*id.* ¶90); (3) he did not disclose the conduct to any regulator (*id.* ¶47 Response); (4) he did not attempt to correct the books and records, despite the fact that Wexler testified that Cantor could have done so, (*id.* ¶¶101-03); (5) Mattessich and Ludovico were never told that their

arrangement violated any firm policy, and they were never sanctioned by the firm in any way,
(*id.* ¶100); and (6) multiple members of Cantor management did not think that the firm had a
problem with its records, including Wexler and Bandalier.[3]  (*Id.* ¶¶108-09.)  Additionally, Distell
was aware of and his compliance department approved of the practice of pooling trades and
commission compensation under one AE code, described above, which resulted in commission
splits without attributing the splits to specific trades, despite the fact that he now claims that the
sole reason he could not fix the records relating to Mattessich was because the commission
compensation could not be attributed to specific trades.  (*Id.* ¶101).  For all of these reasons,
Distell's testimony suffers from a lack of credibility and cannot be relied upon for summary
judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)
("Credibility determinations, the weighing of the evidence, and the drawing of legitimate
inferences from the facts are jury functions, not those of a judge.").

## B.  Mattessich Did Not Have Knowledge Of A Violation By Cantor

Even if the SEC could demonstrate a primary violation by Cantor, and it has failed to do
so, there are substantial factual disputes regarding whether Mattessich had knowledge of
Cantor's alleged violation.  The SEC misstates the legal scienter standard for aiding and abetting

---

[3] During the March 18, 2019 pre-motion conference, the Court inquired as to whether Cantor's
settlement, on a no-admit-no-deny basis, with the SEC was proof that it had committed a primary
violation.  We note that the SEC has not relied on Cantor's settlement in its motion papers.
Furthermore, as noted, testimony in this case indicated that members of management believed
that Cantor had not committed a violation.  Various practitioners and scholars have opined that
companies may deem it advisable to settle actions brought by prosecutors and regulators even if
convinced that their company has not engaged in wrongdoing.  *See*, *e.g.*, Matthew E.
Fishbein, *Why Individuals Aren't Prosecuted for Conduct Companies Admit*, N.Y. L.J. (Sept. 19,
2014) ("Prosecutors' increasing appreciation of the leverage they enjoy over corporate entities,
coupled with companies' determinations that a 'bad' settlement is likely better than a 'good'
litigation, has resulted in a greater number of corporate settlements in cases where the
government would be unlikely to prevail if forced to prove its case in court.").

liability, stating that it need only prove that Mattessich knew "the circumstances that constitute the primary violation," or, stated another way, "the facts giving rise to Cantor's violation."  (SEC Mot. at 11.)  The law requires more.  In order to succeed, the SEC must show that there is no material factual dispute as to whether Mattessich "'consciously assisted the commission of the specific'" rule violation charged, *DiBella*, 587 F.3d at 566 (quoting *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008)), and "understood the ***consequences*** of [his] actions."  *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) (emphasis added).

The SEC places substantial reliance on the Court's opinion denying the defendant's motion to dismiss.  But almost all of the alleged facts that the Court (properly) relied upon have since been refuted.  *First,* the Court credited the SEC's allegation that the AE code system was the exclusive means by which "the Firm . . . apportion[ed] and record[ed] commission payments."  *SEC v. Mattessich*, 407 F. Supp. 3d 264, 272 (S.D.N.Y. 2019); *see also* (SEC Mot. at 11.)  But, as described above, not all commission compensation was distributed or documented in this manner.  During the Relevant Period, it was acceptable practice for traders to pool their commissions using the AE code of only the group's senior trader and split the commission compensation outside the AE code system.

*Second*, the Court relied upon the SEC's false assertion that Mattessich and Ludovico "secretly agreed to split commissions [in order to] circumvent[] the AE code system."  The evidence demonstrates that the agreement between Mattessich and Ludovico was neither a secret nor an attempt to circumvent the AE code system.  There was, quite simply, no reason for Mattessich to hide anything from Cantor.  Mattessich was authorized to receive commission compensation and received specific permission from Cantor's CEO to cover accounts and

receive the resulting compensation.[4]  (56.1 Resp. Stmt. ¶¶57, 69.)  The only thing that prevented

him from doing so through the AE system was an administrative problem whereby his AE code

was being attributed fees for which he was not responsible and which would have reduced or

eliminated his compensation.  (*Id.* ¶¶70-77.)  As a result, Mattessich entered into arrangements,

first with Schrader and later with Ludovico, to facilitate his earning the commission

compensation to which he was entitled.  He then went about publicly servicing his accounts; and,

as Schrader, Pennella, Ludovico, and Mattessich all testified, they were open and notorious about

their arrangements—writing checks to each other in plain view on the desk—and believed that

their commission splitting was widely known.  (*Id.* ¶¶61-63.)  On one or more occasions,

Mattessich also informed his boss, Spar, about the arrangement, which eventually came to the

attention of the compliance group because Ludovico disclosed it in testimony in a separate

matter in 2013.  (*Id.* ¶¶84-89.)  There is no evidence in the record to support the SEC's false

narrative of a secret scheme.  Mattessich had no reason to hide the compensation arrangement

because he considered it to be both authorized and acceptable, and he therefore did ***not*** "kn[o]w

his conduct to be wrongful."  *Mattessich*, 407 F. Supp. at 272.

  *Third*, whether Mattessich "knew that Cantor's compensation records were inaccurate,"

*id.*, remains at least a disputed question of fact.  In support of this argument, the SEC makes a

series of factual assertions that are either disputed or wholly inaccurate.  As previously noted, the

SEC's contentions that Mattessich's request for commission compensation was denied and that

he admitted to reviewing "Cantor's records" in determining Ludovico's annual bonus, (SEC

---

[4] The SEC's assertion that "Cantor denied [Mattessich] permission to . . . earn commission compensation from Cantor," (SEC Mot. 11), is false.  As noted above, Mattessich testified in both 2017 and 2019 that the firm's CEO authorized him to cover the Smith account and receive commission compensation from that work.

Mot. at 11), are false because Mattessich's request to service accounts was granted and because

Mattessich's testimony regarding bonuses did not relate in any way to Cantor's 2013 records.

Finally, the SEC incorrectly asserts that Mattessich had knowledge of Cantor's alleged violation

because he "helped administer the firm's AE code system by approving changes to the AE codes

associated with customer accounts." *Id.* Wexler testified that the AE code system was

administered by the operations and technology groups (and not the business units), which were

responsible for the maintenance, integrity, and accuracy of the system. (*Id.* ¶21 Response.)

Furthermore, the SEC has failed to explain the connection between Mattessich's role in

approving AE code changes and his awareness of alleged (but unproven) inaccuracies in

Cantor's books and records. The SEC has thus failed to point to a single undisputed fact

supporting its allegation that Mattessich knew that Cantor's records were inaccurate.

*Fourth*, the Court's prior opinion relied on the SEC's false narrative that Mattessich knew

his conduct to be wrongful because "since 2006, Cantor's WSPs have expressly prohibited off-

book commission splitting." *Mattessich*, 407 F. Supp. 3d at 272. Notably, the SEC appears to

have now abandoned this baseless allegation. No fewer than five witnesses, four traders from

the desk (Schrader, Pennella, Ludovico, and Mattessich) and the COO of Equities (Wexler),

testified that there was no Cantor policy or procedure prohibiting off-book commission splitting

and that the firm offered no compliance training regarding books and records requirements.

(56.1 Resp. Stmt. ¶¶96, 98.) And Mattssich, Ludovico, and Pennella all testified that in late 2017

and early 2018 they were told by members of Cantor management that they had done nothing

wrong. (*Id.* ¶¶108-09.) This testimony was further corroborated by the fact that no trader was

ever sanctioned by Cantor for off-book commission splitting, that Mattessich and Ludovico were

promoted after 2014, and that Cantor made no effort to conduct an investigation into the practice.

(*Id.* ¶¶90, 100, 106-07.)  Once again, the only relevant witness to testify otherwise was Distell, whose testimony, in addition to being uncorroborated and contrary to the testimony of numerous witnesses was contradicted by his and the firm's actions (and inaction).[5]  The substantial testimony that Mattessich's commission splitting was consistent with firm policies and procedure is further evidence that Mattessich did not have knowledge that a consequence of the arrangement was that Cantor would violate its regulatory obligations.[6]

*Fifth*, the cases cited by the SEC and in the Court's prior opinion demonstrate the vast difference between defendants deemed to understand a primary violation to be a consequence of their actions and Mattessich.  Summary judgment is highly disfavored in cases involving scienter issues, and the SEC fails to cite a single case granting the SEC summary judgment on an aiding and abetting charge.  *Cf. SEC v. Paulsen,* 18 Civ. 6718, 2020 U.S. Dist. LEXIS 68845, at *19 (S.D.N.Y. Apr. 18, 2020) (denying SEC's motion in aiding and abetting case because issues of knowledge and intent "are for juries, not for judges, and are not susceptible to resolution at summary judgment") (citing *SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) ("[T]he Second Circuit has left no doubt that scienter issues are

---

[5] Cantor's 30(b)(6) witness, Lauren Bradley, also testified that the WSPs prohibited off-book commission splitting, but Bradley, who did not arrive at Cantor until 2018, acknowledged that she had not spoken to anyone that was at Cantor during the relevant time period regarding the meaning of the WSPs, and her testimony was therefore baseless.  (Greenwood Decl. Ex. 8 (Bradley Dep. Tr.) at 91:23-92:3.)

[6] While the SEC makes no mention of the WSPs in either its brief or its Rule 56.1 Statement, it still asserts in its statement of **undisputed** facts that the January 2014 Distell Memo "reiterating the firm's existing policy that all compensation arrangements between employees must be documented using AE Codes," without identifying where this "existing policy" was documented, even though five witnesses—everyone save Distell—testified that the Distell Memo was a new policy and that the Ludovico-Mattessich Arrangement did not violate any firm policy in place prior to 2014.  Even Distell conceded that it would be "not inaccurate" to read the phrase "grandfather provision" in the Distell Memo as describing "something that was previously legal [but] is no longer legal."  (56.1 Resp. Stmt. ¶ 48 Response).

seldom appropriate for resolution at the summary judgment stage.")).  Furthermore, every case cited involves outright fraud wherein it was obvious to the defendant/s that their conduct was both wrongful and deceptive and therefore that they might cause themselves or another entity to commit a regulatory violation.  *See SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012) (SEC allegation in Complaint that defendant engaged in a fraudulent accounting scheme involving two transaction "designed to allow [his company] to recognize revenue prematurely and to inflate the profit generated"); *Fallstaff Brewing*, 629 F.2d at 66-77 (affirming injunction granted by district court after trial-like hearing, finding that public company and its controlling stockholder, Kalmanovitz, had materially misled shareholders by concealing Kalmanovitz's acquisition of a controlling interest in the company in multiple SEC filings); *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 609-10 (S.D.N.Y. 1993) (making post-trial findings of fact that defendants engaged in "blatant scheme to defraud" by entering into secret indemnification agreement and failing to disclose their beneficial interest in stock purchases that facilitated their hostile takeover of company).  By contrast, Mattessich engaged in no fraud and operated openly to obtain commission compensation to which he was entitled under firm policy.  There is thus no precedent to support a legal determination that Mattessich had knowledge of the alleged primary violation given the facts of this case.

The evidence in this case strongly suggests that Mattessich did not believe his actions to be in any way wrongful and had no knowledge that Cantor risked committing any sort of rules violation.  Mattessich merely attempted to work around an administrative problem—whereby fees he was not actually responsible for were attributed to his AE code—so that he could receive the commission compensation he was authorized to receive from Cantor for sales he was transacting and commission revenue he was generating on behalf of Cantor.  Mattessich made no

23

secret of what he considered to be a legitimate and policy-compliant arrangement with Ludovico, even reporting the arrangement to his supervisor.

### C. Mattessich Did Not Substantially Assist The Commission Of A Primary Violation

Finally, the SEC must prove that Mattessich "sought by his actions to make the primary violations succeed." *Apuzzo*, 689 F.3d at 215. "It is particularly appropriate to consider the degree of scienter in evaluating substantial assistance." *Id.* "[A]n evaluation of the different aspects of a defendant's asserted relationship to the primary violator, consisting of the alleged aider and abettor's knowledge of the primary violation, his intent to further it, and the actions supposedly undertaken to assist it, is inherent in determining whether the defendant 'in some sort associate[d] in it as something that he wishe[d] to bring about, that he [sought] by his actions to make it succeed." *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

Once again, the Court previously relied upon factual allegations that have since been refuted to conclude that the SEC had alleged substantial assistance. The Court found sufficient the allegations of the steps Mattessich and Ludovico took to split commissions "in combination with their failure to report such commission-splitting scheme to Cantor." *Mattessich*, 407 F. Supp. 3d at 273. Ludovico testified that he asked Mattessich to make sure that management knew that Ludovico was paying part of his commission compensation to Mattessich because he was concerned that otherwise his bonus would not be calculated appropriately. (56.1 Resp. Stmt. ¶84.) As a result, Mattessich went to his direct supervisor, Spar, on at least two occasions and informed Spar that Ludovico was paying a portion of his commission compensation to Mattessich and then came back and informed Ludovico that he had disclosed their arrangement to their superiors. (*Id.* ¶¶85-86.) Additionally, Ludovico disclosed the arrangement in 2013

24

during testimony in a separate legal matter, and this was how the arrangement came to the attention of the compliance department.  (*Id.* ¶89.)  There is thus ample evidence that Mattessich and Ludovico did report their commission splitting arrangement to Cantor.

Furthermore, while the SEC need not prove proximate cause, *Apuzzo*, 689 F.3d at 213, Mattessich's actions were not even primarily responsible for Cantor's alleged breach of its regulatory obligations.  The Compensation Records Rule states that registered broker dealers "[i]n lieu of making" a record of the compensation attributable "to each associated person . . . may elect to produce the required information promptly upon request of a representative of a securities regulator authority."  17 C.F.R. § 240.17a-3(a)(19)(i).  As Wexler, the former COO of Equities, testified, in late 2013 or early 2014 Cantor could have gotten from Mattessich or Ludovico the necessary information to update its books and records, including copies of the checks Ludovico wrote and Mattessich deposited.  In fact, Cantor was not even required to do this in 2013 or 2014, it could have provided the SEC with the required information at the time of the SEC's request for it, presumably in 2017, when the investigation into this matter began.  But Distell and Cantor's compliance department made the determination not to even attempt to gather the necessary information in order to produce it to the SEC, without requesting any input from Mattessich.

## CONCLUSION

For the foregoing reasons, the Court should deny the SEC's motion for summary judgment as to liability against Mattessich in its entirety

Dated:  June 19, 2020
New York, New York                      By:      /s/ Noam Greenspan
                                                 Denis Patrick Kelleher
                                                 Noam Greenspan

Talkin, Muccigrosso & Roberts LLP
40 Exchange Place, 18th Floor
New York, NY 10005
(212) 472-0007

*Attorneys for Adam Mattessich*