UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                        Plaintiff,

              -v.-

ADAM MATTESSICH,

                        Defendant.

18 Civ. 5884 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Securities and Exchange Commission (the "SEC") brought this civil enforcement action against Defendants Adam Mattessich and Joseph Ludovico, two securities brokers formerly employed by Cantor Fitzgerald & Co. ("Cantor").[1]  Plaintiff alleges that Mattessich and Ludovico schemed to circumvent Cantor's established procedures for paying and recording commission payments to its brokers for the time period between January and December 2013 (the "Relevant Period").  Plaintiff contends that, in so doing, Defendants aided and abetted Cantor's violations of Rule 17a-3(a)(19), 17 C.F.R. § 240.17a-3(a)(19), which was promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), Pub. L. 73-291, 48 Stat. 881, and which requires registered broker-dealers to make and keep accurate records of each securities transaction attributable, for compensation purposes, to each broker.

---

[1]      References in this Opinion to "Defendants" pertain to both Mattessich and Ludovico, while references to "Defendant" pertain to Mattessich alone.

By Order dated September 9, 2019 (Dkt. #41), the Court denied Defendants' motion to dismiss, and on December 18, 2019, the Court entered a final judgment as to Defendant Ludovico on consent (Dkt. #58). Plaintiff now moves for summary judgment as to liability against Defendant Mattessich, the only remaining Defendant in this case. Plaintiff also moves to strike portions of an affidavit Defendant submitted in opposition to the instant motion for summary judgment. For the reasons set forth in the remainder of this Opinion, the Court denies Plaintiff's motion to strike, and grants in part and denies in part Plaintiff's motion for summary judgment.

## BACKGROUND[2]

### A.    Factual Background

The Court has previously expounded on the history of this case in the course of resolving Defendants' motion to dismiss. *Sec. & Exch. Comm'n* v.

---

[2]    The facts alleged herein are drawn from Plaintiff's Local Rule 56.1 Statement in Support of Its Motion for Summary Judgment ("Pl. 56.1" (Dkt. #66)); Defendant's Rule 56.1 Counter Statement of Undisputed Facts ("Def. 56.1" (Dkt. #69)), which comprises both responses to Plaintiff's assertions of material facts not in dispute and material facts ostensibly in dispute; and Plaintiff's Reply to Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Pl. Reply 56.1" (Dkt. #72)). The Court also draws facts from the Declaration of Lee A. Greenwood in Support of Plaintiff's Motion for Summary Judgment ("Greenwood Decl." (Dkt. #67)); the Declaration of Noam Greenspan in Opposition to Plaintiff's Motion for Summary Judgment ("Greenspan Decl." (Dkt. #70)); and certain exhibits attached to these declarations, including the Stipulation of the Parties as to Certain Factual Matters ("Joint Stip." (Greenwood Decl., Ex. A)), and the affidavit of Ron Wexler ("Wexler Aff." (Greenspan Decl., Ex. A)). Further, certain facts are drawn from the transcript of the deposition of Adam Mattessich ("Mattessich Dep." (Greenwood Decl., Ex. 3)); the transcript of the investigative testimony of Adam Mattessich ("Mattessich Inv." (*id.*, Ex. 4)); the transcript of the deposition of Lauren Bradley, as representative of Cantor pursuant to Fed. R. Civ. P. 30(b)(6) ("Bradley Dep." (*id.*, Ex. 8)); the transcript of the deposition of Gary Distell ("Distell Dep." (*id.*, Ex. 9); and the Complaint ("Compl." (Dkt. #1)).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by the non-movant, the Court finds such fact to be true. *See* Local Civil Rule 56.1(c) ("Each

*Mattessich*, 407 F. Supp. 3d 264, 266-68 (S.D.N.Y. 2019) ("*Mattessich I*").  It therefore mentions here only what is relevant to the instant motion.

### 1.  Cantor's Policies and Procedures Concerning the Payment and Recording of Commission Compensation

Cantor has been a registered broker-dealer with the SEC since December 1947.  (Pl. 56.1 ¶ 2).  From at least 2001 to the present, Cantor has used a system of account executive (or "AE") codes linked to customer accounts to apportion and track commission compensation for its brokers for securities transactions related to those accounts.  (*Id.* at ¶¶ 13, 15).  Cantor assigns an individual AE code to each employee with responsibility for sales and trading, and each brokerage transaction is associated with an AE code that dictates which Cantor employee or employees will receive the commission generated by the associated transaction.  (*Id.* at ¶¶ 14, 16).  Some AE codes are associated with a single employee, but other AE codes apportion the commission generated by a transaction among more than one employee or trading desk, according to specific percentages or splits.  (Def. 56.1 ¶ 16).  AE codes are also

---

numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For convenience, Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment is referred to as "Pl. Br." (Dkt. #65); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment is referred to as "Def. Opp." (Dkt. #68); Plaintiff's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment is referred to as "Pl. Reply" (Dkt. #71); and Defendant's Sur-Reply in Further Opposition to Plaintiff's Motion for Summary Judgment is referred to as "Def. Sur-Reply" (Dkt. #75).

used to track at least some transactions that do not generate commissions.
(*Id.* at ¶ 13).

As the Court explained in *Mattessich I*, "Cantor relies on the AE system
to ensure compliance with various regulatory and tax obligations, including
Exchange Act Rule 17a-3(a)(19)(i), 17 C.F.R. § 240.17a-3(a)(19)(i) (the
'Compensation Record Rule'), which became effective in May 2003."
*Mattessich I*, 407 F. Supp. 3d at 267.  (*See also* Bradley Dep. 38:24-25; Distell
Dep. 37:20-38:9, 45:7-48:24).  The Compensation Record Rule requires
registered broker-dealers to make and keep accurate records of each securities
transaction attributable, for compensation purposes, to each broker.
*Mattessich I*, 407 F. Supp. 3d at 267 (citing 17 C.F.R. § 240.17a-3(a)(19)(i)).  All
Cantor registered representatives were required to certify their compliance with
Cantor's policies and procedures, including Cantor's written supervisory
procedures ("WSPs") — which specifically prohibited making or receiving off-
book commission payments — on an annual basis, though the language of
these certifications changed over time.  (Pl. 56.1 ¶ 24; Pl. Reply 56.1 ¶¶ 96, 98;
Bradley Dep. 60:15-61:5; Distell Dep. 59:8-61:23; *see also* Def. 56.1 ¶ 23
(noting that the language of compliance certifications changed between 2007
and 2013)).

### 2. Defendant's Employment at Cantor

Defendant was employed by Cantor from October 15, 2001, to
February 16, 2018.  (Joint Stip. ¶ 1).  From approximately 2004 until mid-
2013, Defendant served as the head of Cantor's International Equities Desk,

and from the middle of 2013 through December 2015, he was the global head of equity trading at Cantor.  (Pl. 56.1 ¶¶ 7, 11).[3]  From approximately 2002 through the Relevant Period, the only compensation Defendant received directly from Cantor comprised a salary and a discretionary bonus.  (Joint Stip. ¶ 5).  Since at least 2001, Cantor had assigned Defendant an AE code.  (*Id.* at 6).  Defendant certified his compliance with Cantor's policies and procedures every year from 2007 through 2013.  (Pl. 56.1 ¶ 23).

Beginning in at least July 2012, Defendant was one of three or four people who could provide a required approval for changes to the AE codes assigned to a customer account.  (Def. 56.1 ¶ 17).  In this capacity, Defendant reviewed and approved requests to change AE codes associated with different customer accounts.  (Pl. 56.1 ¶¶ 18-20).  In so doing, Defendant "would review these requests, discuss them with either the relevant traders or their managers, ensure that all parties agreed on the requested change or resolve any disputes," and "remind[] other Cantor employees to comply with this [AE code] approval process."  (*Id.* at ¶¶ 19, 22).  In February 2018, Cantor terminated Defendant's employment with the firm due to his involvement in the commission-splitting arrangement with Ludovico that was the subject of

---

[3]     From at least 1991 until the termination of his employment with Cantor, including throughout the Relevant Period, Defendant held a General Securities Representative, or Series 7, license from the Financial Industry Regulatory Authority ("FINRA").  (Joint Stip. ¶ 3).  From at least 2004 until the termination of his employment with Cantor, including throughout the Relevant Period, Defendant held a General Securities Principal, or Series 24, license from FINRA.  (*Id.* at ¶ 4).

Plaintiff's investigation.  (*Id.* at ¶ 12).  That arrangement is described in greater detail below.

### 3.    The Commission-Splitting Scheme

In or about 2002, Defendant — then a senior execution trader at Cantor — requested permission from his supervisor to receive commission compensation on certain customer accounts that he serviced.  (Pl. 56.1 ¶ 28). The parties dispute the scope of Defendant's request, and the extent to which that request was denied.  Plaintiff alleges that Defendant requested "authoriz[ation] to receive commission compensation directly from Cantor" and that the request was denied in full (*see* Pl. Reply 56.1 ¶ 55), while Defendant claims that he was told by Cantor's CEO that he could service at least one of the accounts in question and receive a commission, but that he was instructed to "put the AE into a sales trader's AE" and they would "sort it out" later (Def. 56.1 ¶ 57).  Defendant further alleges that his inability to receive compensation through his AE code was due to an "administrative issue" (*see* Wexler Aff. ¶ 15; *see also* Def. 56.1 ¶¶ 58, 69), which allegation Plaintiff disputes (*see* Pl. Reply 56.1 ¶ 69).  Plaintiff argues that to the extent Defendant was given permission by Cantor to receive commission compensation for servicing any of the relevant client accounts, the firm did not authorize him to receive payments via personal check.  (*See id.* at ¶ 100).

Thereafter, as relevant to the instant motion, Defendant entered into a commission-splitting arrangement with Ludovico in or around 2004, whereby Ludovico received from Cantor the commission compensation generated from

customer accounts serviced by Defendant through Ludovico's AE code.  (Joint Stip. ¶ 8; Pl. 56.1 ¶ 32; Mattessich Inv. 168:10-22, 209:25-211:8).  Once Ludovico received the net commission from Cantor, he would remit some portion of it to Defendant via personal check.  (Pl. 56.1 ¶ 35).  Ludovico made payments to Defendant pursuant to their arrangement from approximately 2004 through December 2013.  (*Id.* at ¶ 36).[4]  From 2004 through the Relevant Period, Defendant also served as Ludovico's direct supervisor.  (*Id.* at ¶ 10).  As noted above, the parties dispute the extent to which Defendant had permission from his superiors to assign commission compensation from accounts he serviced to other traders' AE accounts and to receive compensation directly from those other traders by personal check.  (*Compare id.* at ¶¶ 29, 34, *with* Def. 56.1 ¶¶ 29, 34).  There was no predetermined amount or percentage that Ludovico would pay Defendant, but typically Ludovico paid Defendant fifty percent of the commission compensation he received.  (Def. 56.1 ¶¶ 79-80).  During the Relevant Period, Ludovico paid Mattessich at least $58,200 of the commission compensation he received from Cantor via 12 personal checks.  (Joint Stip. ¶ 9).  Cantor neither recorded, nor maintained a record of, the commission compensation paid by Ludovico to Defendant via personal check — either using the AE code system or through any other means.  (*See* Pl. 56.1

---

[4]     From approximately 2002 through 2004, Defendant entered into a similar arrangement with at least one other trader who remitted a portion of the commission compensation he received from Cantor via the AE code system for accounts serviced by Defendant. (*See* Pl. 56.1 ¶¶ 30-31).  Ludovico entered into a similar arrangement with at least one other Cantor employee, and paid that employee a portion of the commission compensation that he received in 2012 and 2013.  (*Id.* at ¶ 40).

¶¶ 32-33, 43; *see also* Bradley Dep. 39:14-20, 55:12-18, 61:11-13, 80:21-81:4; Distell Dep. 45:7-48:24).[5]

In or about 2013, Ludovico disclosed the commission-splitting scheme in the process of giving testimony in a separate FINRA matter.  (Def. 56.1 ¶ 89). When Gary Distell, Cantor's chief compliance officer at the time, learned of the commission-splitting arrangement, he sent an email dated January 14, 2014, to all employees of Cantor's equities group stating:

> Any compensation arrangement between employees whether formal or informal should be discussed with [chief operating officer] Ron Wexler.  It is not permissible for one employee to pay another employee directly in connection with any Cantor activity.   Any such arrangement should be arranged and documented through Ron so that [it] is compliant with regulatory and tax regulations.  There is no grandfather provision so please call even if the arrangement is existing and longstanding.

(Greenwood Decl., Ex. 13; Pl. 56.1 ¶ 48).  After receiving this email, Ludovico stopped making payments of commission compensation to Defendant.  (Pl. 56.1 ¶ 49).  Plaintiff argues that Distell's email "reiterat[d] ... firm[] policy that all

---

[5]   Defendant's objection to Paragraph 43 of Plaintiff's Rule 56.1 Statement argues that "[t]he statement does not define which documents are referred to as 'compensation records,' nor does it cite to any specific 'compensation record.'"  (Def. 56.1 ¶ 43).  While Defendant challenges the definition of compensation record in this paragraph, Defendant fails to undermine the underlying factual assertion: that Cantor maintained or possessed no record of any kind regarding the payment of commission compensation by Ludovico to Defendant.  For example, Defendant's objection fails to rebut testimony cited in Plaintiff's Rule 56.1 Statement from Cantor's Rule 30(b)(6) representative that Cantor did not record this compensation using AE codes or by collecting copies of the personal checks Ludovico used to pay Defendant.  (Pl. 56.1 ¶ 43).  The only specific evidence Defendant offers in rebuttal is that one type of document cited in Plaintiff's Rule 56.1 Statement — a worksheet used to allocate commissions — is not a compensation record and does not come from the relevant period.  (Def. 56.1 ¶ 43).  While this may be true, it fails to create a disputed issue of material fact because Plaintiff cites to other admissible evidence to establish that Cantor did not record this commission using AE codes or other methods.  (Pl. 56.1 ¶ 43).

compensation arrangements between employees must be documented using AE [c]odes." (*Id.* at ¶ 48; *see also* Distell Dep. 55:4-17, 56:22-57:17).  Defendant disputes this interpretation, and contends that some employees of Cantor's Equities Group understood Distell's email either to announce a new policy or to clarify that commission-splitting arrangements like Defendants' were not against Cantor policy prior to that point.  (*See* Def. 56.1 ¶¶ 48, 96).  On June 29, 2018, contemporaneous with the filing of this action, the SEC settled administrative cease-and-desist proceedings against Cantor regarding books and records violations.  (Compl. ¶ 18).

B.    **Procedural Background**

The SEC filed the Complaint in this action on June 29, 2018.  (Dkt. #1). On July 31, 2018, Ludovico requested leave to file a motion to dismiss (Dkt. #26), and on September 21, 2018, Mattessich notified the Court that he would join in any motion to dismiss filed by Ludovico (Dkt. #34).  On September 9, 2019, the Court denied Defendants' motion to dismiss.  (Dkt. #41).  On December 18, 2019, Plaintiff and Ludovico reached a settlement and the Court entered final judgment as to Ludovico.  (Dkt. #58).

At a conference on March 18, 2020, the Court set a briefing schedule for Plaintiff's anticipated motion for summary judgment.  (*See* Minute Entry for March 18, 2020).  Plaintiff filed its motion for summary judgment and supporting papers on May 1, 2020 (Dkt. #64-67); Defendant filed his opposition papers on June 19, 2020 (Dkt. #68-70); and Plaintiff filed its reply on July 7, 2020 (Dkt. #71-72).  On July 9, 2020, Defendant sought permission

to file a sur-reply in further opposition to Plaintiff's motion for summary judgment to address Plaintiff's argument, raised for the first time in its reply brief, that the Court should disregard certain evidence proffered by Defendant in opposition to the instant motion.  (*See* Dkt. #73).  The Court granted Defendant's request the next day (Dkt. #74), and this motion became fully briefed and ripe for decision on July 10, 2020, when Defendant submitted his sur-reply (Dkt. #75).

## DISCUSSION

### A.    Plaintiff's Motion to Strike Is Denied

At the outset, the Court addresses the request made in Plaintiff's reply briefing that the Court disregard portions of the Affidavit of Ron Wexler, Cantor's chief operating officer during the Relevant Period, as well as the corresponding portions of Defendant's Rule 56.1 Statement.  (*See* Pl. Reply 2-4).  Plaintiff argues that these portions of the Wexler Affidavit "are inadmissible hearsay or unsupported speculation" made with the intent to create disputed issues of material fact.  (*Id.* at 3).  Defendant retorts that the disputed portions of the affidavit are based on Wexler's personal knowledge and experience and that the affidavit is therefore admissible in its entirety.  (*See generally* Def. Sur-Reply).  As discussed in greater detail below, the Court denies Plaintiff's motion to strike.

Specifically, Plaintiff challenges three portions of the affidavit.  *First*, Plaintiff argues that the portion of the affidavit wherein Wexler discusses an administrative issue with Defendant's AE code (Wexler Aff. ¶¶ 15-23) — which

issue ostensibly prevented Defendant from receiving commission compensation through his AE code — is based primarily on a conversation Wexler had with other individuals and has no non-hearsay foundation.  (Pl. Reply 3).  *Second*, Plaintiff argues that Wexler's description of several examples of commission-pooling arrangements among other Cantor employees (Wexler Aff. ¶¶ 24-27) also lacks a non-hearsay foundation because "Wexler could have learned of these arrangements only by speaking with one or more people, reviewing documents, or both" (Pl. Reply 3-4).  *Third*, Plaintiff argues that the Court should disregard statements in the Wexler Affidavit to the effect that Cantor could have fixed its commission compensation records — after the fact — using copies of personal checks and other information provided by Defendants. (Wexler Aff. ¶¶ 34-36).  Plaintiff argues that these statements are entirely speculative because Wexler lacks any personal knowledge of: (i) Cantor's commission records concerning Defendants' commission-splitting arrangement, and/or (ii) the records Defendants maintained themselves regarding their arrangement.  (Pl. Reply 4).

"Whether or not a motion to strike is filed, '[o]n a motion for summary judgment, a district court may rely only on material that would be admissible at trial.'" *Seife* v. *Food & Drug Admin.*, No. 17 Civ. 3960 (JMF), 2019 WL 1382724, at *1 (S.D.N.Y. Mar. 27, 2019) (quoting *Rubens* v. *Mason*, 387 F.3d 183, 189 (2d Cir. 2004)).  A court may rely on an affidavit when deciding a motion for summary judgment only if it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or

11

declarant is competent to testify on the matters stated." Fed. R. Civ.

P. 56(c)(4); *see also Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 582

F.3d 244, 264 (2d Cir. 2009); Fed. R. Evid. 602.  In deciding an evidentiary

question, a court may "strike portions of an affidavit that are not based upon

the affiant's personal knowledge, contain inadmissible hearsay or make

generalized and conclusory statements." *Hollander* v. *Am. Cyanamid Co.*, 172

F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel* v.

*Abramson*, 232 F.3d 83 (2d Cir. 2000).  Alternatively, it may, without granting

a motion to strike, simply "decline[ ] to consider evidence" from the

inadmissible declarations.  *Fabrication Enters., Inc.* v. *Hygenic Corp.*, 64 F.3d

53, 59 n.5 (2d Cir. 1995).

Applying these standards, the Court declines to strike portions of the

Wexler Affidavit.  Wexler testified that he personally conducted an investigation

into the administrative issue with Defendant's AE code.  (*See* Wexler Aff. ¶ 16).

Thus, regardless of whether Wexler learned about some individual elements of

the administrative issue from other employees, the Court finds that Wexler's

personal investigation provides a sufficient basis to find that Wexler had

"personal knowledge" of the AE code administrative issue.  *See* Fed. R.

Evid. 602.  The Court agrees with Defendant that to the extent Wexler's

description of his investigation into this issue is vague or poorly substantiated,

such shortcomings go to Wexler's credibility and not the admissibility of his

testimony.  (*See* Def. Sur-Reply 3).

As to Wexler's description of other commission-splitting arrangements,
the Court accepts Defendant's representation that the testimony is offered "for
the fact that such conversations occurred, not for the truth of any matters
asserted," and therefore agrees that is not hearsay.  (Def. Sur-Reply 4 n.2).
Additionally, the Court finds that Wexler's claim that he personally knows of
these arrangements because, for example, he investigated and/or discussed
such arrangements in his role overseeing the payment of commission
compensation (Wexler Aff. ¶¶ 5, 25), is sufficient foundation to establish
personal knowledge for admissibility purposes, even if a factfinder were later to
discredit this testimony.

Finally, Wexler states that it was theoretically possible, in 2013 or 2014,
for Cantor to "recreate the records using copies of the checks and existing
commission reports and payroll records." (Wexler Aff. ¶ 34).  The Court agrees
with Defendant that Wexler has sufficiently established personal knowledge of
how Cantor created certain commission compensation records through his
statement that he oversaw commission compensation payments to Cantor
employees and worked with the accounting department to produce some
relevant documentation.  (*Id.* at ¶ 5).  But that conclusion comes with two
provisos: To the extent Wexler's testimony on this subject discusses the
mechanics of Cantor's hypothetical ability to create certain types of
documentation of transactions on a *post hoc* basis, his testimony is admissible.
To the extent Wexler claims that any such *post hoc* documentation could
actually be created in this specific instance, or that any such documentation

might satisfy the Compensation Record Rule, these are questions for the factfinder and the Court.

Thus, the Court has evaluated whether the disputed portions the Wexler Affidavit are based on "'personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements,'" *Searles* v. *First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000) (quoting *Hollander*, 172 F.3d at 198), and it has concluded that these portions are admissible. Plaintiff's motion to strike is denied.

## B.     Summary Judgment Is Granted in Part and Denied in Part

### 1.     Applicable Law

#### a.     Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[6]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477

---

[6]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York,* 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### b. The Compensation Record Rule and Section 20(e) of the Securities Exchange Act

Section 17(a) of the Exchange Act provides that "[e]very ... registered broker or dealer ... shall make and keep for prescribed periods such records ... as the Commission, by rule, prescribes as necessary or appropriate[.]" 15 U.S.C. § 78q(a)(1). Pursuant to Section 17(a), the SEC enacted the

Compensation Record Rule, which became effective on May 2, 2003.  As noted,

the Rule requires broker-dealers to make and keep current:

> [a] record: (i) As to each associated person listing each
> purchase and sale of a security attributable, for
> compensation purposes, to that associated person.  The
> record shall include the amount of compensation if
> monetary and a description of the compensation if non-
> monetary.  In lieu of making this record, a member,
> broker or dealer may elect to produce the required
> information promptly upon request of a representative
> of a securities regulatory authority.

17 C.F.R. § 240.17a-3(a)(19)(i).[7]  "By its terms, the Compensation Record Rule

requires broker-dealers, such as Cantor, to record the amount of monetary

compensation attributable to each associated person (*i.e.*, broker) for each

purchase and sale of a security."  *Mattessich I*, 407 F. Supp. 3d at 270.

"Compensation is 'attributable' to an employee if it is earned or accrued in

favor of such employee."  *Id.*; *see also Books and Records Requirements for

Brokers and Dealers Under the Securities Exchange Act of 1934*, 76 S.E.C.

Docket 343, Release No. 34-44992, 2001 WL 1327088, at sec. III(E) (Oct. 26,

2001) (hereinafter, "*Books and Records Requirements*") ("Under this

requirement, firms must make records of all commissions, concessions,

overrides, and other compensation to the extent they are *earned or accrued for

transactions*." (emphasis added)).

---

[7]     As noted in *Mattessich I*, to the Court's (and parties') knowledge, no court has
previously interpreted the Compensation Record Rule and this is the first litigated case
addressing it.  *Sec. & Exch. Comm'n* v. *Mattessich*, 407 F. Supp. 3d 264, 270 n.5
(S.D.N.Y. 2019) ("*Mattessich I*").  The Court has been made aware of only one settled
administrative consent order under the Rule.  *See Matter of Legend Sec., Inc.*, SEC
Rel. 34-64502, 2011 WL 1847051 (May 16, 2011).

Plaintiff argues that Defendant aided and abetted Cantor in its violation of the Compensation Record Rule.  Section 20(e) of the Securities Exchange Act establishes liability for those who aid and abet others in securities violations. 15 U.S.C. § 78t(e).  It provides that:

> [a]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

*Id.* To state a claim for aiding and abetting, the SEC must establish three elements: "[i] the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; [ii] knowledge of this violation on the part of the aider and abettor; and [iii] substantial assistance by the aider and abettor in the achievement of the primary violation."  *Sec. & Exch. Comm'n* v. *Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Sec. & Exch. Comm'n* v. *DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).

## 2.    Analysis

Defendant argues that Plaintiff fails to establish all three elements of a Section 20(e) violation.  Specifically, Defendant contends that Plaintiff fails to establish a primary violation of the Compensation Record Rule by Cantor because Plaintiff fails to point to any specific record that is inaccurate.  (Def. Opp. 16-18).  Defendant also argues that he did not have the requisite knowledge of any such violation by Cantor.  (*Id.* at 18-23).  Finally, Defendant disputes that he substantially assisted Cantor's violation, and further contends that his actions were not "primarily responsible" for Cantor's alleged breach of

17

the Compensation Record Rule. (*Id.* at 24-25). Plaintiff counters that Defendant fails to dispute any of the facts material to the Court's denial of Defendants' motion to dismiss in *Mattessich I*, and therefore that summary judgment is appropriate. (*See generally* Pl. Br; Pl. Reply). For the reasons discussed herein, the Court finds that Plaintiff has established the first element of a Section 20(e) violation as a matter of law, but agrees with Defendant that disputed issues of material fact remain as to the second and third elements.

### a. Plaintiff Has Established a Primary Violation of the Compensation Record Rule

As noted above, the Compensation Record Rule requires, in relevant part, broker-dealers to make and keep current records:

> [a]s to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record shall include the amount of compensation if monetary and a description of the compensation if non-monetary.

17 C.F.R. § 240.17a-3(a)(19)(i). The parties do not dispute that any commission compensation paid by Cantor to Ludovico and then paid by Ludovico to Defendant qualifies as compensation for the purposes of the Compensation Record Rule. (*See generally* Def. Opp. 16-18). *See also Mattessich I*, 407 F. Supp. 3d at 270-71 (holding that the commission compensation Ludovico paid Defendant qualified as compensation within the meaning of the Compensation Record Rule). Instead, Defendant argues that Plaintiff "has failed entirely to produce or cite to a single Cantor record, or other document that it alleges to be inaccurate." (Def. Opp. 16). Plaintiff responds that such records are created using Cantor's AE code system and

that the AE code system contained no documentation of Defendant's off-the-books commission payments; and that in any event, the undisputed factual record establishes that Cantor failed to document the commission Ludovico paid Defendant in any way during the Relevant Period.  (*See* Pl. Reply 4-5).

Defendant argues that the AE code system did not create Cantor's definitive record of commission compensation because (i) not all commission compensation was tracked and/or paid out via the AE code system, and (ii) AE codes were used by Cantor to track transactions that did not generate commissions.  (*See* Def. 56.1 ¶ 13).  But the record demonstrates that Cantor *did* use the AE code system to "make sure that its books and records were complete[.]"  (Bradley Dep. 38:24-25; *see also* Distell Dep. 45:7-48:24). Furthermore — even accepting Defendant's argument that AE codes were not the definitive recordkeeping device Cantor employed to track commission compensation — the record clearly establishes that Cantor failed to record the commission remitted to Defendant by Ludovico pursuant to their commission-splitting scheme, whether via the AE code system or any other method.  (*See* Pl. 56.1 ¶¶ 32-33, 43; *see also* Bradley Dep. 39:14-20, 61:11-13, 80:21-81:4; Distell Dep. 45:7-48:24).  Defendant offers no evidence that Cantor relied on anything other than the AE code system to track commissions for compliance with the Compensation Record Rule (*see* Def. Opp. 16-18), and evidence in the record establishes that Cantor used no system other than the AE code system to track sales coverage on any particular transaction (Bradley Dep. 39:14-20).

Defendant suggests that the AE code system was not used for compliance with the Compensation Record Rule because there were other traders who purportedly split commissions in a manner that was not captured by the AE system.  (*See* Def. 56.1 ¶¶ 110, 120-22).  However, even if other traders engaged in commission-splitting schemes that were not captured by the AE code system, as Wexler suggests in his affidavit (*see* Wexler Aff. ¶¶ 24, 27), this fact would still fail to undermine the evidence that Cantor relied on the AE code system to comply with the Compensation Record Rule.  Instead, it just suggests that Cantor violated the Compensation Record Rule by allowing other traders to engage commission-splitting schemes that were only partially documented by Cantor's payroll system.[8]

Thus, even if Cantor did not rely on AE codes to comply with the Compensation Record Rule — as Defendant now argues without citing any evidence — it is undisputed that Cantor had no record whatsoever of the commission paid to Defendant by Ludovico during the Relevant Period. Consequently, it necessarily violated the Compensation Record Rule by failing to "make and keep current" records as to "each associated person listing each

---

[8]     Defendant offers Wexler's testimony describing these other commission-splitting schemes only to establish "the fact that such conversations occurred, not for the truth of any matters asserted[.]"  (Def. Sur-Reply 4).  For this reason, the Court is wary of crediting any of Wexler's detailed descriptions of how these schemes allegedly operated. However, the Court notes that every scheme Wexler describes involved *Cantor's* payment of pooled commissions to traders, and not schemes in which individual Cantor employees paid commissions to other employees, by personal check or otherwise.  (*See* Wexler Aff. ¶ 24).  As such, every scheme Wexler describes would be at least partially recorded by Cantor's payroll system, whereas Defendant's commission-splitting scheme with Ludovico went completely undocumented by Cantor.

purchase and sale of a security attributable, for compensation purposes, to that associated person."  17 C.F.R. § 240.17a-3(a)(19)(i).

### b.   There Is a Disputed Issue of Material Fact as to Defendant's Knowledge of the Primary Violation

The parties dispute the scienter required to establish the second element of an aiding and abetting violation pursuant to Section 20(e).  Defendant argues that Plaintiff must prove that Defendant "'consciously assisted the commission of the specific' rule violation charged" (Def. Opp. 19 (quoting *DiBella*, 587 F.3d at 566)), and "'understood the *consequences* of [his] actions,'" (*id.* (quoting *Sec. & Exch. Comm'n* v. *Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980))).  Defendant further argues that the factual allegations in the Complaint that the Court relied on in denying the motion to dismiss have since been refuted.  (*Id.*).  Plaintiff rejoins that "a defendant's knowledge of the circumstances that constitute the primary violation satisfies the knowledge element of an aiding-and-abetting claim under Exchange Act Section 20(e)" (Pl. Reply 6 (citing *Mattessich I*, 407 F. Supp. 3d at 272)), and that knowledge of the consequences or of the act's "wrongfulness" is not required to establish a Section 20(e) violation (*id.* at 7).  Plaintiff further contends that to the extent facts cited in *Mattessich I* have been refuted, any such facts are immaterial to establishing Defendant's knowledge of Cantor's primary violation.  (*Id.* at 6-7).

At this procedural juncture, Defendant has the better of the dispute. Even accepting Plaintiff's argument regarding the scienter necessary to satisfy this element, the Court believes that a triable issue of fact exists as to Defendant's knowledge of the circumstances that constituted the primary

violation as well as his knowledge that Cantor's records were inaccurate.  As noted above, the record clearly establishes that Cantor maintained no records of Ludovico's payments to Defendant during the Relevant Period.  However, the record does not clearly establish that Defendant knew that Cantor kept no records of these payments.  Rather Plaintiff offers evidence from which a factfinder can — but need not — conclude that Defendant had this knowledge. (*See* Pl. 56.1 ¶¶ 18-22 (discussing Defendant's responsibility for reviewing and approving requests for changes to commission payments via the AE code system)).  And while the record demonstrates that Defendant was aware of, or should have been aware of, Cantor's policies and procedures that prohibited the payment of undisclosed and/or off-the-book commission compensation (*see* Pl. 56.1 ¶¶ 23-24; Pl. Reply 56.1 ¶¶ 96, 98; *see also* Bradley Dep. 60:15-61:5; Distell Dep. 59:8-61:23), the record does not conclusively establish that Defendant knew that his particular arrangement ran afoul of these prohibitions, given Defendant's proffer of evidence that he was granted permission to receive commission compensation for the trades in question due to an administrative issue with his AE code.  (*See* Def. 56.1 ¶¶ 57-59, 69-77).

In *Mattessich I*, the Court found dispositive the allegation that "both [Defendant and Ludovico] were aware of Cantor's AE code system, which [Cantor] used to apportion and record commission payments, and that [Defendant and Ludovico] secretly agreed to split commissions that were paid to Ludovico by Cantor, circumventing the AE code system."  407 F. Supp. 3d at 272 (internal citations omitted).  However, on summary judgment, Defendant

has proffered uncontested evidence that Defendant's implementation of the scheme was not in fact secretive in any way.  (*See* Def. 56.1 ¶¶ 61-62). Additionally, Defendant's claim that he reasonably believed that Cantor's CEO gave him permission to engage in the commission-splitting scheme due to an administrative issue with his AE code raises a disputed issue of fact as to Defendant's scienter.  (*See id.* at ¶¶ 57-59, 69-77).  Had Defendant received Cantor's blessing to engage in the commission-splitting scheme, a jury could reasonably conclude that Defendant did not have the requisite knowledge of the circumstances that constitute the primary violation.  *Cf. Falstaff Brewing Corp.*, 629 F.2d at 77 ("A knowledge of what one is doing and the consequences of those actions suffices.  We therefore hold that because [defendant] knew the nature and consequences of his actions, he acted with scienter.").

"[T]he Second Circuit has left no doubt that scienter issues are seldom appropriate for resolution at the summary judgment stage."  *Sec. & Exch. Comm'n* v. *Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) (collecting cases in the context of Section 10(b) and Rule 10b-5 claims).  Accordingly, and "resolv[ing] all ambiguities and draw[ing] all reasonable inferences in the non-movant's favor," *Vt. Teddy Bear Co.*, 373 F.3d at 244, as the Court must on a motion for summary judgment, the Court concludes that Defendant has raised a disputed issue of material fact as to whether he had the requisite knowledge to satisfy the second element of a Section 20(e) violation, because he has proffered evidence that he believed he

had been given permission by Cantor to engage in the commission-splitting scheme with Ludovico.

### c.   There Is a Disputed Issue of Material Fact as to Whether Defendant Substantially Assisted in Cantor's Primary Violation

To satisfy the substantial assistance component of an aiding and abetting violation, Plaintiff must show that a defendant "in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."  *Apuzzo*, 689 F.3d at 206 (internal quotation marks and alterations omitted) (quoting *United States* v. *Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). Plaintiff is not required to plead that the aider and abettor proximately caused the primary securities law violation.  *Id.* at 213.  "Section 20(e) of the Exchange Act states one can be held liable for aiding and abetting if that person 'knowingly or recklessly provides substantial assistance.'"  *Mattessich I*, 407 F. Supp. 3d at 273 (quoting 15 U.S.C. § 78t(e)).  "Thus, the SEC can allege either knowledge or recklessness; it need not allege both."  *Id.*

The Second Circuit has repeatedly explained that — in the context of a Section 20(e) violation — "'there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance.'"  *Apuzzo*, 689 F.3d at 214 (quoting *DiBella*, 587 F.3d at 566); *see also IIT* v. *Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980) ("Satisfaction of the scienter requirement will, for example, depend on the theory of primary liability and ... there may be a nexus between the degree of scienter and the

requirement that the alleged aider and abettor render 'substantial assistance'"),

*abrogated on other ground by Morrison* v. *Nat'l Austr. Bank Ltd.*, 561 U.S. 247

(2010).  Indeed, the Second Circuit observed that

> [w]hen determining whether a defendant sought by his actions to make the primary violation succeed, if a jury were convinced that the defendant had a high degree of actual knowledge about the steps he was taking and the role those steps played in the primary violation, they would be well justified in concluding that the defendant's actions, which perhaps could be viewed innocently in some contexts, were taken with the goal of helping the fraud succeed.

*Apuzzo*, 689 F.3d at 215.  Here, as noted *supra*, Defendant has raised a

disputed issue of fact as to whether he had "a high degree of actual knowledge"

about "the steps he was taking" or "the role those steps played in the primary

violation."  *Id.*  For example, Defendant has raised a factual dispute as to

whether he received (or believed he received) permission from Cantor's CEO to

engage in off-the-books commission-splitting (*see* Def. 56.1 ¶¶ 57-59), even if

such schemes were prohibited by Cantor's WSPs and even if Defendant

certified his compliance with Cantor's policies (*see* Pl. 56.1 ¶ 24; Pl. Reply 56.1

¶¶ 96, 98).  A jury could conclude that Defendant did not act with recklessness

or knowledge if Defendant received permission from Cantor's CEO to engage in

the commission-splitting scheme.  *Cf. Apuzzo*, 689 F.3d at 214 (explaining that

the SEC sufficiently pleaded the substantial assistance element by alleging that

defendant "*knew* ... that the three-party transaction was *designed* to" facilitate

improper conduct (alteration in original)).

After reviewing the record, the Court cannot conclude as a matter of law that Defendant had a "very high degree of knowledge of the fraud," and therefore the Court is hesitant to find that his "actions, which perhaps could be viewed innocently in some contexts, were taken with the goal of helping the fraud succeed" in this context.  *Apuzzo*, 689 F.3d at 215.  Here, as explained above, Defendant has offered evidence to support a plausible alternative: that he believed that he had received permission to pursue the scheme, creating a disputed issue of material fact as to whether Defendant's contribution to Cantor's violation was knowing or reckless.

Defendant also argues, with less success, that a disputed issue of material fact exists as to the substantial assistance element because Cantor hypothetically could have retroactively created records documenting Ludovico's off-the-books payments to Defendant, which it ultimately failed to do.  (Def. Opp. 25).  Defendant specifically cites the clause of the Compensation Record Rule that provides that registered broker-dealers may "elect to produce the required information *promptly upon request* of a representative of a securities regulator authority[.]"  17 C.F.R. § 240.17a-3(a)(19)(i) (emphasis added).  Defendant reasons that, as a result, he is not primarily responsible for Cantor's breach of its regulatory obligations because Cantor caused the breach when it failed to take steps to "produce the required information" — presumably by recreating the records on a *post hoc* basis — after the SEC requested the records.  (*Id.*).  Putting aside whether Cantor's *post hoc* creation and subsequent production of these records would in fact excuse Defendant's

26

liability, the Court does not believe the Compensation Record Rule allows broker-dealers to avoid their recordkeeping obligations simply by reverse-engineering the records upon request.  Although the interplay between the two clauses of the Compensation Record Rule is a question of first impression, the text of the Rule and the SEC's commentary contemporaneous with its creation both suggest that Defendant's interpretation is incorrect.

The text of the Compensation Record Rule gives registered broker-dealers two options to comply with their obligations under the Rule.  They may either: (i) "*make and keep current*" "records ... as to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person[,]" or (ii) "elect to *produce the required information promptly* upon request of a representative of a securities regulator authority." 17 C.F.R. § 240.17a-3(a)(19)(i) (emphases added).  Under Defendant's reading, broker-dealers could completely ignore the recordkeeping requirement as long as they were able to reverse-engineer records after receiving a request from a regulator.  Such an expansive reading would render the first clause of the Rule completely superfluous.  See *Cap. Ventures Int'l* v. *Rep. of Argentina*, 552 F.3d 289, 294 (2d Cir. 2009) (dispreferring construction of statute that rendered one or more provisions superfluous (citation omitted)).  The Court understands the second clause not to free broker-dealers from any obligation to record commission compensation data, but rather to excuse broker-dealers from the cost of constantly updating (*i.e.*, keeping current) their records, and allowing them instead to maintain documentation that, "upon request ... of a securities

regulator," may be, *inter alia*, updated, compiled, collated, analyzed, searched, filtered, and/or finalized, and thereafter "produced ... promptly upon request[.]" 17 C.F.R. § 240.17a-3(a)(19)(i).

The Court's reading is reinforced by the SEC's own contemporaneous commentary. The SEC explained, with respect to the timing of the creation of records under the Compensation Record Rule, that "*the list of transactions* for which each associated person will be compensated can be created at the time of an examination." *Books and Records Requirements*, 2001 WL 1327088, at sec. VIII(C) (emphasis added). While this means that Cantor could run a series of reports to analyze data or information it already has to generate a "list of transaction" — *i.e.*, a record that establishes compliance with the Compensation Record Rule — this does not authorize Cantor to decline to keep any records or documentation relating to compensation until and unless the SEC requests such records. Indeed, Defendant must have some records or documentation that it can use to create such a list of transactions. Thus, the Court understands that the Rule allows a broker-dealer to produce or create the records in question "promptly" during an examination, with information and data already on-hand or that is readily accessible.

This understanding is further confirmed by the SEC's stated purpose for the Rule, which is "to allow securities regulators to quickly identify compensation trends and focus examinations," *see Books and Records Requirements*, 2001 WL 1327088, at sec. III(E), not to allow broker-dealers to reverse-engineer records only when they are under scrutiny. As it happens,

28

Cantor had no records whatsoever of the commission compensation that Defendant received from Ludovico, and thus could not have reverse-engineered the missing records even had it attempted to do so once the SEC requested the records. And to the extent Defendant argues that Cantor's failure to take steps to remediate the violation is an intervening cause — for example, because Cantor failed to request that Defendant supply it with copies of the personal checks Ludovico sent him in 2013 after Ludovico disclosed the scheme — that argument fails because it is well established that Plaintiff need not demonstrate that Defendant proximately caused Cantor's violation. *See Apuzzo*, 689 F.3d at 213.

The Court concludes that there remains a disputed issue of material fact as to whether Defendant substantially assisted in Cantor's violation of the Compensation Record Rule. However, the Court rejects Defendant's argument that Cantor could have remedied the violation if only it had reverse-engineered the records, thus excusing Defendant from aiding and abetting liability.

## CONCLUSION

For the reasons stated in this Opinion, Plaintiff's motion to strike is denied, and Plaintiff's motion for summary judgment is granted in part and denied in part. The Clerk of Court is directed to terminate the motion at docket entry 64. The parties are directed to submit a joint status letter regarding proposed next steps within 30 days from the date of this Opinion.

SO ORDERED.

Dated:        March 1, 2021
              New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge