**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE**
**COMMISSION,**

Plaintiff,

-against-

**ADAM MATTESSICH,**

Defendant.

**18 Civ. 05884 (KPF)**

---

<u>**SECOND STIPULATION OF THE PARTIES AS TO CERTAIN FACTUAL MATTERS**</u>

     The facts set forth in paragraphs 1 through 4 below have been stipulated to by both Plaintiff

Securities and Exchange Commission (the "Commission") and Defendant Adam Mattessich

("Mattessich") and require no proof:

     1.     On December 10, 2013, Mattessich gave sworn testimony under oath before the

Financial Industry Regulatory Authority ("FINRA") in an investigation FINRA was conducting at the

time (the "Investigation").

     2.     FINRA is an organization that regulates certain aspects of the securities industry.

     3.     FINRA did not charge Mattessich with any wrongdoing in connection with the

Investigation.

     4.     Mattessich read Cantor Fitzgerald's written supervisory procedures in their entirety

early in his tenure at the firm.

     Paragraphs 5 through 8 below are agreements to which both the Commission and Mattessich

stipulate, but which the parties do not intend to have read to the jury:

     5.     The parties agree that the Court's rulings on January 19, 2022, do not preclude the

Commission from offering the portions of Mattessich's testimony reflected in Exhibit A (PX-10) and

Exhibit B (PX-11) attached hereto.  Mattessich reserves the right to object to the admission of such testimony on any other basis.

6.      No party will offer evidence of any charges or settlements arising from the Investigation, except in rebuttal.

7.      No party will offer evidence that the Investigation concerned trading in microcap equities, except in rebuttal.

8.      The Commission will not argue to the jury that Mattessich would have faced liability had he offered different testimony to FINRA in the Investigation.

**STIPULATED AND AGREED BY**:

Dated:  February 3, 2022
      New York, NY

                             /s/ Lee A. Greenwood
                             Lee A. Greenwood
                             Philip A. Fortino
                             Preethi Krishnamurthy
                             SECURITIES AND EXCHANGE
                               COMMISSION
                             New York Regional Office
                             Brookfield Place
                             200 Vesey Street, Suite 400
                             New York, NY 10281-1022
                             (212) 336-1060 (Greenwood)
                             GreenwoodL@sec.gov
                             FortinoP@sec.gov
                             KrishnamurthyP@sec.gov

Dated:  February 3, 2022
       New York, NY

/s/ Denis P. Kelleher
Denis P. Kelleher
Noam Greenspan
TALKIN, MUCCIGROSSO & ROBERTS LLP
40 Exchange Place, 18th Floor
New York, NY 10005
(212) 542-3105 (Kelleher)
DKelleher@talkinlaw.com
NGreenspan@talkinlaw.com

*Attorneys for Defendant Adam Mattessich*

# EXHIBIT A

<u>ADMISSIONS OF ADAM MATTESSICH</u>

<u>FINRA Investigative Testimony (12/10/13)</u>

| | |
|---|---|
| 5:7-5:12 | Q.   You were sworn under oath today. Thus, you must answer all questions truthfully. Giving false answers could lead to your prosecution for perjury.  Do you understand?<br>ADAM MATTESSICH:   Yes. |
| 17:10-17:18 | Q.   Who did you report to before you reported to Mr. Kessler?<br>ADAM MATTESSICH:   Initially when I rejoined Cantor Fitzgerald post-9/11 I reported to Phil Marber, M-A-R-B-E-R and then subsequently I reported to Ken Savio, S-A-V-I-O.<br>  And then briefly to Shawn Matthews, M-A-T-H-E-W-S. M-A-T-T. I am sorry.  And then when Mr. Kessler arrived at the firm and ever since I have reported to Mr. Kessler. |
| 19:4-19:15 | Q.   From sometime in approximately 2004 until approximately six weeks ago you were head of international equities; is that right?<br>ADAM MATTESSICH:   Correct.<br>Q.   During that period of time were your duties and responsibilities substantially the same?<br>ADAM MATTESSICH:   Yes.<br>Q.   Who at Cantor -- and if it is individuals or departments -- reported to you while you were head of international equities?<br>ADAM MATTESSICH:   All employees within the international equities trading desk reported to me. |
| 19:24-20:7 | Q.   What is the difference between a sales trader/account executive and a trader?  In your experience at Cantor on the international equities trading desk?<br>ADAM MATTESSICH:   Your primary duty as a trader is market facing. Your primary duty as a sales trader is customer facing. |
| 21:21-22:12 | Q.   What are the duties and responsibilities that you had as head of international equities?<br>ADAM MATTESSICH:   Executing transactions in ADRs and foreign securities and/or coordinating the direction of foreign orders to affiliates abroad who would there following on that execute on behalf of U.S. customers as delegated.  Informational services, meaning news and information gathering and dissemination to other traders and sales force with regard to the marketplace as well as international securities.  Supervising the traders in their day-to-day trading activity and market making activities, as well as supervising those three sales traders in their account coverage and sales practices. |

**EXHIBIT**

**PX-10**

| | |
|---|---|
| 59:13-24;<br>61:11-61:21 | Q.    Is Mr. Ludovico -- and if it is different during the course of time from, say, 2011 to present -- does he normally act as an account executive?<br>ADAM MATTESSICH:    During the period in question Mr. Ludovico has largely been allowed to wear two roles.  Predominantly his job at the firm has been as trader but he and certain other individuals within the firm have been allowed to both act in an AE capacity as well as a trader's capacity.<br>Q.    AE means account executive?<br>ADAM MATTESSICH:    Account executive.<br><br>*    *    *<br><br>Q.  What other individuals were allowed to wear both the AE and trader hats, if you can recall?<br>ADAM MATTESSICH:   Within the international equities department Max Shea, I believe, also has an AE number.<br>Q.  S-H-E-A?<br>ADAM MATTESSICH:   S-H-E-A.  As well as Julian Cash J-U-L-I-A-N, C-A-S- H.  And possibly -- although I am not certain, Russell Bissett B-I-S-S-E-T-T. |
| 76:14-76:19 | Q.  Would Mr. Ludovico be able to participate in such revenue sharing without your knowledge or consent?<br>ADAM MATTESSICH:   Not that I am aware of, given the ways in which revenue sharing would need to occur and/or the checks and balances in place at the firm.  I can't imagine a scenario where that might have occurred.  However, anything is possible. |
| 81:12-17 | Q.  Did you supervise Mr. Ludovico's activities during that period of time?<br>ADAM MATTESSICH:   Yes.<br>Q.  Does that include activities in his capacity as an account executive?<br>ADAM MATTESSICH:   Yes. |

SEC Investigative Testimony (8/1/17)

| 4:8-4:12 | Q.   We are on the record at 12:07 p.m. on August 1, 2017.  Mr. Mattessich, will you please raise your right hand?  Do you swear or affirm to tell the truth, the whole truth and nothing but the truth?<br>ADAM MATTESSICH:   I do. |
|---|---|
| 31:18-31:22 | Q.   Did there come a time when you became part of the IB chats with Magna?<br>ADAM MATTESSICH:   I believe so.<br>Q.   Why did you become a part of the chats?<br>ADAM MATTESSICH:   Mr. Ludovico invited me to them. |
| 32:23-32:25 | Q.   In terms of Fair Hills, did there come a time when you became part of a Fair Hills chat?<br>ADAM MATTESSICH:   I believe so. |
| 38:2-38:15 | Q.   Does Exhibit 57 appear to be a copy of the employee handbook that you just mentioned?<br>ADAM MATTESSICH:   Yes.<br>Q.   Have you reviewed the Cantor employee handbook during your time at Cantor?<br>ADAM MATTESSICH:   I reviewed it and acknowledged receipt and reading of it upon joining Cantor Fitzgerald and then subsequent additions and addendums to it when provided them, reviewed either the entirety of it or if there was a synopsis provided by H.R. or others, that.<br>Q.   Did you provide any annual certifications related to the issues described in the employee handbook?<br>ADAM MATTESSICH:   Generally, yes. |
| 44:10-44:20 | Q.   Mr. Mattessich, is Exhibit 58 a copy of the WSPs you were referring to earlier?<br>ADAM MATTESSICH:   Yes.<br>Q.   And this copy of the WSP appears to be from October 2011; is that right?<br>ADAM MATTESSICH:   Yes.<br>Q.   Did you review Exhibit 58 in 2011 and thereafter?<br>ADAM MATTESSICH:   I reviewed the WSPs on multiple occasions.  I can't say whether I specifically reviewed the October 2011 edition. |
| 44:21-45:2 | Q.   Have you been, prior to today, provided annual certifications of your compliance of the WSPs during the period that you worked at Cantor?<br>ADAM MATTESSICH:   I believe so.<br>Q.   So that would include one in 2011, one in 2012, one in 2013 and so forth?<br>ADAM MATTESSICH:   Presumably. |

SEC Investigative Testimony (12/19/17)

| 131:4-131:7 | Would you please raise your right hand. Do you swear or affirm to tell the truth, the whole truth and nothing but the truth?<br>MR. MATTESSICH:  I do. |
| --- | --- |
| 134:25-135:5 | Q.   Okay.  And you understand you're under oath again as you were last time?<br>ADAM MATTESSICH:    I do.<br>Q.   And that it's a crime to lie under oath?<br>ADAM MATTESSICH:    I do. |
| 136:2-136:17 | Am I correct that you're in your second employment stint at Cantor Fitzgerald?<br>ADAM MATTESSICH:    Yes.<br>Q.   When was your -- when was your first stint?<br>ADAM MATTESSICH:    January of 1997 through June – June 26th of 2001.<br>Q.   Okay.  And during that time what was your position, just to refresh our memories?<br>ADAM MATTESSICH:    Trader.<br>Q.   And how were you compensated as a trader during that first stint at Cantor?<br>ADAM MATTESSICH:    Salary plus discretionary bonus.<br>Q.   Okay.  Did you receive any commission compensation during that time?<br>ADAM MATTESSICH:    No. |
| 136:18-137:2 | Q.   Are you aware of whether during that time the firm paid commission compensation to any other traders?<br>ADAM MATTESSICH:    To the best of my knowledge, the firm paid sales traders on a compensation -- on a commission compensation basis and their market maker/execution traders, which I was, generally on a salary/bonus model.  And there may have been a handful of individuals that were hybrids, but I don't have any direct knowledge. |
| 137:3-137:6 | Q.   Okay.  And did you -- what were the factors that went into your discretionary bonus during that first stint at Cantor?<br>ADAM MATTESSICH:    Trading, P&L and client servicing. |
| 137:21-138:5 | Q.   During that first tenure were there any -- did you receive payments from any other individual at Cantor outside of the firm's normal compensation process?<br>MR. ZELENKO:  You mean directly from another employee?<br>Q.   Just any -- any payment from another employee outside of the -- your paycheck that the firm would give you.<br>ADAM MATTESSICH:    None that I recall. |

| | |
|---|---|
| 138:23-139:3 | Q.   And when did you return?<br>ADAM MATTESSICH:   I returned October of 2001.<br>Q.   Okay.  And what was your position when you returned?<br>ADAM MATTESSICH:   I returned to be a senior trader on the desk. |
| 139:11-139:24 | Did there come a time when you had supervisory responsibilities over other Cantor employees?<br>ADAM MATTESSICH:   Yes.<br>Q.   When was that, approximately?<br>ADAM MATTESSICH:   Approximately, 2004 or 2005.  I'm not exactly sure on the timing, but approximately three years after my return -- three to four years after my return I was promoted to head of the desk and took on supervisory responsibilities for a small group of individuals.<br>Q.   And as -- when you say "the desk," you're referring to the international --<br>ADAM MATTESSICH:   International equities. |
| 140:2-140:8 | Q.   It's okay.  So, who were the three or four individuals that you had supervisory responsibility over at that time?<br>ADAM MATTESSICH:   Joseph Ludovico, Dave Pennella, Max Shay, Steve Noden, one other trader who's no longer with the firm.  His name's escaping me right now. |
| 140:9-140:19 | Q.   Okay.  Did there come a time when your supervisory role expanded to -- to be over additional employees or include additional employees at the firm?<br>ADAM MATTESSICH:   Yes.<br>Q.   When did that happen?<br>ADAM MATTESSICH:   Approximately, 2007 or 2008.  I -- additional to my trading supervisory responsibilities I was given supervisory duty over a handful of international sales traders based in the United States. |
| 140:20-141:11 | Q.   And just to pause, just for the record, if you could explain what the difference is between a trader -- you referred to a trader and you referred to an international sales trader.  Can you just explain the difference between those two roles.<br>ADAM MATTESSICH:   Sure.  Trader at it's most basic, the primary job function is to facilitate the execution of trades.  And most of their capacity is market facing in nature, meaning, they're pushing the buttons that actually interact with the marketplace versus a sales trader, their primary responsibility is to be client facing and client servicing, to provide market intelligence and color to clients and to bring orders through the door, hand them off to a trader for execution. |

| 142:19-143:1 | Q.    Would -- when you came back to Cantor before you were promoted to be head of the desk did you -- you were -- is it correct that you were an execution trader?  When you say you were a trader -- <br> ADAM MATTESSICH:    Yes. <br> Q.    -- you were an execution trader? <br> ADAM MATTESSICH:    Correct. |
|---|---|
| 143:18-144:8 | Q.    Okay.  And with respect to those accounts how were you -- well, I guess I didn't ask you this question.  During that period where you came back to the firm before you were promoted to being head of the desk what was your compensation structure? <br> ADAM MATTESSICH:    Salary plus discretionary bonus. <br> Q.    So, similar to what you had prior in the prior stint? <br> ADAM MATTESSICH:    Yes. <br> Q.    Okay.  So, with respect to the those accounts -- those five client accounts were there any -- was there any other compensation such as commission based on the transaction activity in those accounts? <br> ADAM MATTESSICH:    There was not that I can recall. |
| 144:9-145:15 | Q.    Okay.  And help me understand why that was.  You testified earlier that people in the sales trading role who helped out with clients could -- it was your understanding that they received commission.  Why is it that you wouldn't receive commission for, basically, doing the same thing in your role? <br> ADAM MATTESSICH:    The -- I don't know what the – my boss's logic was.  I can speculate based on myself being a manager today that, to the extent possible, considering manpower constraints, et cetera, it's preferable to have as clearly defined roles as possible and clearly defined tasks as possible.  And so, while there are individuals who can and should be hybrids because of the nature of their relationships and the nature of the customers they service, my primary duties were execution trading. <br>         And so, to the extent I had a handful of customers who did very limited amounts of commission business being paid to Cantor, in most cases those five customers were Canadian broker-dealers who had reciprocal relationships with the firm where we would help them execute in certain markets that they didn't have access to otherwise and they would help us execute in the Canadian marketplace.  And so, there was bidirectional commissions being paid.  And I speculate that, to some degree, because of that bidirectional nature, management at that point chose to not have their traders be paid for the inbound commissions. |

| 149:4-149:21 | Q.   Okay.  I guess what I'm trying to understand is, did -- when Mr. -- whenever that time was when Mr. Ludovico got to the point where he was going to receive commission compensation for these customers, including customers that you had relationships with, did you, yourself, seek to get commission compensation on the accounts that were your relationships?<br>ADAM MATTESSICH:   I did.  I -- I went to management to inquire about being compensated for those relationships and I don't recall a specific conversation, but my vague recollection of – of the events is such that they essentially said, you're one of my senior traders.  Just go do the job, service the accounts, get trades executed properly and let somebody who is either a dedicated sales trader or a hybrid sales trader be the one to officially service the accounts. |
|---|---|
| 149:22-150:10 | Q.   So, let's just break that down.  Who is -- who in management did you have -- did you communicate with about this topic?<br>ADAM MATTESSICH:   My direct supervisor was Keith Rance. So, I'm certain that I had some conversation with him about it, but more importantly, given the state of the firm at the time, it was exceedingly flat structure.  There was essentially a couple of desk heads and CEO.  So, almost everything went just directly to the CEO, Phil Marber.  And given the situation he was sort of ruling on anything and everything rather swiftly.  So, I imagine that that conversation in some degree was had with Phil Marber. |
| 152:7-152:16 | ADAM MATTESSICH:   So, given the response I got from management that I should maintain my salary/bonus structure and hand off primary account coverage duties to somebody else, I suspect that I probably didn't receive it poorly.  I just assumed that I would be compensated either from individuals who were going to assume the primary coverage component of servicing those customers or ultimately that I would have a case to argue with my superiors at bonus time. |

| 156:16-158:3 | Q.   Okay.  Why don't you just explain how that came -- how that came about.<br>ADAM MATTESSICH:    Over time there were various relationships that I had that my relationship with the customer was stronger than anybody else on the trading desk.  And given the delineation of duties, as well as, time constraints of being -- moving up in terms of my supervisory duties eventually, but prior to that just in terms of my execution duties, I handed off various relationships and the -- the primary task of account coverage to Mr. Ludovico and we serviced those accounts together.  And, as well, Mr. Ludovico had certain relationships that he was servicing that he was the stronger relationship with the account, but he needed the assistance of an execution trader and/or a more senior person.<br>     And so, at some point in the course of that several years where I was handing off certain relationships I had previously had to him for servicing, and then continuing to help him cover those accounts, we initially began talking about, okay, who added what value, should we kind of try to mathematically determine exactly who added what value and -- and attempt to kind of divide the commission money in some formulaic way.  Which, because of the fluidity of one month or one week one of us might be servicing those accounts dramatically more than the other, a set equation really didn't make sense.  It was too cumbersome to try to formulaically do something.<br>     So we agreed upon just an ad hoc, go forward with if Mr. Ludovico felt I added value to servicing the accounts he would split commissions, largely at his discretion.  And if I ever disagreed with, sort of, his assessment of things, we would -- we would talk about it. |
|---|---|
| 161:22-162:3 | Q.   How were the payments made when they eventually started?<br>ADAM MATTESSICH:    By check.<br>Q.   How were the checks -- how did Mr. Ludovico provide you with those checks?<br>ADAM MATTESSICH:    He wrote them on the trading desk and handed them to me. |

| | |
|---|---|
| 163:4-163:22 | Q.   The question though was, what's your understanding?  You testified that you thought it was roughly 50/50.  What's that based on?  Did you talk about it?  Did you say, hey, we're going to do this roughly 50/50?<br>ADAM MATTESSICH:   Yeah.  Yeah.  When he and I discussed splitting up the money, at his suggestion he said, look, we're partners with these accounts.  If you open an account that's on my pad that's explicitly your relationship, that's one thing.<br>If I open an account that's just me, that's one thing, but all these accounts in question that I previously mentioned are really a tag team effort to service them.<br>Q.   Yep.<br>ADAM MATTESSICH:   And so, unless there's a clear abundance of one of us doing the lion's share of work, we're just partners.  We'll just split the money. |
| 163:25-164:9 | Q.   You said it was a 50/50 split as to the five accounts that you talked about earlier?<br>ADAM MATTESSICH:   Yes.<br>Q.   Okay.<br>      BY MR. FORTINO:<br>Q.   Were there any other accounts that were included in the split?<br>ADAM MATTESSICH:   That methodology largely persisted regardless of what new accounts were brought on to Mr. Ludovico's sales coverage universe. |
| 165:11-165:20 | Q.   So, let's talk about account executive, that designation for a second.  Am I correct that Mr. Ludovico as the account executive for these various accounts had an account executive number at Cantor?<br>ADAM MATTESSICH:   Yes.<br>Q.   And was that used to insure his commissions were routed to -- to him from those accounts?<br>ADAM MATTESSICH:   Yes. |

| 166:6-167:21 | Q.   Okay.  And how did that – just describe what you know about that process and how that worked.<br>ADAM MATTESSICH:   Sure.  To the best of my knowledge, everybody, any sales or trading role, has an AE code.  They are given it when they are given sales or trading responsibilities.  Whether or not that AE code is eligible to be paid commissions that accrue to it is a separate conversation and a separate amount of back office and administrative processing, but every front office person servicing a trade or a customer has one.  And it's used for various operational processes to track who touched a given trade and who spoke to a given client.<br>    As such, I had an AE number that actually originated from my first stint at Cantor Fitzgerald that was reinstated when I returned to Cantor Fitzgerald.  Neither my first stint, nor initially when I returned to Cantor Fitzgerald, was my AE number approved for payout.  Hence, the conversation I at some point had with management about, could I be paid.<br>    The -- the firm's process, assuming that different AEs have been approved to be paid, today -- I don't know what it was then because I wasn't in management or administration at the time, but today the process looks like, the sales manager is the primary responsibility for reviewing requests to have payout AEs and requests for who covers what accounts.  And they determine who's going to be assigned as a primary account executive, who's going to potentially be a back up account executive.  If there's going to be split coverage that's -- the percentages are, to the extent possible, determined at that time.  The sales manager approves that and instructs administrative and operational groups to hard code that into a database somewhere in the back end.  That's then reflected on trades as well as on the commission system. |
|---|---|
| 170:3-170:7 | Q.   When you entered into this arrangement with Mr. Ludovico who else did you discuss it with at Cantor?<br>ADAM MATTESSICH:   I don't recall if I did or didn't have discussions with anybody else about it. |
| 176:5-176:8 | Q.   Okay.  And you're familiar generally I take it with -- with the firm's internal policies and procedures?<br>ADAM MATTESSICH:   Yes. |

| 187:19-188:20 | Q.   Earlier we talked about a conversation that I think you generally recalled with – with the CEO of the firm when you returned in 2001 about sort of receiving a pay out from the five accounts you covered.  Do you remember that?<br>ADAM MATTESSICH:    Yes.<br>Q .   As part of that conversation did you ask for permission to receive tips from Mr. Ludovico for the commissions related to those accounts?<br>ADAM MATTESSICH:    I don't recall expressly asking for that arrangement.  I guess more broadly as I recall the conversation with him, it was – it was based more in given the administrative burden of setting up a pay out AE then paying monthly becomes a manual process, even to this day.<br>Given the lack of individuals that could actually do the processing, et cetera, as well as, the delineation of tasks between a senior trader and at the time what was a junior trader becoming a hybrid, his response was one more of, I'm not giving you a pay out AE for a handful of accounts.  Give those accounts over to somebody else who already does that function and we already do all these tasks for every month and we'll sort out the compensation.  And what that meant I don't expressly know. |
|---|---|
| 188:21-189:7 | Q.   So -- so you remember Mr. Marber saying that -- that -- that the firm would sort out the compensation for you related to those five accounts?<br>ADAM MATTESSICH:    Yeah.  It was a -- it was a -- to the best of my recollection, more of just a, kind of, get out of my office kind of.  You know, don't worry we'll sort this out.  You can go now.<br>Q.   Did you ever have a follow-up conversation with Mr. Marber how to sort out your compensation with respect to those five accounts?<br>ADAM MATTESSICH:    Not that I recall. |
| 191:15-191:20 | Q.   In other words, it may appear to someone just looking at the records that Mr. Ludovico had already received more compensation than he actually had because he had given some of it to you?<br>ADAM MATTESSICH:    Correct. |

| 208:2-208:20 | Q.   Through -- through your professional career are you -- have you become aware with requirements broker-dealers have to keep books and records?<br>ADAM MATTESSICH:   Yes.<br>Q.   Okay.  And what is your general understanding of -- of those requirements if you could just summarize it?<br>ADAM MATTESSICH:   Broker-dealers have to keep accurate records of which AEs -- which -- which – which registered individuals are conducting what businesses with which accounts and what commissions are generated on the back of those accounts, et cetera.  I believe the time frame is readily available for three years.  Some were for seven.  I don't know specifics on what – what actually constitute what type of record or real detailed knowledge of what records are or aren't kept where or how. |
|---|---|
| 208:21-209:10 | Q.   With regard to -- and is that an understanding that you had at the time that you were engaged in this practice with Mr. Ludovico?<br>     MR. ZELENKO:  When you say, "the practice," can you just clarify, Phil.<br>Q.   Yeah.  The payments of receiving payments from Mr. Ludovico.<br>ADAM MATTESSICH:   I, at some point during that time, took and passed my Series 24.  So, without an expressed knowledge of when I became aware of it, I have to assume it was in conjunction with studying for my Series 24.  So, at some point during the time where this arrangement occurred I became aware of books and records in greater detail than I may have had previously. |
| 209:25-210:17 | Q.   Well, you, yourself, personally conducted some of the trading activity during the time frame you were receiving payments from Mr. Ludovico, correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   And your AE code wasn't associated with the account, at least for the purposes of being the registered account executive during that time frame, correct?<br>ADAM MATTESSICH:   Correct.<br>Q.   Okay.  And -- and in fact, the payments that you received from Mr. Ludovico weren't reflected in any commission runs at Cantor, as far as you know; is that right?<br>ADAM MATTESSICH:   As far as I know, yes.<br>Q.   Did you, yourself, provide information about those payments to the firm?<br>ADAM MATTESSICH:   No. |
| 221:5-221:9 | Q.   Okay.  Generally with respect to the checks you received from Mr. Ludovico, was it your practice to deposit them in that Chase account?<br>ADAM MATTESSICH:   Yes. |

| 222:11-222:15 | Q.    When you received these checks and deposited them into your account would you subsequently report that income on your tax return?<br>ADAM MATTESSICH:    No. |
|---|---|
| 223:19-223:24 | Q.    Let's talk about the second period when you returned to the firm.  Any occasion to overhear other individuals at the firm discussing payments?  Obviously aside from the ones you were involved in.<br>ADAM MATTESSICH:    None I recall. |
| 225:17-225:20 | Q.    And I think you testified it earlier that you -- how often did you typically receive checks from Mr. Ludovico?<br>ADAM MATTESSICH:    Monthly. |
| 234:15-235:16 | Q.    So, aside from the communications you had in person with Mr. Ludovico, were there occasions where you would have electronic communications with him relating to the payments?<br>ADAM MATTESSICH:    I don't recall ever having any conversations with him in a -- in a written medium.<br>Q.    Okay.  And was there -- is there a reason for that?<br>ADAM MATTESSICH:    We sit next to each other for 12 to 14 hours a day for 50 weeks a year for the last 17 years.  We spend more time with each other than our families.  We can just talk and talk – you know, turn and talk.<br>Q.    Did you ever have occasion to text him for any other purpose?<br>ADAM MATTESSICH:    Yeah.  We might text each other to say, hey, I have a meeting, I'll be late.  Hey, I'm taking my kids to school in the morning, I'll be late.  Hey, I need to go to a doctor's appointment I need to leave early tomorrow.  Hey, what are you doing this weekend?  My family is having a barbeque, do you want to come over?<br>Q.    But you don't recall ever texting him with respect to this topic, the payments or the commission sharing?<br>ADAM MATTESSICH:    No. |

Deposition (2/7/20)

| | |
|---|---|
| 10:1-10:4 | (Witness sworn.)<br>THE REPORTER:  State your name and address for the record, please.<br>THE WITNESS:  Adam Mattessich, |
| 15:5-15:9 | Do you understand you're under oath today?<br>ADAM MATTESSICH:   I understand.<br>Q.  And you understand your oath requires you to answer all questions truthfully?<br>ADAM MATTESSICH:   I do. |
| 19:12-19:17 | Q.   Finally, the Series 24?<br>ADAM MATTESSICH:   Series 24 is the general securities principle.  And it encompasses -- sometimes referred to as the supervisor's exam.  It is the requirement for any individual who is tasked with supervising other Series 7 registered individuals. |
| 20:20-21:1 | Q.   What precipitated you taking the Series 24 exam in 2003 or 2004?<br>ADAM MATTESSICH:   I was a senior trader on the international equities desk.  And my direct supervisor at the time, Keith Rance, requested I do so so that the desk would have a 24 when he was out of the office, vacation, et cetera. |
| 28:17-29:13 | Q.   What was the -- what was your position at that time?<br>ADAM MATTESSICH:   I -- I was global chief operating officer of equities.<br>Q.   How long did you hold that position?<br>ADAM MATTESSICH:   Approximately six months.<br>Q.   You would have started in that position approximately August of '17?<br>ADAM MATTESSICH:   Yes.<br>Q.   What were your duties as the global COO of equities?<br>ADAM MATTESSICH:   To interface with all accounting and operational activities and HR activities with regard to the equity business.  Directing technology, directing accounting, et cetera, with any projects for equities, any reconciliations for equities, any operational problems for equities.<br>As well as interfacing -- being the interface between departments and desk heads within the equity division and compliance and legal.  As well as representing management as necessary in any ongoing legal matters. |

| | |
|---|---|
| 30:9-31:3 | Q.   In August of '17, before you became the global COO of equities, what was your title?<br>ADAM MATTESSICH:   Global head of -- global cohead of equities.<br>Q.   How long did you have that position for?<br>ADAM MATTESSICH:   '16 -- I assumed it mid December of '15, so roughly a year and a half.<br>Q.   What were your responsibilities as the global cohead of equities?<br>ADAM MATTESSICH:   Managing all business decisions and front-office employees within the equity division on all matters related to sales and trading of equity securities for the firm.<br>Q.   When you say "front-office employees," what do you mean?<br>ADAM MATTESSICH:   Salesmen in any capacity.  Research sales.  Sales trading.  Managing execution traders, market-makers.  Equity derivative salesmen and traders.  Syndicate and book-building staff for the capital markets group.  Research sales.  And a somewhat dotted line to actual research department. |
| 31:4-31:14 | Q.   Before that position, what was your title?<br>ADAM MATTESSICH:   Global head of equity trading.<br>Q.   And when did you start in that position?<br>ADAM MATTESSICH:   Mid 2013.<br>Q.   What did that job entail?<br>ADAM MATTESSICH:   Managing all execution traders and market-makers of equity products.  And representing -- being the senior person on anything that required representation within the equity trading space, such as best execution committees, decisions on trading systems, things of that nature. |
| 31:18-31:25 | Q.   Prior to being the global head of equity trading, what was your position?<br>ADAM MATTESSICH:   The head of international equities.<br>Q.   Was that a global role?<br>ADAM MATTESSICH:   No.<br>Q.   When did you become the head of international equities?<br>ADAM MATTESSICH:   Approximately 2004. |

| 32:1-32:13 | Q.  We're going to spend more time on this segment of your career at Cantor, I think, but, generally, can you give us an overview of what your responsibilities entailed at that time?<br>ADAM MATTESSICH:   Initially it was managing and supervising the execution traders on the international desk, all based in New York, as well as carrying out trades myself in international equities for Cantor's sales traders.<br>Q.  Did that change at any point?<br>ADAM MATTESSICH:  It did.  Eventually -- I'm uncertain of the exact timing, but at some point several years later, I was given a supervisory duty over the international sales traders as well as the execution traders. |
| 32:22-33:5 | Q.  I guess let's just start with -- let's go back to October of '01, when you were a trader.  How were you compensated for your work at Cantor?<br>ADAM MATTESSICH:   Salary plus discretionary bonus.<br>Q.  Did that compensation arrangement of salary plus discretionary bonus continue when you became the head of the international equities desk?<br>ADAM MATTESSICH:  Yes. |
| 38:2-38:10 | Q.  All right.  I've mentioned commission compensation.  Can you just describe what you understand commission compensation to be.<br>ADAM MATTESSICH:   A compensation arrangement whereby commissions paid to the firm by a customer that are attributable to your work are accrued.  Costs and deductions are made, and the remaining amount, subject to some percentage payout schedule, is paid to you as your periodic compensation. |
| 39:13-40:5 | Q.  Did you ever request permission to receive commission payments directly from Cantor Fitzgerald during the time that you were an equity trader?<br>ADAM MATTESSICH:  Yes.<br>Q.  When was that?<br>ADAM MATTESSICH:   Approximately -- somewhere around Christmas of '01 and possibly into January of '02.<br>Q.  And to whom did you make the request?<br>ADAM MATTESSICH:  Two individuals.  My initial request was to my direct supervisor, Keith Rance, and then subsequently to Phil Marber, the CEO.<br>Q.  Were there specific accounts that you were requesting to receive commission compensation on?<br>ADAM MATTESSICH:  Yes.<br>Q.  What were those accounts?<br>ADAM MATTESSICH:   Smith Management [sic].<br>Q.  Any others?<br>ADAM MATTESSICH:   Not at that time. |

| 40:6-40:11 | Q.   And what was Mr. Rance's response when you asked to be able to receive commission compensation on the Smith account?<br>ADAM MATTESSICH:   He was fine with it, but he was not in a position to authorize the actual payouts, only Mr. Marber was. |
| --- | --- |
| 40:15-41:14 | Q.   And what did you say to Mr. Marber?<br>ADAM MATTESSICH:   I described my relationship with Smith Management and asked if I could receive payments for commissions generated.<br>Q.   And what did he say?<br>ADAM MATTESSICH:   He asked me some questions.  We discussed the accounts further.  I don't recall the specifics of that.  Ultimately saying, yes, you can cover the account, partner with a sales trader who has an AE that you can run it through, and we will figure out the payments.<br>Q.   Did he say anything else?<br>ADAM MATTESSICH:   He sort of tossed me out of his office.<br>Q.   What do you mean by "tossed" you out of his office?<br>ADAM MATTESSICH:   I tend to the verbose, and he tends to be extremely to the point and perhaps curt in his interactions with people.  And given -- that, combined with the time frame where it was all hands on deck trying to rebuild, time was at a premium.<br>      And so he -- as I best recall it, he effectively said, okay, done, you know, go cover the account and now get out of my office.<br>Q.   Did he -- did he elaborate at all on the statement you reported, "we'll figure out the payment"?<br>ADAM MATTESSICH:   Not that I recall. |
| 45:12-46:4 | Q.   Did anyone -- did Mr. Marber -- strike that.<br>      Did Mr. Marber tell you, in that conversation, that it was acceptable for you to receive payments directly from other employees of Cantor Fitzgerald?<br>ADAM MATTESSICH:   I don't recall.<br>Q.   Did Mr. Rance tell you, during these conversations you described, that it was acceptable for you to receive payments from other people at Cantor Fitzgerald?<br>ADAM MATTESSICH:   I don't recall.<br>Q.   Did you ask Mr. Marber whether it would be appropriate for you to receive payments from other employees at Cantor Fitzgerald?<br>ADAM MATTESSICH:   I don't recall.<br>Q.   Did you ask Mr. Rance whether it would have been appropriate for you to receive payments from other employees at Cantor Fitzgerald?<br>ADAM MATTESSICH:   I don't recall. |

| 50:11-50:20 | Q.   Are you familiar with something called an account executive code? <br> ADAM MATTESSICH:   Yes. <br> Q.   Also known as an AE code? <br> ADAM MATTESSICH:   Yes. <br> Q.   What is an AE code? <br> ADAM MATTESSICH:   All front-office individuals at Cantor get an AE code to be attached to account assignments and/or trades so that the firm can track, for instance, where commissions should get paid from a given transaction. |
|---|---|
| 53:6-53:20 | Q.   Is there an approval process for assigning AE codes to customer accounts? <br> ADAM MATTESSICH:   There is a process for assigning an AE code to a new customer account. <br> Q.   What is that process? <br> ADAM MATTESSICH:   The new account form has to be approved by a principal.  And that -- the principal who is approving the new account form would simultaneously be approving the AE that is to be affiliated with that account. <br> Q.   When you say "principal," would that have <br> included you once you became head of the international equities desk? <br> ADAM MATTESSICH:   Any principal can approve a new account form. So, yes, once I was head of the desk, I could have approved that. |
| 53:21-54:3 | Q.   What about if there's a change in account coverage from one AE code to another AE code; is there an established process for changing coverage on an account? <br> ADAM MATTESSICH:   Not that I'm aware of. <br> Q.   Is there an approval that's required in order to change coverage on an account? <br> ADAM MATTESSICH:   Not that I'm aware of. |

| | |
|---|---|
| 54:4-54:22 | Q.   What about -- sort of a subset of that.<br>  Are you familiar with something called an AE split code or an AE split?<br>ADAM MATTESSICH:   Yes.<br>Q.   What's that?<br>ADAM MATTESSICH:   So each individual has an AE code that represents 100 percent payout of whatever commission is due to be paid.  An AE split code is a new AE code comprised of at least two 100 percent payout AE codes with their respective share of that AE code assigned to them.<br>Q.   So in other words -- what does that percentage signify?<br>ADAM MATTESSICH:   Cumulatively, the two or more parties that are on that split AE code -- whatever percentages are individually assigned to them would need to total<br>100 percent.<br>Q.   For what purpose?<br>ADAM MATTESSICH:   For recording of commissions paid. |
| 55:6-55:15 | Q.   You mentioned that you -- as a principal, at a certain point during your tenure, you would have been one of the people who could have approved a new account form and the initial AE assignment; correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   Is there any other role that you played in assigning or in -- in the AE code process?<br>  MR. GREENSPAN:  Objection.<br>  THE WITNESS:  I don't believe I've ever had any other formal role in the AE process. |
| 60:25-61:9 | Q.   Was it your -- was it your function at this point in time to approve new splits?<br>ADAM MATTESSICH:   At no time was it specifically my function to approve new splits.  At some point during my increased responsibility and subsequent promotions, I was allowed to approve splits, et cetera, new accounts, things of that nature, beyond my international group.<br>  But I couldn't recall specific dates, and I don't believe there was a specific sort of authorization that said, now you can approve X. |
| 63:19-64:1 | Q.   On those occasions when you were asked to approve a coverage change, what criteria would you have used to approve a coverage change?<br>ADAM MATTESSICH:   I would speak to the individuals, either directly or via their branch managers, to ensure that all the parties involved were in agreement on the change or, if they were in disagreement, that it had been resolved.  And then that's really it. |

| | |
|---|---|
| 75:13-75:18 | Q.   Just to pause for a minute, when you approved these coverage changes -- just to make sure the record is clear, when a new AE code is assigned to the account, the account is attributed to a new rep or reps for compensation purposes; is that correct?<br>ADAM MATTESSICH:   Yes. |
| 80:12-80:24 | Q.   If you look at the bottom e-mail, again from Debbie Evans, it appears that there have been several occasions, in the e-mails we've looked at so far, where people from the new accounts group are stating as firm policy that changes have to be approved by one of three people.<br>     Was that, in fact, the firm policy at this time?<br>ADAM MATTESSICH:   It was eventually the firm policy.  And I can only infer from the statements evident in these e-mails you've shown me that it was at each of the dates of the respective e-mails, but I don't directly recall at what point I was added to any sort of approval process. |
| 82:9-82:21 | Q.   Why was it important for there to be an approval before the AE changes took place?<br>ADAM MATTESSICH:   Because there could be a potential conflict between the salesmen who were to get paid.  Because there may be some kind of formal rebate arrangement, such as commission sharing or soft dollars, that need to be addressed.<br>     There may be other charges that the – to research, et cetera, that the salesmen and/or operations people carrying this out are unaware of.<br>     And so any of those things, which might not be evident in an e-mail, need to at least be thought about or inquired about. |
| 90:25-91:10 | Was there a mechanism at Cantor for the sales coverage on an account to direct some of the commissions to another AE code at the firm on a transaction basis?<br>     MR. KELLEHER:  Objection to form.<br>     THE WITNESS:  During what period of time?<br>BY MR. FORTINO<br>Q.   I'm asking just generally during your tenure at the firm.<br>ADAM MATTESSICH:   Yes.  At the end of my tenure at the firm, there was a process that I'm aware of to change the individual transaction-level payment of commissions. |

| 91:11-92:25 | Q.   What about -- are you familiar with a term called "journaling"? |
| --- | --- |
| | ADAM MATTESSICH:   Yes. |
| | Q.   What is journaling? |
| | ADAM MATTESSICH:   It is, as I understand it, having somebody in the accounting department make a debit and corresponding credit entry between two accounts.  Those accounts can be commission accounts for -- corresponding to a particular AE number, or they can be between a house account, like a trader's P&L account, and another P&L account, or between a P&L account and an AE. |
| | Q.   So, hypothetically, if I were a sales trader and -- would I be able to request that a portion of the commissions from my AE account be journaled to another employee's AE account? |
| | ADAM MATTESSICH:   You certainly would, at the end of my tenure, have been able to request that.  I don't know if there was a specific policy and procedure around any kind of approval of it that it needed to go through. |
| | Q.   When you say at the "end of your tenure," what do you mean by that? |
| | ADAM MATTESSICH:   Well, I was at the firm for 28 years.  And if we exclude the first stint at Cantor, I was there 18 years -- excuse me. Misstated. |
| | I was at the firm 21 years, and 18 of them in the second stint.  Much changed as far as process, procedure, policy as well as my position and corresponding authorities and knowledge of systems and process. |
| | Q.   Right. |
| | So I guess what I'm trying to ascertain is when this journaling that we've just been discussing of commissions -- do you know exactly when that was permissible at the firm, the time period that was permissible at the firm? |
| | ADAM MATTESSICH:   I believe -- I don't know when a mechanism came into being to facilitate the journaling, as I just described, but I don't believe there was ever a time that it wasn't theoretically possible to have accountants move money. |

| | |
|---|---|
| 112:3-114:3 | Q.   So I just want to make sure I understand what you're saying.<br>   So during the time frame this rule was in place, if a rep wanted to split commissions on the books at Cantor through the AE code system, they would need approval from one of three people identified in the various e-mails we've been looking at; correct?<br>ADAM MATTESSICH:   Yes.<br>   MR. GREENSPAN:  Objection.<br>BY MR. FORTINO<br>Q.   But if they wanted to split commissions informally, without going through the official AE code channel, it's your testimony they wouldn't have needed any approval from Cantor?<br>   MR. GREENSPAN:  Objection.<br>   THE WITNESS:  Depending on the time.<br>BY MR. FORTINO<br>Q.   To be clear, I'm talking about the exact same time.<br>   So the time that that rule we've been discussing was in effect, during that time frame, my question is, would it have been permissible for representatives to share commissions outside of the AE code system without getting approval from one of the three people identified in the e-mails we've been looking at?<br>   MR. GREENSPAN:  Objection.<br>   THE WITNESS:  Can you either give me a specific month...<br>BY MR. FORTINO<br>Q.   Let's say July 2013, which is the date -- which is the month in which Exhibit -- the change in Exhibit 55 happens.<br>ADAM MATTESSICH:   To the best of my recollection, July of '13, the firm did not have an established policy on off-books sharing of commissions between representatives.  So if a formal change was to be put through the system of account coverage or splits, it would need to be approved by one of those three individuals, based on the exhibits you've shown me and the time frame that I believe, therefore, a policy was instituted.<br>   But July of '13 predates when I understand the firm to establish a policy regarding individuals sharing commissions with other registered representatives off the books.<br>Q.   When you were at -- when you instruct people to follow the rules, did you ever tell anyone that they had the option of not putting in a change in coverage of the AE code system and they could enter into an informal arrangement?<br>ADAM MATTESSICH:   Not that I recall. |

| | |
|---|---|
| 121:21-122:18 | So I understand -- I want to just focus this next question on the period of 2012, 2013, same time period covered by the exhibits that we've been looking through.<br><br>During that period, would it be fair to say that there was documented in these e-mails a process to request changes in account coverage under the AE code system?<br>ADAM MATTESSICH:   Yes.<br>Q.   And, in fact, you were one of three people who were charged, during that time period at least, with administering that system by approving those requests; correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   We're going to get into sort of informal commission sharing, which we've alluded to already today.<br>I guess my question is, during this time period of 2012 to 2013, are you aware of any written Cantor policy or procedure or even any documentation whatsoever that -- of the Cantor policy that allowed informal commission splitting?<br>ADAM MATTESSICH:   No. |
| 123:19-123:25 | Q.   But your request when you went into the meeting was to have your AE code receive the commissions on the account?<br>ADAM MATTESSICH:   Yes.<br>Q.   And you were not given permission to do that; correct?<br>ADAM MATTESSICH:   No. |
| 127:2-127:16 | Q.   I just want to make sure I understood you.<br>It sounded as though you said Mr. Schrader volunteered to take the Smith Capital account on his AE code?<br>ADAM MATTESSICH:   Yes.<br>Q.   And did you agree?<br>ADAM MATTESSICH:   Yes.<br>Q.   So what happens after that conversation?<br>ADAM MATTESSICH:   I continued servicing the account. Commissions are generated.  They accrue to Mr. Schrader's AE number.  And on a monthly basis going forward, if there were commissions generated by Smith Management, Mr. Schrader wrote me a check from his personal checkbook for the after-tax amount of commission generated. |

| | |
|---|---|
| 127:17-128:2 | Q.  Okay.  When did -- approximately when was the first check given -- did he give you the first check?<br>ADAM MATTESSICH:   I don't recall specifically.  Presumably after the first month of moving the account to his name, but I don't know exactly what month that occurred.<br>Q.  Do you know what year?<br>ADAM MATTESSICH:   I believe that was 2002.<br>Q.  How long did the practice of Mr. Schrader paying you commissions on the Smith Capital account continue for?<br>ADAM MATTESSICH:   I believe two to three years. |
| 128:21-129:3 | Q.   What did you do with the checks that Mr. Schrader gave to you?<br>ADAM MATTESSICH:   Deposited them in my bank account.<br>Q.   Where was your bank account?<br>ADAM MATTESSICH:   JPMorgan Chase.<br>Q.   Did you deposit all the checks he gave you in your bank account?<br>ADAM MATTESSICH:   I believe so. |
| 130:3-130:25 | Q.   Did you ever -- prior to receiving these payments from Mr. Schrader, did you ever seek approval to enter into this arrangement from anyone at Cantor?<br>ADAM MATTESSICH:   Not that I recall.<br>Q.   Did you ever discuss the arrangement with Mr. Schrader with any of your superiors at Cantor?<br>ADAM MATTESSICH:   Not that I recall.<br>Q.   What about with the compliance department?  Did you ever discuss your arrangement with Mr. Schrader with anyone in the compliance department?<br>ADAM MATTESSICH:   Not during that time frame.<br>Q.   You mean during the time you were receiving the payments?<br>ADAM MATTESSICH:   Correct.<br>Q.   Did you ever disclose that Mr. Schrader was making these payments to you to anyone else at Cantor during the time the payments were being made?<br>ADAM MATTESSICH:   I don't recall.<br>Q.   What about after?<br>ADAM MATTESSICH:   I don't recall.<br>Q.   Did you keep any records of the payments that Mr. Schrader made to you?<br>ADAM MATTESSICH:   No. |

| 131:1-131:15 | Q.  Just so I understand, the Smith Capital account, at that time, Mr. Schrader's AE code would have been associated with that account; is that correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   And so the firm's records would have shown that Mr. Schrader was the representative being paid the commissions on the account; correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   In fact, Mr. Schrader was paying those commissions forward to you; correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   To the best of your knowledge, the firm's records -- the firm's records didn't reflect that he was making those payments by check to you?<br>ADAM MATTESSICH:   I don't believe so. |
|---|---|
| 132:15-133:20 | Q.  So can you explain how it came to be that Mr. Ludovico began making payments to you?<br>ADAM MATTESSICH:   When Mr. Ludovico moved from focusing on European equities, I moved him over to work with me on Canadian equities. I had several Canadian broker/dealers that Cantor Fitzgerald used to execute trades in the Canadian marketplace.<br>    Mr. Ludovico was helping me trade Canadian equities through those brokers.  Over time, he developed his own relationships with those customers and convinced them to give us reciprocal business in other equities, typically European and Asian equities.<br>    At some point thereafter, the balance of commission payments between what we were paying the Canadian brokers for their services versus what they were paying Cantor for ours shifted towards Cantor being a net beneficiary of those commission payments, at which point they were put into Mr. Ludovico's AE number for reciprocal payments such that he could get paid for them.<br>    And I don't recall the specific conversation that originated the arrangement, but an informal discussion of some kind occurred where he said, we're covering these accounts together.  I had the relationship for the northbound business, meaning Cantor paying them.  He had developed relationships with those same accounts for southbound business and paying us.<br>    And it was determined that we would just continue to tag team service those accounts and any commissions that he earned, because it was a joint effort, he would pay me something for the effort. |

| | |
|---|---|
| 134:10-134:17 | Q.   And how would Mr. Ludovico make payments to you?<br>ADAM MATTESSICH:   By personal check.<br>Q.   And what did you do with the personal checks that you received from Mr. Ludovico?<br>ADAM MATTESSICH:   Deposited them in my bank account.<br>Q.   Did you deposit all the checks he gave you?<br>ADAM MATTESSICH:   Yes. |
| 134:21-135:7 | Q.   Prior to entering into this relationship with Mr. Ludovico -- or this arrangement with Mr. Ludovico, did you seek approval of the arrangement from any of your superiors?<br>ADAM MATTESSICH:   No.<br>Q.   What about compliance?<br>ADAM MATTESSICH:   No.<br>Q.   Did you disclose the payments Mr. Ludovico was making at any time during which he was making the payments?<br>      MR. KELLEHER:  Objection to form.<br>      THE WITNESS:  Not that I recall. |
| 135:19-136:4 | Q.   So was it really left to Mr. Ludovico's discretion as to the exact amounts of the payments to you?<br>ADAM MATTESSICH:   Yes.<br>Q.   And he would also determine which accounts you would be sharing the commissions on?<br>ADAM MATTESSICH:   Yes.<br>Q.   So would he be in a better position to know which accounts you were actually receiving part of the commissions on?<br>ADAM MATTESSICH:   Yes. |
| 136:5-136:8 | Q.   How long did Mr. Ludovico make payments to you in this manner?<br>ADAM MATTESSICH:   From inception through December of '13, I believe. |
| 140:19-140:23 | Q.   Let me ask you a different question.<br>      Before the SEC investigation in this matter, at any time had you provided Cantor Fitzgerald with a copy of these checks?<br>ADAM MATTESSICH:   No. |
| 149:22-150:5 | Q.   Would it be fair to say that when Mr. Ludovico paid you a portion of the commissions that were earned on his AE code, that you had a financial interest in the transactions that he was processing on behalf of the client?<br>      MR. GREENSPAN:  Objection.<br>      THE WITNESS:  Not specific transactions, but a financial interest in the total account package that he was servicing and I was helping him with, yes. |

| 155:24-156:19 | Q.   During your testimony in the investigative phase of this matter, you didn't mention Mr. Schrader; is that correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   Why not?<br>ADAM MATTESSICH:   I -- to the best of my recollection, combined with rereading my testimony, I don't believe the form of the questions I was asked ever should have elicited a response that included his name.<br>Q.   Okay.  During your testimony -- your earlier testimony, you indicated that Smith Capital was an account that you transferred to Mr. Ludovico; isn't that correct?<br>ADAM MATTESSICH:   Correct.<br>Q.   We just read that section a little while ago.<br>ADAM MATTESSICH:   Yes.<br>Q.   That was inaccurate; correct?<br>ADAM MATTESSICH:   Yes.<br>Q.   In fact, that account had been transferred to Mr. Schrader?<br>ADAM MATTESSICH:   Correct.  It was an inaccuracy on my part. |
|---|---|
| 158:10-159:6 | Q.   During your time at Cantor, were you – did you become familiar with any of the firm's written policies and procedures?<br>ADAM MATTESSICH:   Yes.<br>Q.   Which of the firm's policies and procedures did you have an opportunity to become familiar with?<br>ADAM MATTESSICH:   When --<br>    MR. KELLEHER:  Sorry.  Can we have a time frame on this question.<br>    MR. FORTINO:  During his time at Cantor.<br>    MR. KELLEHER:  During the entire time?<br>    MR. FORTINO:  Yes.<br>    MR. KELLEHER:  Okay.<br>    THE WITNESS:  I, upon joining Cantor, endeavored to read the employee handbook in place at the time in its entirety.  Upon rejoining Cantor, I don't believe any materials of any kind were given to me.<br>    In subsequent years, e-mails would be circulated about new versions of the WSPs being available.  And at some point, at the very least around when I passed my 24, I endeavored to actually read them in their entirety at least once. |
| 167:1-167:7 | Q.   Did you, in fact, review all those policies while you were employed at Cantor?<br>ADAM MATTESSICH:   I don't recall specifically reviewing any or all of them, but I generally endeavored to, at the very least, once read every manual that I was required to do and generally stay abreast of any manual changes, et cetera, as they were brought to my attention. |

# EXHIBIT B

<u>OTHER STATEMENTS OF ADAM MATTESSICH</u>

<u>FINRA Investigative Testimony (12/10/13)</u>

| | |
|---|---|
| 62:13-61:16 | Q.  Do you know, was there a particular impetus for Mr. Ludovico getting his AE rep number?<br>ADAM MATTESSICH:   I don't recall the circumstances under which it was granted. |
| 82:2-82:17 | Q.  Do you know if Mr. Ludovico's compensation in 2011 and 2012 was in any way substantially different from his compensation, for example, in 2010? If you know.<br>ADAM MATTESSICH:   I don't know what compensation he earned in his role as account executive.  Our firm pays account executives a percentage of their commission on a monthly basis and although I could find that out from product control and other accounting parties, it was not readily available to me on a minute-to-minute or day-to-day basis.  I can only speak to his compensation that I had some role in determining his compensation for his trader duties and I don't recall the exact amount by which his compensation varied from 2010 versus 2011 or 2012.  However, in general he, as well as all my traders, I believe, were generally in a declining compensation environment. |
| 82:18-83:11 | Q.  Do you act as account executive on any accounts?<br>ADAM MATTESSICH:   I am the designated account executive on various accounts at the firm that is more a matter of housekeeping.  As every account on our books and records needs to have a designated account executive and we do have various intercompany accounts that are utilized mostly for the purposes of moving securities between operational groups and trading groups or one trading group and another trading group, they don't constitute actual trades, per se, I am the designated AE on various of these, I call them housekeeping accounts, but I -- I may be the designated account executive on other things but I in no way cover directly nor receiving any compensation for speaking to any accounts that you would, or any reasonable man would think of as an account of the firm's. |

**EXHIBIT**

**PX-11**

1

SEC Investigative Testimony (12/19/17)

| 159:12-20 | Q.   Okay. So, going back to the conversation itself. Do you remember which accounts you handed off to Mr. Ludovico, so to speak?<br>ADAM MATTESSICH:   Canaccord Capital, CIBC, Sprout which eventually changed its name to Core-Mark, Smith Management which I previously noted, and  eventually several years later Rossport Investments. |
|---|---|
| 223:6-223:11 | Q.   Did you have occasion to observe any other reps at Cantor engaged in similar tipping activity or payment activity?<br>ADAM MATTESSICH:   No.  I never expressly saw anybody transfer a check or -- or two parties discuss that they were going to. |