UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

                -v.-

ADAM MATTESSICH,

                        Defendant.

18 Civ. 5884 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Following a five-day jury trial, Adam Mattessich ("Defendant") was found liable for aiding and abetting violations of Section 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a), and Rule 17a-3(a)(19) (the "Compensation Record Rule") promulgated thereunder.  The United States Securities and Exchange Commission ("Plaintiff") now seeks a permanent injunction against Defendant for future violations of the Compensation Record Rule, as well as a civil penalty of $240,000.  For the reasons stated in the remainder of this Opinion, the Court grants in part Plaintiff's motion for post-trial remedies, permanently enjoins Defendant from future violations of the Compensation Record Rule, and imposes a civil penalty of $180,000.

## BACKGROUND[1]

**A.    Factual Background**

**1.    Defendant's Role at Cantor Fitzgerald, His Supervision of Traders, and His Receipt of Off-Book Commission Payments**

The Court recounts only the facts relevant to the instant motion for post-trial remedies.  Defendant rejoined Cantor Fitzgerald & Co. ("Cantor") in 2001 following a brief hiatus from the company.  (Tr. 393:2-8).  Thereafter, Defendant took the Series 24 exam, passed it, and became a supervisor at Cantor.  (*Id.* at 393:14-394:25).[2]  By 2004, Defendant was promoted to head of the international equities desk; in that position, he oversaw Joseph Ludovico ("Ludovico") and other Cantor employees.  (*Id.* at 444:9-14).  At Cantor, registered employees like Ludovico were supervised by superiors who had Series 24 licenses, like Defendant.  (*Id.* at 89:17-90:13).  By dint of passing the Series 24 exam, these licensees were knowledgeable of the applicable securities

---

[1]    The facts set forth in this Opinion are principally drawn from the trial record in this case.  ("Tr.").  The Court sources additional facts from the Declaration of Philip A. Fortino and its attached exhibits (Dkt. #135 ("Fortino Decl.")) and the Declaration of Adam Mattessich (Dkt. #137 ("Mattessich Decl.")).

For ease of reference, the Court refers to Plaintiff's memorandum of law in support of its motion for post-trial remedies as "Pl. Br." (Dkt. #134); Defendant's memorandum of law in opposition as "Def. Opp." (Dkt. #136); and Plaintiff's reply memorandum of law as "Pl. Reply" (Dkt. #138).

[2]    According to the Financial Regulatory Authority, or "FINRA," which administers the exam, the Series 24 General Principal Securities Exam

> qualifies a candidate as a general securities principal for FINRA only.  By passing the Series 24, the candidate can supervise all areas of the member's investment banking and securities business, such as underwriting, trading and market making, advertising, or overall compliance with financial responsibilities.

SERIES 24 – GENERAL SECURITIES PRINCIPAL EXAM, https://www.finra.org/registration-exams-ce/qualification-exams/series24 (last accessed Nov. 14, 2022).

rules and regulations, and could ensure that employees complied with such rules.  (*Id.* at 90:1-10, 91:10-92:2, 101:14-20).

Defendant continued supervising Ludovico through 2013.  (Tr. 385:3-11). That year, Ludovico cut checks directly to Defendant to remit a portion of the commissions Ludovico received from Cantor.  (*Id.* at 385:14-23).  Defendant received twelve such checks from Ludovico in 2013, totaling $58,200.  (*Id.* at 386:25-387:3; *see also* Fortino Decl., Ex. 1 (Trial Exhibit PX-1 ("PX-1") (summary of checks))).  But 2013 was not the only year in which Defendant received such checks from Ludovico; rather, Ludovico sent Defendant monthly checks handing over a portion of his commissions for some ten years, from approximately 2003 through 2013.  (Tr. 387:5-23; *see also id.* at 388:2-389:24 (discussing 2011 and 2012 payments from Ludovico to Defendant)).

Defendant was aware that Cantor was required to keep records of commissions paid to its registered representatives.  (Tr. 400:11-401:12). Cantor did so through the use of account executive ("AE") codes, which tracked the traders who worked on transactions and the persons to whom commissions should be paid for such transactions.  (*Id.* at 424:15-24).  Defendant helped administer these codes, and could approve changes to them, including changes to which employees would receive commissions on customer accounts.  (*Id.* at 244:14-245:14, 256:12-18, 271:13-24, 452:7-453:9, 455:16-19).  Accordingly, Defendant or Ludovico could have requested that accounts be split such that their AE codes would reflect commission payment splits between Ludovico and Defendant.  (*Id.* at 456:10-24).  However, only Ludovico's AE code was assigned

3

to the customer accounts that both he and Defendant covered.  (*Id.* at 441:12-442:18 (accounts referred to at trial as the "Canadian accounts"), 442:19-443:10 (additional accounts), 444:9-20 (accounts following Defendant's promotion to Ludovico's supervisor)).[3]  Ludovico's off-book payments to Defendant were — by definition if not by design — not reflected in the AE code system; instead, the system indicated that Ludovico alone was receiving these commissions.  (*Id.* at 447:23-450:9).

Defendant was also aware that he was bound by Cantor's Written Supervisory Procedures ("WSPs").  (Tr. 407:3-408:11).  One of the rules included in the WSPs noted:

> I agree that I will not take, accept or receive directly or indirectly from any person, firm, corporation or association, other than Cantor Fitzgerald, compensation of any nature, as a bonus, commission, fee, gratuity, or other consideration, in connection with any security or commodities, transaction or transactions, except with the prior written consent of Cantor Fitzgerald.

(*Id.* at 408:16-409:3).  Defendant testified as to his belief that his arrangement with Ludovico did not run afoul of this rule, because Ludovico received his commissions from Cantor, and thus Defendant also received his commission payments from the company, albeit indirectly.  (*Id.* at 543:8-22).

---

[3]     Defendant offered evidence at trial that, because of an administrative snafu, his own AE code was assessed extensive, but erroneous fees.  (*See, e.g.*, Tr. 505:15-24 (testifying that the "fee issue" associated with Defendant's AE code affected accounts Defendant covered with Ludovico, including the Canadian accounts)).  Once Cantor learned of Defendant's arrangement with Ludovico in late 2013, Defendant initiated a conversation with Ron Wexler.  (*Id.* at 527:12-25).  After this conversation, the "administrative fee issue" associated with Defendant's AE code was resolved, and Defendant began receiving commission compensation from Cantor through his regular monthly paycheck.  (*Id.* at 528:1-10; *see also id.* at 575:7-13 (same)).

Further, Defendant testified at trial that he had a conversation with Cantor's then-CEO Phil Marber in December 2001 or January 2002 about requesting permission to have Defendant's AE code receive commissions from certain Cantor customers, like Smith Capital.  (Tr. 431:6-24; *see also id.* at 433:10-19).  Defendant did not receive such permission; instead, he was told that the compensation issue would be sorted out later.  (*Id.* at 433:22-436:13). Following this conversation, the AE code for Jacob Schrader, a sales trader on Cantor's international desk, was assigned to the Smith Capital account.  (*Id.* at 436:14-22).  Defendant and Schrader then agreed that Schrader would pay over to Defendant a portion of the commissions on the account by check.  (*Id.* at 436:23-438:21).  At trial, Defendant testified that he was entitled to compensation for accounts like Smith Capital, but that there were administrative issues associated with his receiving commissions for such work. (*Id.* at 497:4-9, 498:2-4, 505:6-14 (testifying that the "fee issue" existed in 2002 and continued to exist in 2013)).

Defendant likewise did not receive approval for his commission-splitting arrangement with Ludovico.  (Tr. 445:18-25, 450:14-23).  When Defendant did disclose to certain superiors that he was receiving commissions from Ludovico, he did not disclose that the commissions were off the books and paid through personal check.  (*Id.* at 450:10-451:3 (disclosing fact of commission split to Elon Spar, but failing to disclose that Defendant had not received permission to split commissions or that payments were not reflected by AE codes)).  Nor did Defendant report the payments he received from Ludovico and other Cantor

employees on his tax returns.  (*Id.* at 447:8-22).  In sworn testimony before

FINRA, Defendant stated that he did not receive compensation for servicing

certain accounts, despite the fact that Ludovico was paying commissions to

Defendant by personal check.  (*Id.* at 467:18-468:24).[4]  Defendant also stated

that he did not have information about Ludovico's compensation, even though

Ludovico made commission payments to him and Defendant received

information about Ludovico's compensation as part of Ludovico's year-end

review.  (*Id.* at 471:1-23).

By the end of 2013, Cantor became aware of Defendant's arrangement

with Ludovico after the latter disclosed it, and Cantor notified Defendant that

the payments had to stop.  (Tr. 471:24-472:24).  Following this disclosure,

Defendant was asked about the payments he received from Ludovico.  (*Id.* at

472:11-22).  During this conversation, Defendant did not inform Cantor of

payments he received from other traders, like Schrader.  (*Id.* at 472:25-473:2;

*see also id.* at 474:14-480:2 (failing to disclose that others at Cantor, including

Schrader, were making off-book commission payments, when asked by Plaintiff

during deposition)).

At trial, Defendant testified that prior to 2014, he was not aware of the

fact that off-book commission splitting arrangements were prohibited at

Cantor.  (Tr. 546:13-547:7).  Other witnesses similarly testified that they did

---

4       Defendant disputes certain representations Plaintiff makes about Defendant's FINRA
        testimony.  (Def. Opp. 16 n.3 ("[T]he SEC asserts that [Defendant] lied during FINRA
        testimony in 2013, though a close examination of the transcript demonstrates that he
        was never asked whether he was splitting commissions and his answers to the
        questions asked were entirely truthful[.]")).

not believe that such arrangements violated any regulatory requirements, and that Cantor announced a new policy prohibiting such arrangements only in 2014. (*See, e.g.*, *id.* at 698:15-700:19). Still other witnesses at trial, including Schrader (*id.* at 234:2-7), Ludovico (*id.* at 366:5-11), and David Pennella (*id.* at 738:4-10), testified that off-book commission splitting via checks occurred out in the open at Cantor, and that no one perceived a need to hide such arrangements.

### 2.   The Jury Verdict

At trial, the jury concluded that Defendant aided and abetted Cantor's violations of the Compensation Record Rule. (Tr. 894:14-19; *see also* Dkt. #116 (Jury Verdict)). Prior to the jury's verdict, this Court charged the jury, and explained the elements of an aiding and abetting claim under Section 20(e) of the Exchange Act. (Dkt. #115 at 19). In particular, the Court instructed the jury that in order to find Defendant liable for aiding and abetting, Plaintiff must prove three elements by a preponderance of the evidence:

> *First*, that a person or entity other than [Defendant] — here, Cantor Fitzgerald — violated the Compensation Record Rule. *Second*, that [Defendant] knew of, or recklessly disregarded, Cantor Fitzgerald's violation of the Compensation Record Rule. This element is sometimes called the scienter element. *Third*, that [Defendant] provided substantial assistance to Cantor Fitzgerald in connection with that violation.

(*Id.*). The Court also provided detailed instructions to the jury on how Plaintiff could prove each element, including scienter. (*Id.* at 20-23).

### 3.      Defendant's Post-Cantor Experience

Since leaving Cantor, Defendant has worked for both Hondius Capital Management ("Hondius") and Domain Money.  (Fortino Decl., Ex. 4 at 24:4-26:8; Ex. 5 at 18).  Hondius is a registered investment adviser founded by former Cantor employees.  (Fortino Decl., Ex. 4 at 24:4-26:8; Mattessich Decl. ¶ 9).  Although Defendant avers that he "worked primarily as a market researcher and mentor to junior analysts" while at Hondius (Mattessich Decl. ¶ 10), and "had no discretion to buy or sell any security" at the firm (*id.*), Defendant was promoted to Head of Trading at some point during his tenure at the company (Fortino Decl., Ex. 5 at 18).  Defendant left Hondius in October 2020, citing "the negative publicity generated by this case[.]"  (Mattessich Decl. ¶¶ 9, 11).  In December 2021, Defendant joined Domain Money.  (*Id.* at ¶ 14).  There, Defendant "act[s] as the central operational contact and source of market knowledge" for various employees at the company.  (*Id.* at ¶ 17).  Although Domain Money owns a separate legal entity that operates as a registered investment adviser, Defendant claims that he has no involvement with that entity.  (*Id.* at ¶ 16).

Despite securing positions at both Hondius and Domain Money, Defendant laments that it has been difficult to find steady employment.  (Mattessich Decl. ¶¶ 6-7).  For example, Defendant alleges that, since February 2018, he has been unemployed for at least twenty-six months, and has applied for over 615 positions, many of which are outside of the securities industry.  (*Id.*).  Further, Defendant states that "there is no current prospect that [he] will

8

ever again attain a position at an investment advisor, even in a non-registered role"; indeed, as a result of his lack of registration, Defendant's securities licenses expired over two years ago.  (*Id.* at ¶¶ 11, 13).

Defendant also claims to have suffered various personal hardships.  He claims that Cantor allegedly owes him approximately $900,000 in deferred compensation, which money the company refuses to pay.  (Mattessich Decl. ¶ 18).  Defendant has also incurred legal fees in the six-figure range defending himself in this case.  (*Id.* at ¶ 19).  And he has suffered from various health-related issues.  (*Id.* at ¶¶ 20-23).

## B.    Procedural Background

This case was initiated on June 29, 2018, when Plaintiff filed a complaint against Defendant and Ludovico, alleging that both Defendants had aided and abetted Cantor's violations of Section 17(a) of the Exchange Act and Rule 17a-3(a)(19).  (Dkt. #1).  On August 30, 2018, the Court held a pre-motion conference, at which Defendants discussed their intentions to move to dismiss the complaint against them.  (Dkt. #32; August 30, 2022 Minute Entry). Following the submission of the parties' briefing on the motion to dismiss (Dkt. #36, 39, 40), this Court denied Defendants' motion (Dkt. #41 (Opinion and Order of September 6, 2019)).  *See S.E.C.* v. *Mattessich*, 407 F. Supp. 3d 264 (S.D.N.Y. 2019).[5]

---

[5]    Given the many different ways in which Plaintiff is identified in various opinions, the Court adopts the abbreviation "S.E.C." for its citations in this Opinion.

Thereafter, Ludovico settled with Plaintiff (Dkt. #57), and this Court entered a final judgment as to him on December 18, 2019 (Dkt. #58). By its terms, the final judgment permanently enjoins Ludovico from violating Section 17(a) of the Exchange Act and Rule 17a-3(a)(19). (*Id.* at 1). Ludovico was also ordered to pay a civil penalty of $25,000. (*Id.* at 2).

Following the close of fact discovery, Plaintiff indicated that it wished to move for summary judgment against Defendant. (Dkt. #62). On March 18, 2020, the Court held a pre-motion conference at which the parties discussed Plaintiff's contemplated motion for summary judgment, and the Court set a briefing schedule. (March 18, 2020 Minute Entry). Plaintiff filed its motion for summary judgment and supporting papers on the issue of Defendant's liability on May 1, 2020. (Dkt. #64-67). Defendant filed his opposition papers on June 19, 2020. (Dkt. #68-70). And Plaintiff filed its reply papers on July 7, 2020. (Dkt. #71-72). In its reply memorandum of law, Plaintiff requested that the Court strike portions of an affidavit from Ron Wexler, a former Cantor senior executive. (Dkt. #71 at 2-4). On July 9, 2020, Defendant requested leave to file a sur-reply brief, responding to Plaintiff's request to strike portions of the affidavit. (Dkt. #73). The Court granted this request (Dkt. #74), and Defendant filed his sur-reply brief on July 10, 2020 (Dkt. #75).

On March 1, 2021, the Court denied Plaintiff's motion to strike portions of the Wexler affidavit (Dkt. #76 at 10-14), and granted in part and denied in part Plaintiff's motion for summary judgment (*id.* at 14). *See S.E.C.* v. *Mattessich*, No. 18 Civ. 5884 (KPF), 2021 WL 797669 (S.D.N.Y. Mar. 1, 2021).

10

In particular, the Court found that Plaintiff established a primary violation of the Compensation Record Rule (Dkt. #76 at 18-21); that a disputed issue of material fact existed as to Defendant's knowledge of the violation (*id.* at 21-24); and that a disputed issue of material fact existed as to whether Defendant substantially assisted in Cantor's primary violation (*id.* at 24-29).

A jury trial commenced on February 9, 2022. (February 9, 2022 Minute Entry). The trial continued over five days (Minute Entries for February 9-15, 2022), and on February 16, 2022, the jury rendered its verdict finding that Defendant had aided and abetted Cantor's violation of the Compensation Record Rule (Dkt. #116).

On February 28, 2022, the parties submitted a joint letter to the Court to propose a briefing schedule on the issue of post-trial remedies. (Dkt. #131; *see also* Dkt. #132 (endorsement of schedule)). On March 28, 2022, Plaintiff filed its motion for post-trial remedies and supporting papers. (Dkt. #133-35). On April 18, 2022, Defendant filed his opposition memorandum of law and supporting declaration. (Dkt. #136-137). And on April 29, 2022, Plaintiff filed its reply memorandum of law. (Dkt. #138).

## DISCUSSION

### A.   Civil Remedies for a Federal Securities Law Violation

"Once [a] district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies[.]" *S.E.C.* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). Such remedies may include civil penalties and injunctive relief. *S.E.C.* v. *Frohling*, 851 F.3d 132, 138 (2d

11

Cir. 2016).  In this case, Plaintiff requests that the Court enter a permanent injunction against Defendant and assess second-tier civil penalties totaling $240,000.  (Pl. Br. 1).

## B. The Court Permanently Enjoins Defendant from Future Violations of the Compensation Record Rule[6]

### 1. Applicable Law

"Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws." *S.E.C.* v. *Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (citing 15 U.S.C. § 78u(d)).  "Such relief is warranted if there is a reasonable likelihood that [a] defendant[] will commit future violations of the securities laws." *S.E.C.* v. *Am. Growth Funding II, LLC*, No. 16 Civ. 828 (KMW), 2019 WL 4623504, at *1 (S.D.N.Y. Sept. 24, 2019) (citing *S.E.C.* v. *Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978)).  Indeed, "[t]o award such relief, a court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence"; "[a] jury's liability findings do not by themselves provide an adequate basis for granting permanent injunctive relief[.]" *In re Rsrv. Fund Sec. & Derivative Litig.*, No. 09

---

[6]  In its opening brief, Plaintiff notes that it is seeking to permanently enjoin Defendant from "future violations of Section 17(a) of the Securities Exchange Act of 1934 … and Rule 17a-3(a)(19) (the 'Compensation Record Rule')[.]" (Pl. Br. 1).  At other points in its briefing, Plaintiff only refers to seeking a permanent injunction as to future violations of the Compensation Record Rule.  (*See, e.g.*, *id.* at 3; *id.* at 12).  In his opposition brief, Defendant highlights this lack of clarity as to Plaintiff's requested relief.  (Def. Opp. 8 n.1 (noting Plaintiff's inconsistent requests for relief, and stating that "[f]or purposes of this opposition, [Defendant] assumes that the requested injunction relates only to violation of the Compensation Record Rule")).  Despite Defendant calling attention to this inconsistency, Plaintiff's reply offers no clarity on the requested injunctive relief.  Accordingly, the Court construes Plaintiff's requested permanent injunction to pertain only to future violations of the Compensation Record Rule.

Civ. 4346 (PGG), 2013 WL 5432334, at *22 (S.D.N.Y. Sept. 30, 2013) (internal

quotation marks and citations omitted).

In assessing the propriety of an injunction, courts within the Second

Circuit balance the following factors:

> [i] the fact that [the] defendant has been found liable for
> illegal conduct; [ii] the degree of scienter involved;
> [iii] whether the infraction is an "isolated occurrence;"
> [iv] whether [the] defendant continues to maintain that
> his past conduct was blameless; and [v] whether,
> because of his professional occupation, the defendant
> might be in a position where future violations could be
> anticipated.

*Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100 (internal citation omitted); *see

also Cavanagh*, 155 F.3d at 135 (citing these factors).  Further, "'in assessing

the strength of the showing concerning likelihood of future violations, the

[C]ourt should consider the specific nature of the injunctive relief sought.'"

*S.E.C.* v. *Bronson*, 246 F. Supp. 3d 956, 974 (S.D.N.Y. 2017) (quoting *S.E.C.* v.

*Lipkin*, No. 99 Civ. 7357 (VVP), 2006 WL 435035, at *1 (E.D.N.Y. Jan. 9, 2006)),

*aff'd*, 756 F. App'x 38 (2d Cir. 2018) (summary order), *as amended* (Nov. 20,

2018).

### 2.  Analysis

Plaintiff argues that each of the five factors discussed in *Commonwealth

Chemical Securities* weighs in favor of a permanent injunction in this case.  In

particular, Plaintiff notes that Defendant: (i) was found liable of aiding and

abetting Cantor's violations of the Compensation Record Rule at trial (Pl. Br. 3);

(ii) acted with a "*high* degree of scienter" as demonstrated by the jury's finding

at trial, Defendant's knowledge that off-book commission payments resulted in

Cantor having inaccurate records, and Defendant's attempts to conceal his conduct (*id.* at 3-4); (iii) engaged in that conduct as "part of a long-running, illegal scheme," rather than an isolated episode (*id.* at 4-5); (iv) has failed to acknowledge that his conduct was wrongful (*id.* at 5-6); and (v) has been employed post-Cantor in positions where future violations can be expected (*id.* at 6-7). Defendant does not dispute that he was found liable at trial, but argues that the record does not support Plaintiff's views on the other factors the Court should consider. (Def. Opp. 1-3). Defendant further argues that Plaintiff's request for a permanent injunction is an impermissible attempt at punishing him, rather than a prophylactic measure to protect the investing public. (*Id.* at 14-15).

> ### a.   Defendant's Scienter and Continued Protestations That His Conduct Was Blameless Counsel in Favor of the Requested Injunctive Relief

The record at trial evinces Defendant's high degree of scienter, while the broader record of this case reflects Defendant's continued protestations that his conduct was blameless. At a minimum, the jury found that Defendant acted knowingly or recklessly, an element of the aiding and abetting violation that Plaintiff was required to prove by a preponderance of the evidence at trial. (Pl. Br. 3 (citing Dkt. #115 at 19-22 (Jury Charge) (explaining the scienter element))). And the evidence at trial demonstrated that Defendant knew that his off-book commission-splitting arrangements were wrong.

Among other facts proven at trial, Defendant knew that Cantor was required to keep accurate records of commissions (Tr. 400:11-401:12), and that

the company used AE codes to discharge that requirement (*id.* at 424:15-24).

Indeed, Defendant helped administer the AE codes at Cantor.  (*Id.* at 244:14-

245:14, 256:12-18, 271:13-24, 452:7-453:9).  When Defendant received off-

book commission payments from employees like Ludovico, he knew that such

payments were not reflected in Cantor's books and records, as the AE codes did

not capture them.  (*Id.* at 447:23-450:9).  As a supervisor, Defendant was

required to remain knowledgeable of applicable securities rules and

regulations, and it was incumbent upon him to make sure that other

employees complied with such regulations.  (*Id.* at 90:1-10, 91:10-92:2,

101:14-20).  Instead, Defendant assisted in perpetuating a culture at Cantor of

off-book commission payments that violated the Compensation Record Rule.

On this point, the Court finds neither the culture at Cantor — which, to

be clear, was exacerbated by Defendant's own conduct in this case — nor the

fact that off-book commission-splitting took place in the open, to be a

mitigating factor.  Instead, such evidence merely suggests that others were also

committing securities violations, and that supervisors like Defendant did

nothing to redress the issue.  The trial evidence makes plain that Cantor's

WSPs prohibited receipt of commissions from any source other than Cantor

itself.  (Tr. 408:16-409:3).  Although Defendant testified that he believed his

payment arrangements with the other traders did not run afoul of this rule (*id.*

at 543:8-22), he also studiously avoided confirming that belief.  As noted,

Defendant never received permission to receive off-book payments.  (*Id.* at

445:18-25, 450:14-23; *see also id.* at 437:19-438:23).  And when Defendant

15

did disclose the fact that he was receiving commissions, he failed to disclose that they were paid off the books. (*Id.* at 450:10-451:3). Defendant had ample opportunity to seek clarity as to whether his off-book commission payments were allowed at Cantor, or whether they constituted securities violations. He also could have sought to resolve the "fee issue" associated with his receiving commissions. (*Id.* at 505:6-24). Instead, Defendant appears to have either been willfully blind, or to have taken advantage of the proclaimed lack of clarity at Cantor. (*See, e.g.*, *id.* at 433:22-436:12 (testifying regarding a conversation with Phil Marber, in which Defendant was told that his compensation would be sorted out later)).

Further, the Court echoes the jury's conclusion that Defendant's explanations regarding his failure to disclose his off-book commission payments as income on his taxes or in his FINRA testimony were unsatisfactory. (*See* Def. Opp. 16 n.3 (noting that failure to disclose payments on his tax returns was "an honest mistake" and that his answers before FINRA were "entirely truthful")). Defendant did not testify at trial that his failure to report his off-book commission payments on his taxes was a mistake. (Pl. Reply 3-4 n.2). And while asserting that his FINRA testimony was truthful, Defendant admitted at trial that he told FINRA he did not cover any accounts, when in fact he was doing so with Ludovico. (Tr. 467:18-468:24). Further, Defendant's statements to FINRA as to whether he knew about Ludovico's compensation were at best disinguous, given the commission-splitting arrangement Defendant maintained with Ludovico. (*See id.* at 470:8-471:23).

16

To be clear, the Court does not hold Defendant's legal defenses at trial against him.  (*See* Def. Opp. 15-18).  But even in his post-trial submission, Defendant continues to deflect blame for his conduct by pursuing arguments that failed at trial; these include, among other things, harping on the administrative issues associated with his AE code, and the fact that others at Cantor engaged in off-book commission splitting arrangements in the open, as well as re-litigating issues associated with his tax returns and FINRA testimony.  *See, e.g.*, *S.E.C.* v. *Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) ("We have also noted that the court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable." (citing *S.E.C.* v. *Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972))); *Frohling*, 851 F.3d at 139 (finding district court did not abuse its discretion in ordering relief given defendant's "continued manifestation of a lack of concern for his responsibilities under the federal securities laws"); *Am. Growth Funding II, LLC*, 2019 WL 4623504, at *1 ("As [d]efendants' opposition to the requested relief demonstrates, they continue to dispute their blame for the illegal conduct.").  To the extent that Defendant attempts to distinguish these cases, such attempts are unavailing.  (*See* Def. Opp. 17).  That the cases may involve "deception and investor injury" does nothing to assuage the Court's concern that, even today, Defendant does not appreciate the wrongfulness of his Compensation Record Rule violations.  (*See id.*).  Plaintiff does not seek an injunction against Defendant as to other securities laws; it seeks an injunction as to violations of the Compensation Record Rule, precisely

the violation that Defendant continues to dispute today.  (*See* Pl. Reply 3).  *See also Am. Growth Funding II, LLC*, 2019 WL 4623504, at *1 ("[T]he injunction is not onerous because it merely requires [d]efendants not to break the law." (citing *Bronson*, 246 F. Supp. 3d at 974)).

> **b.    The Fact That Defendant's Conduct Was Not an Isolated Incident Counsels in Favor of the Requested Injunctive Relief**

There is no dispute that Defendant received off-book commission payments on more than one occasion.  (*See, e.g.*, Pl. Br. 4 (citing PX-1)).  Nor is there any dispute that Defendant received off-book commission payments from Cantor employees for at least ten years.  (*See id.* (citing Tr. 387:5-23, 440:7-13, 444:9-20) (testimony that Defendant received approximately one check per month from 2003 to 2013)).  However, Defendant asks the Court to view his conduct as "a single episode because it involved a single arrangement to divide commission dollars," and because the finding at trial was his "first and only securities law violation."  (Def. Opp. 12-13).  The Court declines the invitation.

Defendant's conduct took place over a period of years, involved monthly violations of the securities laws, and embroiled other Cantor employees.  *See, e.g.*, *Lorin*, 76 F.3d at 461 ("When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct." (quoting *United States* v. *Carson*, 52 F.3d 1173, 1184 (2d Cir. 1995) (internal quotation marks omitted))); *Am. Growth Funding II, LLC*, 2019 WL 4623504, at *1 ("The violations continued over a period of years, and were not simply an isolated occurrence of bad judgment."); *S.E.C.* v.

18

*Opulentica, LLC*, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) ("[Defendant's] behavior did not arise from a single, isolated incident, but rather represented a continuing course of wrongful conduct of more than eighteen months."). Although Defendant seeks to distinguish Plaintiff's cases on the basis that they involve insider trading, market manipulation, and other fraudulent conduct (Def. Opp. 13 & n.2), he concedes that his "commission-splitting arrangement lasted a number of years" (*id.* at 13).

Once again, as it relates to the Compensation Record Rule — future violations of which Plaintiff seeks to permanently enjoin now — Plaintiff's cited cases shed light on whether the Court should view Defendant's conduct as isolated or long-running. Accepting Defendant's contention that his conduct was isolated because it was different in kind, even though it was in fact repeated, would suggest that no one could be permanently enjoined from violating the Compensation Record Rule. The Court finds no reason to create such a precedent.

Instead, the Court finds Defendant's proffered cases to be readily distinguishable. *See In re Rsrv. Fund Sec. & Derivative Litig.*, 2013 WL 5432334, at *23 (finding that defendant's conduct was isolated because it "took place over a period of less than 36 hours[,]" and because "the SEC has not offered proof of other violations committed by" defendant); *S.E.C.* v. *Ingoldsby*, No. Civ. A. 88 1001 MA, 1990 WL 120731, at *2 (D. Mass. May 15, 1990) ("The mere fact of a single past violation by the defendant does not demonstrate a realistic likelihood of recurrence."). Defendant's conduct took place over the

19

course of *years*, not hours.  And while the jury's finding represents the first

securities law violation for which Defendant was found liable, this may merely

be a result of the fact that it took years for his conduct to come to light, and for

Plaintiff to initiate an enforcement action.  It is true that Defendant has worked

in the securities industry for nearly thirty years (Def. Opp. 14); it is also true

that he engaged in conduct violative of the securities laws for one-third of his

career.

As a final effort to convince the Court that a permanent injunction is

unnecessary because his conduct was an isolated occurrence, Defendant

argues that nine years have passed since the relevant violations.  (Def.

Opp. 14).  While it is true that such passage of time militates against a

permanent injunction, *see, e.g.*, *S.E.C.* v. *Jones*, 476 F. Supp. 2d 374, 384

(S.D.N.Y. 2007) ("The Court also notes that several years have passed since

[d]efendants' alleged misconduct apparently without incident.  This fact further

undercuts the Commission's assertion that [d]efendants pose a continuing risk

to the public."); *S.E.C.* v. *Dibella*, No. 04 Civ. 1342 (EBB), 2008 WL 6965807, at

*13 (D. Conn. Mar. 13, 2008) ("[T]he passage of nearly 10 years without

another violation weighs heavily against an injunction."), *aff'd*, 587 F.3d 553

(2d Cir. 2009), the passage of time "is just one factor among several to be

weighed" by the Court, *Lorin*, 76 F.3d at 461 (citing *S.E.C.* v. *Universal Major*

*Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied*, 434 U.S.

834 (1977)).  In light of the facts that Defendant's conduct spanned a decade

and involved recurring securities violations throughout that period, the Court

remains concerned that Defendant may violate the Compensation Record Rule in the future.  Indeed, half of the nine-year period to which Defendant points has been spent litigating this case, during which time Defendant maintained his blamelessness and minimized his conduct.  *See supra* Section B.2.a.

### c.     Defendant's Post-Cantor Work Experience Counsels in Favor of the Requested Injunctive Relief

The parties disagree as to whether Defendant's post-Cantor experience heightens the risk of further violations of the Compensation Record Rule. Plaintiff argues that Defendant has continued to work in the securities industry since leaving Cantor, and thus "his continued role … puts him in a position where future violations could be anticipated." (Pl. Br. 7).  For example, over the last four years, Defendant has worked for Hondius and Domain Money. (Fortino Decl., Ex. 4 at 24:4-26:8; Ex. 5 at 18).  And at some point during his time at Hondius, a registered investment adviser, Defendant was promoted to Head of Trading.  (*Id.*, Ex. 5 at 18).  Defendant contends that Plaintiff's picture of his post-Cantor experience is inaccurate.  He argues that he spent most of his time at Hondius in a lower-level position, at which he "had no discretion to buy or sell any security." (Mattessich Decl. ¶ 10).  And he notes that he left Hondius in October 2020 due to the negative publicity of this case.  (*Id.* at ¶¶ 9, 11).  Further, while Plaintiff claims that Domain Money is a registered investment adviser and that Defendant works in a trading-related capacity at the company (Pl. Br. 7), Defendant avers that he does not work for Domain Money's registered investment adviser (Mattessich Decl. ¶ 16).  Finally, Defendant points to the difficulties he has faced in finding steady employment

21

since leaving Cantor (*id.* at ¶¶ 6-7), and the fact that he has applied for over 615 positions since leaving the company, many of which are outside of the securities industry (*id.*).  As a result, his securities licenses expired over two years ago.  (*Id.* at ¶¶ 11, 13).

The record is thus mixed as to Defendant's post-Cantor work in the securities industry.  The Court agrees with Defendant that many of the cases Plaintiff cites with respect to this factor are not directly on point, insofar as Defendant claims that he does not currently work in a position where he trades securities and his licenses have lapsed.  (*See* Def. Opp. 10-11).  *See S.E.C.* v. *Savino,* No. 01 Civ. 2438 (GBD), 2006 WL 375074, at *17 (S.D.N.Y. Feb. 16, 2006) (finding defendant was "in a position to engage in further fraudulent conduct" in part due to "his current occupation as a licensed securities professional trading bonds for a broker-dealer"), *aff'd in part, remanded in part*, 208 F. App'x 18 (2d Cir. 2006) (summary order); *S.E.C.* v. *U.S. Env't, Inc.*, No. 94 Civ. 6608 (PKL) (AJP), 2003 WL 21697891, at *25 (S.D.N.Y. July 21, 2003) ("[I]n light of the fact that [individual defendant] continues to operate [corporate defendant] as a registered broker-dealer, and the fact that [corporate defendant's] website claims that [it] will continue to underwrite public offerings of securities, it is clear that [corporate defendant] and [individual defendant] will have several opportunities to commit future securities violations."), *aff'd*, 114 F. App'x 426 (2d Cir. 2004) (summary order).

Yet Defendant has, at a minimum, worked in the securities industry since leaving Cantor.  And, as Plaintiff notes, Defendant has not disclaimed any

desire or intent to continue working in that industry.  (*See* Pl. Reply 4). Although Defendant has found it difficult to find employment in the industry since leaving Cantor, he has continued to find such work.  (*Id.* at 4-5).  While at Hondius, Defendant ascended to the position of Head of Trading.  (Fortino Decl., Ex. 5 at 18).  Further, even taking as true Defendant's representations about his employment at Domain Money, his job title is Head of *Trading* Operations.  (*Id.*).  Defendant has thus continued to work in the securities industry and to seek promotions within that industry.  Although he represents to the Court that his securities licenses are "unlikely to ever be renewed," and that he has not had an impact on Hondius's or Domain Money's obligations under the Compensation Record Rule (Def. Opp. 10-11), there is nothing (other than this litigation) stopping him from seeking future employment with a broker-dealer or renewing his licenses.  Defendant is thus differently situated than the defendants in the cases on which he relies to make his point that a permanent injunction is unnecessary.  *See In re Rsrv. Fund Sec. & Derivative Litig.*, 2013 WL 5432334, at *23 (considering facts that corporate entities were now "defunct" and that individual defendant left the securities industry and now worked in patent licensing); *Dibella*, 2008 WL 6965807, at *13 (observing that defendant was "not regularly employed in the securities industry" and violation arose from political and lobbying work).

As is clear from the Court's discussion, consideration of whether an injunction is warranted is fact-intensive, and does not lend itself to bright-line rules.  In highlighting that he does not currently work in a registered capacity

and that he has not received commission compensation since leaving Cantor, Defendant argues that such facts are sufficient to deny the requested injunction. (Def. Opp. 10). The caselaw says otherwise. *See, e.g.*, *In re Rsrv. Fund Sec. & Derivative Litig.*, 2013 WL 5432334, at *23 (considering totality of the circumstances when weighing whether injunctive relief was necessary, and finding that defendant's conduct was "merely negligent," that it was isolated, that it took place over the course of only 36 hours, and that defendant no longer worked in securities); *S.E.C.* v. *Dang*, No. 20 Civ. 01353 (JAM), 2021 WL 1550593, at *6 (D. Conn. Apr. 19, 2021) ("[W]hile [defendant] has failed to appear in this matter and it is unclear whether [defendant] continues to work as an investment adviser, [his] egregious conduct is sufficient to weigh in favor of granting a permanent injunction[.]"). The Court finds that Defendant's continued employment in the securities industry, in addition to the other factors the Court has discussed, raises a risk of future violations, and thus militates in favor of a permanent injunction here.

### d. A Permanent Injunction in This Case Is Not an Impermissible Attempt at Punishment

Although not one of the *Commonwealth Chemical Securities* factors, Defendant argues that a permanent injunction here is an impermissible attempt at punishing him, rather than a prophylactic measure to protect the investing public. (Def. Opp. 14-15). *See Jones*, 476 F. Supp. 2d at 384 ("[T]he absence of a similar showing [that the defendants are likely to violate the securities laws in the future] would indicate that the requested injunction is not aimed at protecting the public from future harm, but more likely aimed at

punishing [d]efendants.").  As discussed throughout this Opinion, the Court

disagrees.  The Court has weighed the factors discussed in *Commonwealth*

*Chemical Securities*, applied them to the facts of this case, and determined that

a permanent injunction is necessary to guard against future violations of the

Compensation Record Rule.  Such a finding necessarily means that a

permanent injunction here is not designed to merely punish, but to protect the

investing public.

　　　Defendant's argument on this point appears to rest on the fact that

Plaintiff intends to seek further relief in a follow-on administrative proceeding.

(Def. Opp. 15).  Plaintiff does not hide this intention, and notes that it will

pursue an associational bar.  (*See* Pl. Br. 7 n.3; Pl. Reply 1-2).  While the

Court's permanent injunction may provide a predicate for an associational bar,

it is not a necessary prerequisite.  (Pl. Reply 2).  *See, e.g., VanCook* v. *S.E.C.*,

653 F.3d 130, 142 (2d Cir. 2011) (affirming sanctions, including associational

bar, imposed by the SEC for Exchange Act violations of aiding and abetting

failure to keep accurate books and records, among others).

　　　The Court is aware that "the potential collateral consequences of a

permanent injunction are quite serious."  *Jones*, 476 F. Supp. 2d at 385

(citations omitted).  Assuming Plaintiff moves forward with a follow-on

proceeding, Defendant will have an opportunity to contest further relief.  (Pl.

Br. 7 n.3).  But before the Court now is a request for a permanent injunction to

prevent Defendant from further violations of the Compensation Record Rule,

not a permanent associational bar.  On the facts before the Court, such

injunction is warranted.  Again, the Court finds that certain of the statements in Defendant's submission do not reflect the seriousness of this case, and instead continue to minimize his role and his blameworthiness.  (*See, e.g.*, Def. Opp. 15 ("The SEC has not cited a single case relating solely to a books and records violation, let alone a violation of the Compensation Record Rule, nor has the SEC made any attempt to explain why it should be enabled to permanently bar [Defendant] and end his career over the conduct at []issue.")). As such, the Court does not view a permanent injunction to be an attempt to merely punish Defendant, but rather as a protection against future violations.

## C.     The Court Imposes a Civil Penalty in the Amount of $180,000

### 1.     Applicable Law

The Exchange Act also expressly authorizes courts to impose civil penalties for a violation of the Act or rules promulgated thereunder.  15 U.S.C. § 78u(d)(3).  In particular, the Exchange Act authorizes three "tiers" of penalties depending on the facts of the violation:

> a first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons[.]"

*S.E.C.* v. *Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013), *as amended* (Nov. 26, 2013) (citations omitted).  The parties agree that Plaintiff may seek second-tier penalties based upon the jury's verdict.  (Pl. Br. 8; Def. Opp. 18-19).  2013 is

the relevant year for the conduct in this case. The maximum allowable penalty is $75,000 for each second-tier violation committed before March 5, 2013, and $80,000 for each violation committed after March 5, 2013. *See* 17 C.F.R. § 201.1001; Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2022), https://www.sec.gov/enforce/civil-penalties-inflation-adjustments (last accessed Nov. 14, 2022).

"Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *S.E.C.* v. *Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (citing *S.E.C.* v. *Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996)). While the applicable penalty tier sets forth the maximum allowable penalty, "the actual amount of the penalty [is] left up to the discretion of the district court." *S.E.C.* v. *Kern*, 425 F.3d 143, 153 (2d Cir. 2005). A sister court in this District has explained that

> In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including [i] the egregiousness of the defendant's conduct; [ii] the degree of the defendant's scienter; [iii] whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; [iv] whether the defendant's conduct was isolated or recurrent; and [v] whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Haligiannis*, 470 F. Supp. 2d at 386 (citing *S.E.C.* v. *Coates*, 137 F. Supp. 2d 413, 429 (S.D.N.Y.2001)); *see also S.E.C.* v. *Tavella*, 77 F. Supp. 3d 353, 362-63 (S.D.N.Y. 2015) (same). That said, the *Haligiannis* factors "are not to be

taken as talismanic." *S.E.C.* v. *Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019).  It is appropriate to consider other factors as well, such as a defendant's cooperation and honesty with authorities versus a defendant's failure to admit wrongdoing.  *S.E.C.* v. *Alt. Green Techs., Inc.*, No. 11 Civ. 9056 (SAS), 2014 WL 7146032, at *4 (S.D.N.Y. Dec. 15, 2014).

In determining the appropriate penalty, the Court must first consider the threshold issue of the number of violations arising from Defendant's conduct. The Exchange Act does not define what constitutes a violation, and courts within the Second Circuit have adopted different approaches to determine the number of violations.  For example, some courts have simply counted the number of offending transactions.  *See, e.g.*, *S.E.C.* v. *Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 n.7 (2d Cir. 2013) ("Although we vacate the civil penalty award, we find no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation."); *S.E.C.* v. *Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019) ("[T]he SEC met its burden to prove on summary judgment 2,720 separate violations[.]"), *aff'd*, 982 F.3d 68 (2d Cir. 2020).  Other courts have considered whether multiple violations occurred within the context of a single scheme, and thus whether a single penalty is appropriate.  *See, e.g.*, *S.E.C.* v. *Rabinovich & Assocs., LP*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (finding single penalty appropriate because repeated violations "arose from a single scheme or plan"); *In re Rsrv. Fund Sec. &*

*Derivative Litig.*, 2013 WL 5432334, at *20 (same) (collecting cases surveying courts' varying approaches).

### 2.    Analysis

Plaintiff seeks a civil penalty in this case in the amount of $240,000 — $20,000 per each violation of the Compensation Record Rule during 2013. (Pl. Br. 1, 9). In support, Plaintiff cites many of the same reasons it offered in support of its request for a permanent injunction. (*Id.* at 1-2). *See also Am. Growth Funding II, LLC*, 2019 WL 4623504, at *4 (finding that the court's consideration of the egregiousness of the defendant's conduct, defendant's scienter, and whether the conduct was isolated or recurrent "largely overlap with the permanent injunction factors" and also "weigh in favor of imposing significant penalties"). Plaintiff concedes that there was no evidence at trial that Cantor customers suffered losses as a result of Defendant's violations (Pl. Br. 11), but maintains nonetheless that the Compensation Record Rule "plays an important role in protecting investors" (*id.*). Plaintiff further argues that Defendant "appears to have substantial assets." (*Id.*).

Defendant counters that a civil penalty is not warranted here, or in the alternative that the Court should impose a fine not in excess of $58,200, the amount of commissions Defendant received from Ludovico in 2013. (Def. Opp. 24). To support this argument, Defendant notes that there was no actual investor loss or risk of loss from Defendant's conduct (*id.* at 20); that Defendant has already suffered as a result of this case (*id.* at 21-22); that

Defendant's conduct was not egregious (*id.* at 22-24); and that his conduct amounts to a single violation (*id.* at 14).

*First*, the Court will not re-hash its analyses as to Defendant's scienter, the egregious nature of his conduct, or whether the conduct was isolated or recurrent, given its extensive discussion of these factors in the context of whether a permanent injunction is warranted.  In their briefing, the parties essentially treat these factors as overlapping, and the Court has already addressed and rejected Defendant's arguments that he did not act with a high degree of scienter.  (*See* Def. Opp. 22-24).

*Second,* the Court agrees with Plaintiff that the proper number of violations in this case is twelve, and not one as Defendant contends.  Although Defendant points the Court to cases in which sister courts have found that violations arising from a "single scheme or plan" may be treated as a single violation (Def. Opp. 24), it is undisputed that Defendant received and deposited twelve checks from Ludovico in 2013 (Pl. Br. 9; PX-1).  The twelve checks received by Defendant in 2013 only reflect the Compensation Record Rule violations for a single year, and do not include his arrangements with other traders or his other violations over the course of a decade.  (Pl. Br. 8-9).  Other than merely pointing the Court to caselaw suggesting that this Court *may* consider his conduct to constitute a single violation, Defendant makes no meaningful argument as to why the Court *should.*  (*See* Def. Opp. 24).

*Third*, the Court acknowledges that the absence of losses to investors cuts in Defendant's favor.  (Def. Opp. 20-21).  That said, it agrees with Plaintiff

that the Compensation Record Rule is designed, at least in part, to protect the investing public.  (*See* Tr. 639:7-13, 645:13-646:1).  Indeed, civil penalties are not meant simply to punish, but also to deter.  *See, e.g.*, *Haligiannis*, 470 F. Supp. 2d at 386.  Thus, the fact that no investor actually lost money does not mean that the Court should not impose a civil penalty.

*Fourth*, Defendant has, without a doubt, suffered as a result of this case. As the Court previously discussed, Defendant avers that he lost his job at Cantor, that his career has been damaged, that he has lost over one million dollars between legal fees and Cantor's withholding of his deferred compensation, and that his mental and physical health have deteriorated. (Def. Opp. 21).  Plaintiff does not dispute these facts, but instead points out that Defendant has not identified any cases in which a court took into account a defendant's legal fees or lost compensation when determining whether to reduce a requested civil penalty.  (Pl. Reply 5).[7]  Of perhaps greater significance to the Court, Defendant has not claimed that he is unable to pay a penalty; indeed, Plaintiff has submitted documentary evidence suggesting otherwise. (*See* Fortino Decl., Ex. 7 (2016 W-2), Ex. 8 (2017 Bank Account Statement)). Defendant has also not stated that he has "relinquished his claim" to his

---

[7]     Plaintiff further notes that it is not aware of any cases in which a court reduced a civil penalty in light of a defendant's legal fees.  At a minimum, the Court finds that it should take Defendant's legal fees into account when considering his financial position. *See, e.g.*, *S.E.C.* v. *Neurotech Dev. Corp.*, No. 04 Civ. 4667 (TCP) (WDW), 2011 WL 1113705, at *5 (E.D.N.Y. Feb. 28, 2011) (considering defendant's and wife's liabilities, including legal fees, in determining proper amount of civil penalty), *report and recommendation adopted*, No. 04 Civ. 4667 (TCP), 2011 WL 1099864 (E.D.N.Y. Mar. 23, 2011).

withheld deferred compensation.  (Pl. Reply 5-6).  After reviewing all of this evidence, the Court does not believe that a reduction in any civil penalty is warranted based on Defendant's financial condition.

The Court now decides the appropriate civil penalty in this case.[8] Plaintiff arrived at its requested amount of $240,000 by determining that $20,000 per violation was an appropriate sanction.  (Pl. Br. 9-10).  Beyond discussing the general appropriateness of a penalty, however, Plaintiff does not explain how it arrived at the $20,000 figure.  Defendant requests that, if the Court finds a penalty is warranted, it not exceed $58,200, the total amount of commissions he received from Ludovico in 2013.  (Def. Opp. 24).

At the outset, the Court rejects the notion that a penalty of $58,200 — essentially amounting to an interest-free loan on the proceeds from Defendant's Compensation Record Rule violations in 2013 — serves a sufficient deterrent or punitive effect here.  To the contrary, such a penalty would have the perverse effect of incentivizing these types of violations.  More broadly, the Court finds that neither of the parties' proposed amounts properly balances the relevant factors.  Instead, the Court will impose a civil penalty of $15,000 per violation, for a total of $180,000, which — while remaining substantially below the maximum penalty authorized for this conduct — better addresses the length of time of Defendant's violative conduct, his multifaceted effort to cover up that conduct, and the total amount of his ill-gotten gains.  (*See* Trial Exhibits PX-1

---

[8]     Although Defendant complains that Plaintiff's requested penalty is "almost ten times that which it agreed to with Ludovico," he does not explain why the Court should reduce any penalty based on this fact.  (Def. Opp. 19-20).

to PX-6).  *See S.E.C.* v. *One Wall St., Inc.*, No. 06 Civ. 4217 (NGG) (ARL), 2008 WL 5082294, at *9 (E.D.N.Y. Nov. 26, 2008) (observing that a "review of the relevant case law indicates that the amount of the regulatory penalty assessed should have some relationship to the amount of ill-gotten gains"); *see also, e.g.*, *S.E.C.* v. *Murray*, No. 05 Civ. 4643 (MKB), 2013 WL 839840, at *6 (E.D.N.Y. Mar. 6, 2013) (declining to impose a maximum penalty, and finding that "imposition of sanctions equal to [d]efendant's ill-gotten gains" was appropriate).

To review, a civil penalty is not only meant to punish, but also to deter violations of the securities laws.  A civil penalty of $180,000 here serves Congress' goals of deterring future violations of the securities laws and punishing Defendant for his past conduct.  By contrast, Defendant's proposal for *de facto* disgorgement of only the money he made during 2013 reflects a myopic view of Defendant's actions and their consequences.  *See, e.g., S.E.C.* v. *Milligan*, No. Civ. 7357 (NG) (VVP), 2007 WL 9724904, at *8 n.6 (E.D.N.Y. June 5, 2007) (noting that "disgorgement serves a purpose (remediation) different from that of a civil penalty (punishment)[,]" and that the "penalty imposed should carry its own distinct message of deterrence" (internal citation omitted), *report and recommendation adopted sub nom. S.E.C.* v. *Curtis*, No. 99 Civ. 7357 (NG) (VVP), 2007 WL 9724905 (E.D.N.Y. Oct. 2, 2007)).

**CONCLUSION**

For the reasons stated in this Opinion, the Court permanently enjoins Defendant from future violations of the Compensation Record Rule, and imposes a civil penalty of $180,000.  The Clerk of Court is directed to terminate the pending motion at docket entry 133, and to enter judgment in accordance with this Opinion.

SO ORDERED.

Dated:      November 15, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge